UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

TREVERS JACKSON,                                    :

                    Petitioner,                     :

                                                            10 Civ. 3062 (LAK) (AJP)
          -against-                                 :

                                                    **REPORT AND RECOMMENDATION**
WILLIAM A. LEE,                                     :

                    Respondent.                     :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**ANDREW J. PECK, United States Magistrate Judge:**

**To the Honorable Lewis A. Kaplan, United States District Judge:**

          Pro se petitioner Trevers Jackson seeks a writ of habeas corpus from his June 18,

2004 conviction for enterprise corruption, fourth degree conspiracy, second degree burglary, second

degree grand larceny, second degree criminal possession of stolen property and first degree perjury

(two counts) and sentence of concurrent terms of twenty-five years to life imprisonment.  (Dkt. No.

8: Am. Pet. ¶¶ 1-5.)

          Jackson's habeas petition asserts that:  (1) the trial court deprived Jackson of a fair

trial when it erroneously changed its pre-trial <u>Sandoval</u> ruling after Jackson's direct trial testimony

(Am. Pet. ¶ 13[1] & Ex. E: Jackson 1st Dep't Br. at 35-46); (2) the trial court deprived Jackson of a

fair trial when it improperly allowed the prosecutor to impeach Jackson with his grand jury

testimony that was not inconsistent with his trial testimony (Jackson 1st Dep't Br. at 46-50); (3) the

---

[1]       Jackson's Amended Petition merely attaches as Exhibits E-L, various state court briefs.
          (Am. Pet. ¶ 13, stating: "(See Attached Briefs and Exhibits) E, F, G, H, I, J, K, L.")

trial court deprived Jackson of a fair trial when it allowed evidence that a co-defendant had threatened a witness during trial and denied Jackson's severance motion (Jackson 1st Dep't Br. at 50-52); (4) the trial court deprived Jackson of a fair trial when it erroneously allowed evidence of uncharged crimes that Jackson had committed with a co-defendant (Am. Pet. Ex. E: Jackson Pro Se 1st Dep't Br. at 5-8); (5) the evidence was insufficient to establish the crime of enterprise corruption and the jury's verdict was against the weight of the evidence (Jackson Pro Se 1st Dep't Br. at 9-13); (6) trial counsel was ineffective for failing to investigate and raise an alibi defense and failing to properly cross-examine witnesses (Am. Pet. Ex. F: Jackson 440 Aff. ¶¶ 2, 12, 16, 28-39, 42-45 & Jackson 440 Br. at 1-7); (7) Jackson's sentence as a persistent felony offender was unconstitutional (Jackson 1st Dep't Br. at 52); and (8) Jackson's sentence was excessive (Jackson 1st Dep't Br. at 52-57).

For the reasons set forth below, Jackson's habeas petition should be <u>DENIED</u>.

## <u>FACTS</u>

Jackson was one of the leaders of a criminal organization that burglarized numerous Manhattan commercial establishments between spring 2001 and fall 2002. (Dkt. No. 16: State Br. at 2.) The group solicited orders from buyers and looked for businesses that sold the desired goods. (State Br. at 2.) The group broke into the location in middle of the night, put the merchandise in garbage bags, loaded the bags into a vehicle and drove away. (State Br. at 2.) After each burglary, the group sold the merchandise to the buyer who had placed the order. (State Br. at 2.)

On November 24, 2001, Jackson was arrested during the burglary of City Streets, a clothing store in Manhattan. (Dkt. No. 17: Dannelly Aff. Ex. A: Jackson 1st Dep't Br. at 2; State

3

Br. at 2.)   On March 4, 2003, Jackson and fifteen co-defendants were indicted for enterprise corruption and related charges.   (Jackson 1st Dep't Br. at 2; State Br. at 3.)

**The Trial**

On March 8, 2004, Jackson and five co-defendants[2] started a jury trial before Justice Carol Berkman in Supreme Court, New York County.  (Dkts. Nos. 10-14: Trial Transcript ("Tr.") 1.)[3]

**Motions in Limine**

Prior to jury selection, Justice Berkman ruled that if Jackson testified at trial, the prosecutor could impeach Jackson with the fact that he had three prior felony convictions in 1991, but could not elicit that the convictions were for burglaries.  (Dkt. No. 10: 2/26/04 Sandoval Hearing ("SH.") 59-68.)  The prosecutor also could ask about Jackson's 1998 burglary conviction, but could only elicit that he had committed the crime with co-defendant Lucas and others.  (SH. 67.)  Justice Berkman noted that this burglary conviction was "substantive in terms of [Jackson's] relationship with [co-defendant] Mr. Lucas," and warned Jackson that she would revisit her ruling if there was "some denial of the length or closeness of their relationship."  (SH. 67-68.)  Jackson also could be

---

[2]     Ten of Jackson's co-defendants pled guilty prior to trial.  (Dkt. No. 16: State Br. at 2 n.1.) On April 12, 2004, in the middle of the trial, co-defendant George Lucas pled guilty to enterprise corruption and two counts of second degree burglary in exchange for a sentence of twenty-two years imprisonment.  (Tr. 2455-90.)

[3]     The trial lasted two and a half months with more than 100 witnesses and over 5500 pages of trial transcript.  (See State Br. at 3 n.2.)  This Report and Recommendation will focus only on the facts relevant to Jackson's habeas petition.

questioned about his 1993 bank fraud conviction, his use of a forged registration and his use of aliases and different dates of birth when arrested.  (SH. 67-69.)

Justice Berkman also ruled that, as part of the prosecution's case, the prosecutor could elicit testimony that Jackson and co-defendant George Lucas committed several burglaries together in 1997 and 1998.  (Dkt. No. 10: 3/1/04 <u>Ventimiglia</u> Hearing ("VH.") 4-5.)   In allowing this evidence, Justice Berkman noted that the uncharged crimes "are admissible really only to show how the conspiracy, the enterprize [sic] formed and how the two gentlemen formed their . . . business relationship together."  (VH. 4.)

**The Prosecution Case at Trial**

In 1997, Mark Parson[4] met Jackson through Lucas, Parson's brother-in-law.  (Parson: Tr. 4101-04, 4261.)[5]   At some point, Lucas brought a large amount of computers and office equipment to Parson's home.  (Parson: Tr. 4105-06, 4338.)  Jackson and Lucas informed Parson that these items were "from the burglaries" they had committed.  (Parson: Tr. 4106, 4115.)  Although they never told him what they were doing with the property, Parson assumed that they were selling it.  (Parson: Tr. 4106-07.)  Parson was unemployed at the time and sold drugs to make money. (Parson: Tr. 4108, 4339.)

---

[4]   Parson testified pursuant to a cooperation agreement with the District Attorney's office. (Parson: Tr. 4134-45, 4253-59, 4287-91, 4310-11.)

[5]   Throughout the trial, Jackson is referred to as "Jeff" and Lucas is referred to as "Peter" or "Ptah."  (<u>E.g.</u>, Williams: Tr. 2768, 2777-78; Parson: Tr. 4102, 4103; Jackson: Tr. 4705, 4733-34.)

One day in 1997, Parson rented a U-Haul truck for Lucas and drove him to an office building in Manhattan. (Parson: Tr. 4112-14.) When they got there, either Jackson or Lucas gave Parson a walkie talkie and told him to "[l]ook around and make sure the police or anything wasn't coming." (Parson: Tr. 4112, 4114.) Jackson, Lucas and others stole clothing from the office building, taking the property out in black plastic garbage bags and leaving them on the curb to look like garbage, until their truck arrived. (Parson: Tr. 4121-22.) The group loaded the bags into the truck and drove to the Bronx. (Parson: Tr. 4121-23.) During this burglary, Jackson appeared to be "more in charge" than Lucas. (Parson: Tr. 4115-16.)

During 1997-98, Parson took part in three or four burglaries with Jackson and Lucas, acting mostly as a lookout. (Parson: Tr. 4105, 4124-26, 4129.) Parson knew that Jackson and Lucas were performing other burglaries without him because he "would see the merchandise." (Parson: Tr. 4130-31.)

On October 1, 1998, Jackson, Lucas and two other individuals were arrested after plainclothes police officers caught them burglarizing a Manhattan building. (Baker: Tr. 2699-2746; Parson: Tr. 4131-32.) During this incident, officers recovered fifty-nine garbage bags containing approximately 2,130 different items of clothing from the group's van at the scene, as well as duffle bags containing various tools. (Baker: Tr. 2723-24, 2730-38.) Jackson pled guilty to third degree burglary and was sentenced to 2 1/2 to 5 years in prison. (Tr. 4409-10.)

After release from prison in 2001, Jackson and Lucas assembled a crew of several relatives and associates that committed approximately 22 burglaries in Manhattan. (E.g., Sweeney: Tr. 1740; Williams: Tr. 2776-77, 3206-07, 3503; Parson: Tr. 4132-33.) This crew included Parson

6

and Jabar Williams,[6/] Lucas' brother.  (E.g., Williams: Tr. 2767-68, 2781-82, 2793-803, 2828, 2836, 3206-07, 3212-13, 3297, 3494, 3496, 3503, 3507; Parson: Tr. 4133-34, 4145-46, 4149, 4256-57, 4329.)   Prior to each burglary, a buyer placed an order with Jackson or Lucas for stolen merchandise.  (Williams: Tr. 2803, 2854, 2860.)  Jackson and/or Lucas wore a suit and traveled to Manhattan to find a location to burglarize that had the requested goods.  (Williams: Tr. 2784-85, 2803-04, 2854, 2860, 3418-20; Parson: Tr. 4155-56.)  After finding an acceptable location, Lucas rented a truck or van and assembled a crew to commit the burglary.  (Williams: Tr. 2780, 2783, 2784, 2803, 2854; Parson: Tr. 4156-57.)  The group committed the burglaries at night and wore dark clothing and gloves.  (Williams: Tr. 2835, 2837-38, 2854, 2868; Parson: Tr. 4169-71.)  Jackson and Lucas told Parson to wear a hat so his face was not visible to security cameras and to wear gloves so that he did not leave fingerprints.  (Parson: Tr. 4170-71.)

During the burglaries, either Jackson or Lucas entered the location using a screwdriver or crowbar.  (Williams: Tr. 2788-89, 2827-28, 2855.)  Once inside, crew members placed the stolen property in black plastic garbage bags while the lookouts remained outside.  (Williams: Tr. 2789-90, 2827, 2828, 2855.)  After spending a couple of hours bagging merchandise, the crew members took the garbage bags outside and loaded them into the rented vehicle.  (Williams: Tr. 2790, 2855-58; Parson: Tr. 4158.)  Jackson or Lucas sold the stolen property to the buyer who had placed the order.  (Williams: Tr. 2858-59; Parson: Tr. 4158.)

---

[6/]   Like Parson, Jabar Williams testified pursuant to a cooperation agreement with the District Attorney's office.  (Williams: Tr. 2750-65, 3214-27, 3405, 3412-13, 3493-94, 3506-07.)

In the beginning, Jackson seemed more in charge than Lucas because Jackson "split the money up" and also gave Lucas instructions about how to conduct the burglaries. (Williams: Tr. 2831, 2833-34.) Since Jackson "had a little more experience," he told the others what needed to be done. (Parson: 4155.) Jackson did "a little bit of everything," including breaking into the locations, bagging up the stolen property, acting as a lookout, and collecting payments from the buyers. (Williams: Tr. 2860-61.)

In spring 2001, Jackson and Lucas led a group, including Jabar Williams, in the burglary of 13-15 West Twenty-Seventh Street in Manhattan, a building that contained various suppliers of counterfeit goods. (Peters: Tr. 593-97; Courani: Tr. 696–97; Dougherty: Tr. 1268-70; Williams: Tr. 2862, 2866-68, 3507, 3510.) During this burglary, Jackson taught Williams how to act as a lookout. (Williams: Tr. 2868-70.) The group was inside for almost three hours and removed about eighty to one hundred black garbage bags filled with clothing. (Williams: Tr. 2871-73, 3507-10.) The bags were placed in a U-Haul truck and taken to Jackson's New Jersey house to be sorted. (Williams: Tr. 2874-76.)

Jackson and Lucas burglarized 13-15 West Twenty-Seventh Street two more times in the next few weeks to fill orders from buyers. (Courani: Tr. 700-01, 705-06, 721; Williams: Tr. 2890-95, 2906, 2909, 3229, 3233, 3510.) All three burglaries were conducted in the same manner. (Williams: Tr. 2893-95, 2909, 2910.) After the third burglary, Jackson drove back to New Jersey with the key to open the rental truck containing the stolen property. (Williams: Tr. 2912; Parson: Tr. 4164.) Lucas' friend forced open the back of the truck to sort the stolen property. (Williams: Tr. 2912-14; Parson: Tr. 4164, 4331-32.) Jackson returned and argued with Lucas, telling him that

he could not "trust anybody touching anything in the truck." (Williams: Tr. 2913; Parson: Tr. 4164, 4331-32.)

After this argument, Jackson and Lucas's relationship changed. (Williams: Tr. 2835, 2914; Parson: Tr. 4164, 4332.) Jackson and Lucas worked together less, but continued to commit burglaries with their own crews. (Williams: Tr. 2914-17; Parson: Tr. 4164-66.) Despite this change, Lucas sometimes called Jackson to the scene of burglaries, allowing Jackson to go inside and steal some merchandise for himself. (Williams: Tr. 2915-16, 3006, 3010-11, 3016-18; Parson: Tr. 4166-68, 4193.) For example, on September 29, 2001, Lucas led a group in the burglary of a Nine West shoe store in lower Manhattan. (Oliva: Tr. 782-94; Williams: Tr. 3014-18.) Lucas called Jackson down to the Nine West location, and Jackson arrived "[a]bout two, two and a half hours" after Lucas and other individuals had entered the store. (Williams: Tr. 3016-17.) Jackson showed up with his wife, entered the building, exited with garbage bags and loaded the bags into his car. (William: Tr. 3017-18.) Jackson told Parson about this burglary and Parson observed some of the stolen footwear in Jackson's vehicle. (Parson: Tr. 4199-200.)

### City Streets Burglary

At about 4:00 a.m. on November 24, 2001, Jackson called Parson and told Parson to meet him near City Streets, a clothing and sneaker retail store on West Fourteenth Street in Manhattan. (Parson: Tr. 4201-02, 4222-23, 4226-27.) Jackson explained that Lucas and his crew were inside with a lot of clothing and Timberland boots. (Parson: Tr. 4202-03.) When Parson arrived, he saw Jackson's wife sitting in Jackson's van. (Parson: Tr. 4203, 4223-27.) She informed

Parson that Jackson was inside the store and she asked Parson to get into the van.  (Parson: Tr. 4203,

4224).

> Ten minutes later, Jackson came out of the store and brought Parson inside.  (Parson:

Tr. 4203, 4223-25.)  Once inside, Jackson directed Parson to take boots out of their boxes and put

them in a garbage bag.  (Parson: 4204.)  The crew became nervous when the phone in the store rang

repeatedly and Parson was told to leave the bag and exit the store.  (Parson. Tr. 4204.)

> About 5:00 a.m., as the group started to bring the garbage bags out, the building

superintendent Miguel Pelaez arrived with another worker.  (Pelaez: Tr. 132-34; Parson: 4205-06.)

Pelaez observed "many" garbage bags in the main entrance and inside the building.  (Pelaez: Tr.

134-35.)  Pelaez had not put those garbage bags there and he did not know what was inside the bags.

(Pelaez: Tr. 135.)  As Pelaez began to take out the building's trash, Jackson approached and asked

if he needed help.  (Pelaez: Tr. 134; Parson: Tr. 4206.)[7]  Pelaez, who had never seen Jackson before,

declined the offer.  (Pelaez: Tr. 134.)   Jackson and Parson continued to take the garbage bags

containing stolen goods out of the building.  (Parson: Tr. 4206.)

> Once he finished taking out the building's trash, Pelaez noticed Jackson "looking at

[him] in a bad way."  (Pelaez: Tr. 135.)  Pelaez and his coworker sat in Pelaez's car and watched

Jackson in front of the building's main entrance.  (Pelaez: Tr. 135-36; Parson: Tr. 4206.)  When

Jackson and Parson walked to Sixth Avenue, Pelaez went back into the building.  (Pelaez: Tr. 136-

37.)  After seeing "a lot of bags" in the hallway and hearing "a lot of voices" near the emergency

---

[7]     Although Pelaez was unable to identify any of the defendants at trial (Pelaez: Tr. 143), Mark
        Parson's testimony established that it was Jackson and Parson who Pelaez saw that night
        (Parson: Tr. 4206).

10

exit, Pelaez called 911 on his cell phone and went back to his car.  (Pelaez: Tr. 137.)  While Pelaez was on the phone, he saw Jackson and Parson return to the building and saw a U-Haul truck pull up in front of the building next to the bags.  (Pelaez: Tr. 137-38.)  Three men got out of the truck, opened its back door, and approached the bags.  (Pelaez: Tr. 138-39.)

            Responding to a call "for a burglary in progress," Police Officers Christopher O'Hare and Andrew Stimus arrived at about 6:00 a.m. and observed Jackson and Parson standing east of the building next to Jackson's van.  (O'Hare: Tr. 72-75, 113; Pelaez: Tr. 139; Stimus: Tr. 193; Parson: Tr. 4206.)  The officers observed a U-Haul truck in front of the location and "quite a few large black plastic garbage bags placed on the curbside."  (O'Hare: Tr. 75, 126-27; Stimus: Tr. 193, 201.)  As Officer Stimus approached, Jackson and Parson started to walk away.  (Stimus: Tr. 194.)  Officer Stimus called them back, but they ran towards Sixth Avenue.  (O'Hare: Tr. 77, 127, 128; Pelaez: Tr. 140-41; Stimus: Tr. 194, 202-03; Parson: Tr. 4207.)  Several officers ran after them and, after about a block and one half, Parson stopped running and Jackson tried to hide under a van.  (O'Hare: Tr. 77; Pelaez: Tr. 141; Stimus: Tr. 194-95, 199, 203-04, 206-08, 212; Lindow: Tr. 4017; Parson: Tr. 4207-08.)  Jackson dropped his cellular phone and the police vouchered it into evidence.  (O'Hare: Tr. 101-02; Stimus: Tr. 196-99.)[8]  The police arrested Jackson, Parson and several others. (O'Hare:

---

[8]    The phone was registered to Compu-All Enterprises, a business owned by Jackson and his wife located at 1271 Teller Avenue in the Bronx.  (Muldoon: Tr. 2553; Williams: Tr. 3489; King: Tr. 3829; Jackson: Tr. 4730-32, 4735.)  Jackson's phone records showed that, in the weeks prior to the first burglary of 13-15 West Twenty-Seventh Street, there were numerous calls between Jackson, Lucas and Syed Javed, one of the buyers of the merchandise stolen during that burglary.  (Williams: Tr. 2862, 2877-81, 2888-89; Prevost: Tr. 4461-64.)

            Phone records also demonstrated that, between August 1, 2001 and November 24,
                                                                                                    (continued...)

Tr. 81, 86, 88; Pelaez: Tr. 145-46; Inch: Tr. 150-52; Stimus: Tr. 199; Lindow: Tr. 4017; Parson: Tr. 4201, 4208, 4247.)[9]

        Officer O'Hare entered the building and observed full, large plastic bags "lined all the way from the vestibule, going all the way up to the second floor." (O'Hare: Tr. 81-83, 85.) When he reached the second floor, O'Hare saw that the door was "ripped open" and the place was "totally ransacked." (O'Hare: Tr. 83, 84.) The first floor office also was "in disarray" and the safe was wide open. (O'Hare: Tr. 84-85.) Officer O'Hare found clothing and shoes from City Streets in the bags that were left on the curb and inside the building. (O'Hare: Tr. 85-87.)

        At the precinct, Jackson and Parson were placed in neighboring cells and fabricated a story regarding the events leading up to their arrest. (Lindow: Tr. 4017-19; Parson: Tr. 4213, 4247-51, 4342-44.) Jackson told the police that he had picked up Parson from Nells, a bar located near City Streets, in order for Parson to help with some plumbing work at Jackson's house. (Parson: Tr. 4212-13.) Jackson also stated that he left the bar at about 5:00 a.m. and that he was looking for a blue van in the area when he was arrested. (Lindow: Tr. 4018-19.) Jackson apologized for running from the police. (Lindow: Tr. 4019.)

---

[8]    (...continued)
2001, the night of the City Streets burglary, Jackson called Parson forty to fifty times. (Prevost: Tr. 4441.) On the early morning of the City Streets burglary, Jackson called Parson at 4:20 a.m., 4:45 a.m. and 5:55 a.m. (Parson: Tr. 4202; Prevost: Tr. 4442.)

[9]    The police found a Compu-All Enterprises business card listing Jackson's wife's name and addresses in a van associated with Lucas and another co-defendant. (Muldoon: Tr. 2413, 2445-49.) In another vehicle connected to Lucas, the police recovered a Compu-All Enterprises paystub with Lucas' name on it. (Muldoon: Tr. 2413, 2551-53.)

After they were released on bail, Jackson directed Parson "to stick to the story that [they] came up with." (Parson: Tr. 4214, 4325-26.) Jackson instructed Parson to get receipts from stores in the vicinity of City Streets or to pay someone like a bouncer or store employee to state that Parson had been in the area that night. (Parson: Tr. 4214-15.) According to this fabricated story, Jackson was looking for Parson so Parson could help with some plumbing work. (Parson: Tr. 4212-13, 4215.) Parson, however, did not know anything about plumbing. (Parson: Tr. 4215.)

### Co-defendant William Coleman's Threat Against the People's Witness Jabar Williams

Jabar Williams remained incarcerated while testifying pursuant to a cooperation agreement. (Williams: Tr. 2749; see page 6 n.6 above.) On April 15, 2004, the prosecutor informed Justice Berkman that co-defendant William Coleman had threatened Williams' life the night before as they were being transported through the courthouse. (Tr. 2841-42.) The prosecutor argued that Williams should be allowed to testify about this threat as evidence of Coleman's consciousness of guilt, as well as to explain any change in Williams' demeanor on the witness stand. (Tr. 2842-43.)

Jackson's counsel and the other defense attorneys objected, arguing that such testimony would have "a spill-over effect" that would deprive the other defendants of a fair trial. (Tr. 2844-48.) The attorneys requested a severance on behalf of their clients if Justice Berkman was going to allow evidence of co-defendant Coleman's threat. (Tr. 2845-46.) Justice Berkman ruled the evidence was admissible, noting:  "Unfortunately, when there's evidence against one person in a case charging Enterprise Corruption and Conspiracy[,] . . . [t]here's a spill-over automatically." (Tr. 2848-49.)

Williams testified that, the night before in the Department of Correction's section of the courthouse, Coleman passed by Williams and asked, "why [are you] doing this[?]" (Williams: Tr. 2852.)  Coleman told Williams to "fix it" and that if Coleman "looses [sic] his life it's not going to rest like that." (Williams: Tr. 2852.)  Coleman told the other people in the area that Williams was a snitch and that they should "take care of that." (Williams: Tr. 2853.)  Williams understood Coleman's words as a threat to him or his family. (Williams: Tr. 2853.)

### Jackson's Defense Case at Trial

#### Jackson's Testimony

In 1998, Jackson, Mark Parson and George Lucas worked together renovating Jackson's father's five-unit building. (Jackson: Tr. 4733.)  Lucas told Jackson that "you need a lot of money to do" construction, and offered to pay Jackson if he acted as a lookout for Lucas. (Jackson: Tr. 4733-34.)  Jackson accepted the offer, and met Lucas and others at night near a Manhattan building.  (Jackson: Tr. 4734, 4834, 4841.)  Jackson did not know what the plan was, yet he knew it involved doing "something wrong." (Jackson: Tr. 4842, 4843.)  Jackson did not go inside, but saw the others bringing dozens of garbage bags out of the building. (Jackson: Tr. 4841.)  Jackson and Lucas were arrested during this burglary, and Jackson pled guilty to third degree burglary and was sentenced to 2-1/2 to 5 years imprisonment. (Jackson: Tr. 4702-03, 4732-33.)

Jackson denied being involved in the City Streets burglary and explained what he was doing in the vicinity when he was arrested. (Jackson: Tr. 4710, 4729-30.)  On November 22, 2001, Jackson, his brother-in-law, Parson and William Keitt were working converting the basement of 556 Walnut Avenue, Elizabeth, New Jersey, into an apartment. (Jackson: Tr. 4710-11, 4781, 4783-85.)

As part of the renovation, the group installed temporary sewer lines to replace the ones they had dug up.  (Jackson: Tr. 4711, 4785.)

In the early morning of November 24, 2001, Jackson was sleeping at his home in Elizabeth, New Jersey, when a tenant at 556 Walnut Avenue called saying there was a sewage backup.  (Jackson: Tr. 4711, 4781-84.)  Jackson and his wife arrived there at 3:30 a.m. and found the temporary rubber pipe had "popped off," flooding the basement with sewage.  (Jackson: Tr. 4712, 4713, 4784.)

In order to repair the sewer lines, Jackson and his wife drove to the Bronx to pick up Keitt, figuring they would pick up Parson along the way if they were able to contact him.  (Jackson: Tr. 4712-13, 4791-92, 4796-99.)  As they drove to the Lincoln Tunnel, Jackson's wife called Parson who said he was in a club on Fourteenth Street in Manhattan, so they drove to Manhattan to pick him up.  (Jackson: Tr. 4713-15, 4787, 4797-800.)  At the club called Two Eyes, next door to Nells, the bouncer told Jackson that everyone had left the club and someone fitting Parson's description had walked up the block.  (Jackson: Tr. 4714-15, 4797, 4809-10.)  Jackson found Parson nearby and they walked to Jackson's wife who  had driven around the block.  (Jackson: Tr. 4717, 4719, 4813-15.)

Parson stopped to talk to a man while Jackson kept walking down the street.  (Jackson: Tr. 4717, 4816-17, 4819.)  The man walked away from Parson and entered a building on the block.  (Jackson: Tr. 4717.)  About a minute later, the man came out of the building with three or four other men who all ran down the street.  (Jackson: Tr. 4717, 4817-20.)  As Jackson continued walking to his wife with Parson, he saw a man down the block beckoning them with his finger and

another man wearing dark clothing came out from behind a van and told them to "[c]ome here." (Jackson: Tr. 4718.)   When the second man "reached like [he was] going to pull a gun or something," Parson started running down the block, followed by Jackson.  (Jackson: Tr. 4718-19, 4820-21.)  Jackson did not realize that the man was a police officer; he ran because, being from "the ghetto[,] [i]f someone runs, I'm running."  (Jackson: Tr. 4770, 4772, 4821, 4822, 4830.)  Jackson tried to call his wife, but his phone dropped and slid underneath a car.  (Jackson: Tr. 4720, 4772, 4827-28.)  When Jackson tried to pick up the phone, a police officer told him to freeze and arrested him.  (Jackson: Tr. 4720, 4772, 4829.)  While in adjoining cells in the precinct, Jackson and Parson discussed what Parson was doing downtown, but did not agree to fabricate a story.  (Jackson: Tr. 4726-27.)

### Cross-examination of Jackson and Modification of Pre-Trial Sandoval Ruling

On direct, Jackson had explained his October 1, 1998 burglary arrest by claiming that Lucas had offered to pay him as a lookout.  (See page 13 above.)  Prior to cross-examination, the prosecutor requested a modification of the Sandoval ruling, arguing that Jackson's misleading testimony opened the door to the fact that his three prior felony convictions were for burglaries.  (Tr. 4774-75.)  Specifically, the prosecutor argued that Jackson had testified that the "1998 burglary was a result of being propositioned by Mr. Lucas and that it -- that he was essentially told by Mr. Lucas what to do about being a lookout."  (Tr. 4775.)  Given Jackson's three prior burglary convictions, the prosecutor argued that "the idea that somehow George Lucas was the one who led Mr. Jackson to be involved in this type of crime should not be allowed to stand before the jury."  (Tr. 4775.)

16

Justice Berkman agreed, noting that "the clear implication of [Jackson's] testimony with regard to being propositioned by Mr. Lucas and to committing that burglary" in 1998 was that he had not committed a burglary before that night.  (Tr. 4778.)  Justice Berkman allowed the prosecutor to ask Jackson "whether he had previous experience committing burglaries," and whether those burglaries involved Lucas.  (Tr. 4778.)

During cross-examination, Jackson admitted that he had committed the 1998 burglary with Lucas, but claimed it was "Lucas' idea" and that it was the only burglary they had committed together.  (Jackson: Tr. 4834, 4843.)  Jackson acknowledged that he had three other burglaries before 1998, but none of the them included Lucas.  (Jackson: Tr. 4844.)

The prosecutor also impeached Jackson with portions of his grand jury testimony. Jackson had testified on direct that, when the sewer line broke on November 24, 2001, he called Keitt and drove to the Bronx to pick Keitt up, figuring he would also pick up Parson on the way if he contacted him.  (Jackson: Tr. 4712.)  During cross-examination, however, Jackson testified that he never called Keitt that night because he knew that he "could show up right at [Keitt's] doorstep" and did not want to wake Keitt's mother by calling.  (Jackson: Tr. 4800.)  The prosecutor confronted Jackson with his grand jury testimony where he never mentioned that Keitt was involved that night at all:

> On the night in question, I went to pick up a friend.  I have -- I also have some real estate.  And I had a man, I had a guy on a phone, a phone call, say around two, [three] o'clock in the morning.  I called Mark Parson is his name.  He's a plumber.  He assisted me on numerous jobs in various buildings that I have.

(Jackson: Tr. 4801.)  Jackson's attorney objected that it was "not inconsistent," but Justice Berkman

allowed it stating, "We'll let the jury decide that."  (Jackson: Tr. 4802.)  The prosecutor continued

to impeach Jackson with his grand jury testimony that did not mention Keitt:

> . . . I got a telephone call from one of my tenants that there was some major
> problems with one of my properties, 556 Walnut.  There was either sewage backup
> or there was a cracked soil pipe or something of that nature.  Me and Mr. Parson[]
> had been working there prior to that.  Anyway, I called him.  He stated his
> whereabouts and I went to go pick him up.

(Jackson: Tr. 4802-03.)  When Jackson explained that he was not asked about Keitt in the grand

jury, the prosecutor responded, "Well, you had an opportunity to say whatever you wanted, didn't

you, Mr. Jackson?"  (Jackson: Tr. 4803.)  Justice Berkman overruled Jackson's attorney's renewed

objection.  (Tr. 4803.)

### The Jury Charge

As part of the jury charge, Justice Berkman instructed the jury to view the case

against each defendant separately:

> You must deliberate separately as to each defendant and render a separate
> verdict as to each defendant.  The case against each is separate and distinct.  It is
> neither necessary nor required that you render an identical verdict as to each.  You
> can find one guilty and the others not as to any count.

(Charge: Tr. 5351.)  Justice Berkman repeated this again, instructing the jury with respect to the

enterprise corruption count that "you must deliberate separately as to each" defendant.  (Charge: Tr.

5397.)

Justice Berkman gave a limiting instruction regarding the evidence about the 1998

burglary committed by Jackson and Lucas:

You've heard evidence of 1998 burglary activity by George Lucas and Trevers Jackson. This evidence is no proof at all that either of them has the propensity or predisposition to commit any of the crimes charged in this indictment or any other crime. You must not consider it for this purpose.

The evidence was permitted as proof of background and/or relationship between Jackson and Lucas which is relevant in your consideration of the enterprise corruption and conspiracy charges. Consider it only for this purpose.

(Charge: Tr. 5352-53). Justice Berkman gave further instruction about Jackson's prior criminal history: "With respect to Mr. Jackson, understand that prior convictions or criminal conduct are not evidence of his guilt in this case or evidence that he is disposed to commit crimes. You are permitted to consider his convictions to evaluate his truthfulness." (Charge: Tr. 5357-58.)

Justice Berkman also gave a limiting instruction relating to co-defendant Coleman's threats against Williams:

The People have introduced evidence of certain remarks allegedly made by Mr. Coleman to and about Mr. Williams during the time that Mr. Williams was testifying after the court session.

If you find Mr. Williams' testimony credible in this respect, you may consider it both in evaluating his manner of testifying, but what we call his demeanor on the stand, which is a factor you may consider in evaluating the testimony of any witness and also as supporting an inference of Mr. Coleman's consciousness of guilt.

Now, whether this evidence, if you find it credible, does, in fact, reflect that Mr. Coleman had a guilty mind and if so, what weight you should give this evidence, is a question of fact for you to decide.

First, you have to decide whether you accept and believe the evidence. Then, you have to decide whether the evidence does, in fact, establish a consciousness of guilt on Mr. Coleman's part. Understand that even an innocent person may resort to conduct for the purposes of avoiding conviction. For this reason, if you find an innocent explanation from the nature of the conduct and from the evidence that you've heard in the case, you must disregard this evidence totally.

Only if you find that this conduct was solely motivated by Mr. Coleman's consciousness of guilt may you consider it in determining whether his guilt has been proved beyond a reasonable doubt.

Also understand that even if you accept this evidence and conclude that it shows consciousness of guilt, that kind of evidence has slight value. Standing alone it's never sufficient for a finding of guilt. You have the right to consider it together with all the rest of the evidence in determining whether the evidence establishes his guilt beyond a reasonable doubt.

(Charge: Tr. 5362-64.)

### Verdict and Sentence

On May 17, 2004, the jury convicted Jackson of enterprise corruption, Penal Law § 460.20, finding that he committed twenty underlying "pattern act[s]." (Tr. 5553, 5565-71.) The jury also convicted Jackson of the underlying crime for several of the pattern acts: second degree burglary (based on pattern act fifty), second degree grand larceny (based on pattern act fifty-one), second degree criminal possession of stolen property (based on pattern act fifty-two), and two counts of first degree perjury (based on pattern acts eighty-one and eighty-two). (Tr. 5406-08, 5568-71.)[10] The jury also convicted Jackson of fourth degree conspiracy. (Tr. 5568.)

Prior to sentencing, Jackson's counsel filed a brief challenging the constitutionality of New York's discretionary persistent felony offender statute. (See Dkt. No. 14: 6/18/04 Sentencing Transcript ("S.") 6, 13-16.) At sentencing on June 18, 2004, Jackson admitted all of his previous felony convictions and dates of incarceration. (S. 2-5, 8.) Justice Berkman rejected Jackson's challenge to the sentencing statute. (S. 6-7.)

---

[10] Jackson's perjury convictions were based on his grand jury testimony that he had not been in contact with Lucas in two years, and that he had not committed any burglaries or handled any stolen property since his May 2001 release from prison. (Tr. 4419-21.)

Justice Berkman noted that once Jackson had the prior felony convictions, he was eligible to be sentenced as a discretionary persistent felony offender.  (S. 8).  Justice Berkman noted an Appellate Division decision that upheld the discretionary persistent felony offender statute after finding, based solely on prior convictions, that the defendant merited such a sentence.  (S. 27.) Justice Berkman further stated that, in sentencing a defendant as a discretionary persistent felony offender, "I have really never seen anything other than the defendant's convictions."  (S. 28.)

While Jackson only committed economic crimes, Justice Berkman found that "at a certain point they have an enormous kind of effect on the life of everybody who lives in our society." (S. 26.)  Justice Berkman noted that "what we have here is a lifetime of criminality and the selfishness and the escalating nature of his criminal behavior . . . .  The way he got better and better at it. The things got bigger and bigger." (S. 28-29.)  By perjuring himself in the grand jury, Jackson demonstrated "an extraordinary act how totally shameless and totally selfish a thief can be to protect his own interest" by giving "false testimony in an effort to escape his responsibility for these crimes" (S. 29, 30.)

Justice Berkman ruled that Jackson was "the poster child for discretionary persistent felony offender treatment," stating:

> So, this is a man who will do anything to get his own way.  That's his history and character.  All proof beyond a reasonable doubt to this jury, admitted in connection with guilty pleas in other courtrooms, proved in terms of the crimes in this case to the jury's satisfaction and beyond a reasonable doubt.
>
> This is a man who will, it appears, never live a law abiding life in society; never respect the rights of his fellow citizens; will always put somebody first, and that somebody will always be Trevers Jackson.

(S. 31.)  Justice Berkman sentenced Jackson to seven concurrent sentences of twenty-five years to life imprisonment.  (S. 31-33.)

**Jackson's Direct Appeal**

Represented by new counsel, Jackson appealed to the First Department, claiming that:  (1) Justice Berkman deprived him of a fair trial when she erroneously changed her pre-trial Sandoval ruling after his direct testimony (Dkt. No. 17: Dannelly Aff. Ex. A: Jackson 1st Dep't Br. at 35-46); (2) Justice Berkman deprived Jackson of a fair trial when she improperly allowed the prosecutor to impeach him with his grand jury testimony that was not inconsistent with his trial testimony (id. at 46-50); (3) Justice Berkman deprived Jackson of a fair trial when she allowed evidence that a co-defendant had threatened a witness during trial and denied Jackson's severance motion  (id. at 50-52); (4) Jackson's sentence as a persistent felony offender was unconstitutional (id. at 52); and (5) Jackson's sentence was excessive (id. at 52-57).

Jackson filed a pro se brief before the First Department claiming that:  (1) Justice Berkman deprived Jackson of a fair trial when she erroneously allowed evidence of uncharged crimes he had committed with a co-defendant (Dannelly Aff. Ex. C: Jackson Pro Se 1st Dep't Br. at 5-8); and (2) the evidence was insufficient to establish the crime of enterprise corruption and the jury's verdict was against the weight of the evidence (id. at 5-13).

On November 20, 2007, the First Department unanimously affirmed Jackson's conviction, holding in full:

> The court properly modified its Sandoval ruling to permit the People to inquire about three prior burglaries committed by [Jackson], when [Jackson]'s testimony misleadingly implied that he was a naive novice at the time a codefendant had propositioned him to be a lookout in a burglary that the prosecutor had inquired

into under the original <u>Sandoval</u> ruling. In any event, were we to find that the court erred by making this modification, we would find the error harmless in light of the overwhelming evidence of [Jackson]'s guilt.

       The court properly permitted the prosecutor to impeach [Jackson]'s trial testimony by means of portions of his grand jury testimony, including significant omissions, since the circumstances were such as to raise a jury question as to whether there was an inconsistency.  [Jackson] was free to argue that there was no inconsistency, and were we to find any error we would once again find it harmless.

       The court properly admitted evidence that a jointly tried codefendant had threatened a witness during the trial. Such evidence was "highly probative" of that codefendant's consciousness of guilt, and the court's thorough instructions were sufficient to prevent any prejudice to [Jackson]. The court also properly denied [Jackson]'s severance motion.

       We perceive no basis for reducing the sentence. [Jackson]'s sentencing as a discretionary persistent felony offender was constitutional.

       The verdict was based on legally sufficient evidence and was not against the weight of the evidence. [Jackson]'s remaining pro se argument is unpreserved and we decline to review it in the interest of justice. Were we to review this claim, we would find it without merit.

<u>People</u> v. <u>Jackson</u>, 45 A.D.3d 433, 433-34, 846 N.Y.S.2d 126, 127-28 (1st Dep't 2007) (citations omitted).

       On December 14, 2007, Jackson's counsel submitted a letter to the New York Court of Appeals seeking leave to appeal as to three claims:  (1) Justice Berkman erroneously changed her pre-trial <u>Sandoval</u> ruling after Jackson's direct testimony; (2) Justice Berkman erred when she allowed evidence that a co-defendant had threatened a witness during trial and denied Jackson's severance motion; and (3) Jackson's sentence as a persistent felony offender was unconstitutional. (Dannelly Aff.  Ex. F: 12/14/07 Ct. App. Leave Letter at 2-9.)  Jackson's counsel also attached the First Department briefs to the leave letter.  (12/14/07 Ct. App. Leave Letter at 1.)

On March 20, 2008, the New York Court of Appeals denied leave to appeal.  People v. Jackson, 10 N.Y.3d 812, 857 N.Y.S.2d 45, cert. denied, 129 S. Ct. 462 (2008).

**Jackson's C.P.L. § 440 Motion**

On September 29, 2009, Jackson filed a pro se C.P.L. § 440.10 motion arguing that his trial counsel was ineffective for failing to investigate and raise an alibi defense for the September 29, 2001 burglary of a Nine West store.  (Dkt. No. 8: Am. Pet. Ex. F: Jackson 440 Aff. ¶¶ 2, 12, 16, 28-39, 42-45 & Jackson 440 Br. at 1-7.)  Jackson was implicated in this burglary through the trial testimony of Jabar Williams and Mark Parson.  (See page 8 above.)  Jackson claimed that he had informed his attorney that he could not have participated in that burglary because "he was returning from [his grandmother's] funeral in Virginia."  (Jackson 440 Aff. ¶¶ 28-29.)  In support of this claim, Jackson attached letters from several family members, as well as E-ZPass and ATM records.  (Jackson 440 Aff. ¶¶ 17, 30, 33-37 & Exs. J, L, N, O, R-X.)

Jackson also alleged that trial counsel failed to properly cross-examine cooperating witness Jabar Williams concerning his testimony that Jackson stored stolen goods in Jackson's basement at 439 Maple even though, according to Jackson, Williams had never been to his home, Jackson did not live at that address at the relevant time and his basement ceiling was too low for storage.  (Jackson 440 Aff. ¶¶ 39-41, 45 & Jackson 440 Br. at 5.)  Jackson further argued that counsel failed to effectively cross-examine eyewitness Miguel Pelaez about his inability to identify Jackson in court.  (Jackson 440 Aff. ¶¶ 42-45.)

On February 22, 2010, Justice Berkman denied Jackson's § 440.10 motion, noting that  "all [Jackson] offers to prove the lack of investigation by counsel is [Jackson]'s statement that

'there is nothing in the [trial lawyer's case] file generated by trial counsel indicating that any investigation or inquires [sic] to[ok] place in reference to the claims herein.'" People v. Jackson, No. 1430/03, 26 Misc. 3d 1236(A) (table), 2010 WL 932601 at *2 (Sup. Ct. N.Y. Co. Feb. 22, 2010). Justice Berkman found that "the witnesses whose statements are referenced do not provide an alibi for the time of the Nine West burglary, not even enough to establish that it was unlikely that [Jackson] could have returned to New York to participate in that crime." People v. Jackson, 2010 WL 932601 at *2.  Jackson's motion also never "provide[d] any sworn statement about how and when [Jackson] actually returned to the New York City area." People v. Jackson, 2010 WL 932601 at *3.  Moreover, "[a]lthough [Jackson] testified at some length at trial, he offered no testimony as to the alleged September 2001 alibi, and the court does not recall testimony about low ceilings or where [Jackson] lived in June 2001." People v. Jackson, 2010 WL 932601 at *1.

In support of his claims, Jackson attached a notarized affidavit of his ex-wife Aymee Minaya, alleging that she had informed trial counsel of the funeral before Jackson's trial, and that she "gave [trial counsel] documents to prove what [Jackson] was saying for him to contact family members and look into it further, but nobody paid attention." (Jackson 440 Aff. Ex: O: Minaya Aff.) Justice Berkman noted, however, that "it is not clear that counsel was told of the actual identity of the other witnesses or whether they were available and willing to testify at the time of trial." People v. Jackson, 2010 WL 932601 at *2.  Additionally, Justice Berkman found that Jackson's submissions only established that his trial counsel was given the name and address of Jackson's ex-wife and sister, but did not establish "what either of these women would have said about [Jackson]'s return

to New York or what if anything they told the lawyer about it."  <u>People</u> v. <u>Jackson</u>, 2010 WL 932601

at *4.<u>11/</u>

> As to the ATM records, Justice Berkman found:
>
> [A] purchase of gas in Virginia on October 2 with one of [Jackson]'s accounts, even
> if by [Jackson], does not establish an alibi as to September 29, particularly as the
> records provided by [Jackson] also show an ATM withdrawal in New Jersey on
> October 1 and a debit card purchase in East Elmhurst, New York on October 2, not
> to speak of the frequent funding and heavy usage of [Jackson]'s EZ pass account.

<u>People</u> v. <u>Jackson</u>, 2010 WL 932601 at *3.  Similarly, Justice Berkman found that Jackson's E-ZPass

records did not support Jackson's alibi claims:

> There are many uses of [Jackson]'s EZ pass account on September 29,
> starting at 2:41 a.m. in Delaware, going through the Lincoln Tunnel at 6:10 a.m., and
> re-entering the Turnpike around 8:00 a.m. Assuming [Jackson] drove his own rather
> than the rented vehicle back to New York and the EZ pass entries are attributable to
> his own travels – and [Jackson]'s allegations do not specifically address this issue –
> the burglaries were normally committed in the middle of the night, [] and according
> to these EZ pass records, [Jackson] certainly could have arrived at Nine West two
> or two-and-one-half hours after that burglary began, as the People's trial evidence
> showed.

<u>People</u> v. <u>Jackson</u>, 2010 WL 932601 at *3.

> Justice Berkman also found that trial counsel had a strategic reason for not pursuing

this alibi defense:  "This burglary was only one of eight pattern acts against [Jackson], and the

decision not to put in a dubious alibi to only one of six alleged burglaries in which [Jackson]

allegedly participated is hardly surprising."  <u>People</u> v. <u>Jackson</u>, 2010 WL 932601 at *4.

---

<u>11/</u>    According to Justice Berkman, "the reason the lawyer would not rely on [Jackson's ex-wife]
for this 'alibi' is obvious: according to the trial evidence, she accompanied [Jackson] to the
scene of the Nine West burglary and she had already lied to authorities to get her husband
out of jail."  <u>People</u> v. <u>Jackson</u>, 2010 WL 932601 at *4.

Justice Berkman also rejected Jackson's claims that trial counsel failed to effectively cross-examine Jabar Williams at trial:

> The testimony was not that proceeds were stored by the burglars in whatever New Jersey house they visited in June 2001, and if Williams was mistaken as to the address (Myrtle as opposed to Maple, perhaps) or ownership of the home, that would hardly deal the fatal blow to his credibility that hours of cross-examination by multiple defense lawyers did not.

People v. Jackson, 2010 WL 932601 at *4.  Justice Berkman also rejected the claim that trial counsel failed to properly cross-examine Pelaez, noting that once Pelaez had already testified that he could not identify Jackson, "cross-examining him on his identification of the various actors at the time of the arrest seems hardly designed to help the defense."  People v. Jackson, 2010 WL 932601 at *4.

On June 30, 2010, the First Department denied leave to appeal from Justice Berkman's § 440 ruling.  (Dkt. No. 17: Dannelly Aff. Ex. P: 6/30/10 Cert. Denying Leave to Appeal.)

**Jackson's Habeas Petition**

On March 5, 2010, Jackson filed a pro se federal habeas corpus petition, attaching his First Department briefs, but not specifying any particular claim he was raising.  (Dkt. No. 1: Pet. ¶ 13.)   On August 11, 2010, Jackson filed an amended petition, directing the Court to exhibit E containing his First Department brief, as well as exhibits F-L containing documents relating to his C.P.L. § 440.10 motion.  (Dkt. No. 8: Am. Pet. ¶ 13.)  This Court will address Jackson's habeas petition as raising the following eight claims previously raised by Jackson on his direct appeal and § 440.10 motion:  (1) Justice Berkman deprived Jackson of a fair trial when she erroneously changed her pre-trial Sandoval ruling after Jackson's direct testimony (Am. Pet. ¶ 13 & Ex. E: Jackson 1st

Dep't Br. at 35-46); (2) Justice Berkman deprived Jackson of a fair trial when she improperly allowed the prosecutor to impeach Jackson with his grand jury testimony that was not inconsistent with his trial testimony (id. at 46-50); (3) Justice Berkman deprived Jackson of a fair trial when she allowed evidence that a co-defendant had threatened a witness during trial and denied Jackson's severance motion (id. at 50-52); (4) Justice Berkman deprived Jackson of a fair trial when she erroneously allowed evidence of uncharged crimes that Jackson had committed with a co-defendant (Am. Pet. Ex. E: Jackson Pro Se 1st Dep't Br. at 5-8); (5) the evidence was insufficient to establish the crime of enterprise corruption and the jury's verdict was against the weight of the evidence (id. at 9-13); (6) trial counsel was ineffective for failing to investigate and raise an alibi defense and failing to properly cross-examine witnesses (Am. Pet. Ex. F: Jackson 440 Aff. ¶¶ 2, 12, 16, 28-39, 42-45 & Jackson 440 Br. at 1-7); (7) Jackson's sentence as a persistent felony offender was unconstitutional (Jackson 1st Dep't Br. at 52); and (8) Jackson's sentence was excessive (id. at 52-57).

## ANALYSIS

## I.    THE AEDPA REVIEW STANDARD

Before the Court can determine whether petitioner is entitled to federal habeas relief, the Court must address the proper habeas corpus review standard under the Antiterrorism and Effective Death Penalty Act ("AEDPA").

In enacting the AEDPA, Congress significantly "modifie[d] the role of federal habeas courts in reviewing petitions filed by state prisoners."  Williams v. Taylor, 529 U.S. 362, 403, 120 S. Ct. 1495, 1518 (2000).  The AEDPA imposed a more stringent review standard, as follows:

(d)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)  . . . was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.)

28 U.S.C. § 2254(d)(1)-(2).[12/]

The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) have "independent meaning."  <u>Williams</u> v. <u>Taylor</u>, 529 U.S. at 404-05, 120 S. Ct. at 1519.[13/]  Both, however, "restrict[] the source of clearly established law to [the Supreme] Court's jurisprudence." <u>Williams</u> v. <u>Taylor</u>, 529 U.S. at 412, 120 S. Ct. at 1523.[14/]  "That federal law, as defined by the

---

[12/]  <u>See also</u>, <u>e.g.</u>, <u>Knowles</u> v. <u>Mirzayance</u>, 129 S. Ct. 1411, 1418 (2009); <u>Henry</u> v. <u>Poole</u>, 409 F.3d 48, 67 (2d Cir. 2005), <u>cert. denied</u>, 547 U.S. 1040, 126 S. Ct. 1622 (2006); <u>Portalatin</u> v. <u>Graham</u>, -- F.3d --, 2010 WL 4055571 at *7 (2d Cir. Oct. 18, 2010) (en banc);  <u>Howard</u> v. <u>Walker</u>, 406 F.3d 114, 121-22 (2d Cir. 2005); <u>Cox</u> v. <u>Donnelly</u>, 387 F.3d 193, 197 (2d Cir. 2004); <u>Dallio</u> v. <u>Spitzer</u>, 343 F.3d 553, 559-60 (2d Cir. 2003), <u>cert. denied</u>, 541 U.S. 961, 124 S. Ct. 1713 (2004); <u>Eze</u> v. <u>Senkowski</u>, 321 F.3d 110, 120 (2d Cir. 2003) ("AEDPA changed the landscape of federal habeas corpus review by 'significantly curtail[ing] the power of federal courts to grant the habeas petitions of state prisoners.'") (quoting <u>Lainfiesta</u> v. <u>Artuz</u>, 253 F.3d 151, 155 (2d Cir. 2001), <u>cert. denied</u>, 535 U.S. 1019, 122 S. Ct. 1611 (2002)).

[13/]  <u>Accord</u>, <u>e.g.</u>, <u>Henry</u> v. <u>Poole</u>, 409 F.3d at 68; <u>Howard</u> v. <u>Walker</u>, 406 F.3d at 122; <u>Parsad</u> v. <u>Greiner</u>, 337 F.3d 175, 181 (2d Cir.), <u>cert. denied</u>, 540 U.S. 1091, 124 S. Ct. 962 (2003); <u>Jones</u> v. <u>Stinson</u>, 229 F.3d 112, 119 (2d Cir. 2000); <u>Lurie</u> v. <u>Wittner</u>, 228 F.3d 113, 125 (2d Cir. 2000), <u>cert. denied</u>, 532 U.S. 943, 121 S. Ct. 1404 (2001); <u>Clark</u> v. <u>Stinson</u>, 214 F.3d 315, 320 (2d Cir. 2000), <u>cert. denied</u>, 531 U.S. 1116, 121 S. Ct. 865 (2001).

[14/]  <u>Accord</u>, <u>e.g.</u>, <u>Georgison</u> v. <u>Donelli</u>, 588 F.3d 145, 153-54 (2d Cir. 2009); <u>Dunlap</u> v. <u>Burge</u>,
(continued...)

Supreme Court, may be either a generalized standard enunciated in the [Supreme] Court's case law or a bright-line rule designed to effectuate such a standard in a particular context." <u>Kennaugh</u> v. <u>Miller</u>, 289 F.3d at 42; <u>accord</u>, <u>e.g.</u>, <u>Davis</u> v. <u>Grant</u>, 532 F.3d 132, 140 (2d Cir. 2008), <u>cert. denied</u>, 129 S. Ct. 1312 (2009).  "A petitioner can not win habeas relief solely by demonstrating that the state court unreasonably applied Second Circuit precedent."  <u>Yung</u> v. <u>Walker</u>, 341 F.3d at 110; <u>accord</u>, <u>e.g.</u>, <u>DelValle</u> v. <u>Armstrong</u>, 306 F.3d at 1200.

> As to the "contrary to" clause:
>
> A state-court decision will certainly be contrary to [Supreme Court] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases. . . .  A state-court decision will also be contrary to [the Supreme] Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent.

---

14/       (...continued)
583 F.3d 160, 164 (2d Cir.), <u>cert. denied</u>, 130 S. Ct. 642, (2009); <u>Carey</u> v. <u>Musladin</u>, 549 U.S. 70, 127 S. Ct. 649, 654 (2006) ("Given the lack of holdings from the Court regarding this [issue], it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'"); <u>Yarborough</u> v. <u>Alvarado</u>, 541 U.S. 652, 659, 124 S. Ct. 2140, 2147 (2004) ("We look for 'the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision.'"); <u>Wiggins</u> v. <u>Smith</u>, 539 U.S. 510, 519, 123 S. Ct. 2527, 2534 (2003); <u>Lockyer</u> v. <u>Andrade</u>, 538 U.S. 63, 72, 123 S. Ct. 1166, 1172 (2003) ("Section 2254(d)(1)'s 'clearly established' phrase 'refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision.'"); <u>Portalatin</u> v. <u>Graham</u>, 2010 WL 4055571 at *7 ("To qualify as 'clearly established' for the purposes of federal habeas review, a rule of law must be embodied in the 'holdings, as opposed to the dicta,' of Supreme Court precedent."); <u>Hargett</u> v. <u>Giambruno</u>, 291 F. App'x 402, 403 (2d Cir. 2008); <u>Howard</u> v. <u>Walker</u>, 406 F.3d at 122; <u>Tueros</u> v. <u>Greiner</u>, 343 F.3d 587, 591 (2d Cir. 2003), <u>cert. denied</u>, 541 U.S. 1047, 124 S. Ct. 2171 (2004); <u>Parsad</u> v. <u>Greiner</u>, 337 F.3d at 181; <u>DelValle</u> v. <u>Armstrong</u>, 306 F.3d 1197, 1200 (2d Cir. 2002); <u>Yung</u> v. <u>Walker</u>, 341 F.3d 104, 109-10 (2d Cir. 2003); <u>Kennaugh</u> v. <u>Miller</u>, 289 F.3d 36, 42 (2d Cir.), <u>cert. denied</u>, 537 U.S. 909, 123 S. Ct. 251 (2002); <u>Loliscio</u> v. <u>Goord</u>, 263 F.3d 178, 184 (2d Cir. 2001); <u>Sellan</u> v. <u>Kuhlman</u>, 261 F.3d 303, 309 (2d Cir. 2001).

Williams v. Taylor, 529 U.S. at 405-06, 120 S. Ct. at 1519-20.[15]

In Williams, the Supreme Court explained that "[u]nder the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams v. Taylor, 529 U.S. at 413, 120 S. Ct. at 1523.[16]  However, "[t]he term 'unreasonable' is . . . difficult to define." Williams v. Taylor, 529 U.S. at 410, 120 S. Ct. at 1522.  The Supreme Court made clear that "an unreasonable application of federal law is different

---

[15]    Accord, e.g., Knowles v. Mirzayance, 129 S. Ct. at 1419 (The Supreme "Court has held on numerous occasions that it is not 'an unreasonable application of clearly established federal law' for a state court to decline to apply a specific legal rule that has not been squarely established by this [Supreme] Court.") (quotation omitted); Brown v. Payton, 544 U.S. 133, 141, 125 S. Ct. 1432, 1438-39 (2005); Bell v. Cone, 543 U.S. 447, 452-53, 125 S. Ct. 847, 851 (2005); Price v. Vincent, 538 U.S. 634, 640, 123 S. Ct. 1848, 1853 (2003); Lockyer v. Andrade, 123 S. Ct. at 1173-74; Portalatin v. Graham, 2010 WL 4055571 at *7; Bierenbaum v. Graham, 607 F.3d 36, 47-48 (2d Cir. 2010); Ortiz v. N.Y.S. Parole in Bronx, N.Y., 586 F.3d 149, 156 (2d Cir. 2009), cert. denied, 2010 WL 2917642 (Oct. 4, 2010); Dunlap v. Burge, 583 F.3d at 164; Davis v. Grant, 532 F.3d at 140; Hawkins v. Costello, 460 F.3d 238, 242 (2d Cir. 2006), cert. denied, 549 U.S. 1215, 127 S. Ct. 1267 (2007); Henry v. Poole, 409 F.3d at 68; Howard v. Walker, 406 F.3d at 122; Rosa v. McCray, 396 F.3d 210, 219 (2d Cir.), cert. denied, 546 U.S. 889, 126 S. Ct. 215 (2005); Tueros v. Greiner, 343 F.3d at 591; DelValle v. Armstrong, 306 F.3d at 1200; Yung v. Walker, 341 F.3d at 109; Kennaugh v. Miller, 289 F.3d at 42; Loliscio v. Goord, 263 F.3d at 184; Lurie v. Wittner, 228 F.3d at 127-28.

[16]    Accord, e.g., Waddington v. Sarausad, 129 S. Ct. 823, 831 (2009); Brown v. Payton, 544 U.S. at 141, 125 S. Ct. at 1439; Wiggins v. Smith, 539 U.S. at 520, 123 S. Ct. at 2534-35; Bierenbaum v. Graham, 607 F.3d at 48; Brisco v. Ercole, 565 F.3d 80, 87 (2d Cir.), cert. denied, 130 S. Ct. 739 (2009); Jones v. West, 555 F.3d 90, 96 (2d Cir. 2009); Davis v. Grant, 532 F.3d at 140; Lynn v. Bliden, 443 F.3d 238, 246 (2d Cir. 2006), cert. denied, 549 U.S. 1257, 127 S. Ct. 1383 (2007); Howard v. Walker, 406 F.3d at 122; Parsad v. Greiner, 337 F.3d at 181.

from an <u>incorrect</u> application of federal law." <u>Id</u>.<u>17/</u>  Rather, the issue is "whether the state court's

application of clearly established federal law was objectively unreasonable." <u>Williams</u> v. <u>Taylor</u>,

529 U.S. at 409, 120 S. Ct. at 1521.<u>18/</u>  "Objectively unreasonable" is different from "clear error."

<u>Lockyer</u> v. <u>Andrade</u>, 538 U.S. at 75, 123 S. Ct. at 1175 ("The gloss of clear error fails to give proper

deference to state courts by conflating error (even clear error) with unreasonableness.").  This is a

"substantially higher threshold" than incorrectness.  <u>Renico</u> v. <u>Lett</u>, 130 S. Ct. at 1862; <u>accord</u>, <u>e.g.</u>,

---

<u>17/</u>    See also, <u>e.g.</u>, <u>Renico</u> v. <u>Lett</u>, 130 S. Ct. 1855, 1862 (2010); <u>Waddington</u> v. <u>Sarausad</u>, 129 S. Ct. at 831; <u>Yarborough</u> v. <u>Alvarado</u>, 541 U.S. at 664, 124 S. Ct. at 2150; <u>Wiggins</u> v. <u>Smith</u>, 539 U.S. at 520, 123 S. Ct. at 2535; <u>Price</u> v. <u>Vincent</u>, 538 U.S. at 641, 123 S. Ct. at 1853 ("As we have explained: '[A] federal habeas court may not issue the writ simply because that court concludes that the state-court decision applied [a Supreme Court case] incorrectly.'") (quoting <u>Woodford</u> v. <u>Visciotti</u>, 537 U.S. 19, 24-25, 123 S. Ct. 357, 360 (2002)); <u>Lockyer</u> v. <u>Andrade</u>, 538 U.S. at 75, 123 S. Ct. at 1175; <u>Dunlap</u> v. <u>Burge</u>, 583 F.3d at 165-66 (A "federal court might agree with a petitioner that the relevant federal law should have been interpreted differently than the way it was interpreted by the state court yet still conclude that the state court's application of federal law was not unreasonable."); <u>Brisco</u> v. <u>Ercole</u>, 565 F.3d at 87-88; <u>Jones</u> v. <u>West</u>, 555 F.3d at 96; <u>Davis</u> v. <u>Grant</u>, 532 F.3d at 140; <u>Hawkins</u> v. <u>Costello</u>, 460 F.3d at 243; <u>Lynn</u> v. <u>Bliden</u>, 443 F.3d at 246; <u>Henry</u> v. <u>Poole</u>, 409 F.3d at 68; <u>Howard</u> v. <u>Walker</u>, 406 F.3d at 122; <u>Rosa</u> v. <u>McCray</u>, 396 F.3d at 219; <u>Cox</u> v. <u>Donnelly</u>, 387 F.3d at 197; <u>Eze</u> v. <u>Senkowski</u>, 321 F.3d at 124-25; <u>DelValle</u> v. <u>Armstrong</u>, 306 F.3d at 1200 ("With regard to issues of law, therefore, if the state court's decision was not an unreasonable application of, or contrary to, clearly established federal law as defined by Section 2254(d), we may not grant habeas relief even if in our judgment its application was erroneous.").

<u>18/</u>    Accord, <u>e.g.</u>, <u>Yarborough</u> v. <u>Alvarado</u>, 541 U.S. at 664, 124 S. Ct. at 2150; <u>Wiggins</u> v. <u>Smith</u>, 539 U.S. at 520-21, 123 S. Ct. at 2535; <u>Price</u> v. <u>Vincent</u>, 538 U.S. at 641, 123 S. Ct. at 1853; <u>Lockyer</u> v. <u>Andrade</u>, 538 U.S. at 75, 123 S. Ct. at 1174-75; <u>Woodford</u> v. <u>Visciotti</u>, 537 U.S. at 25-27, 123 S. Ct. at 360-61; <u>Portalatin</u> v. <u>Graham</u>, 2010 WL 4055571 at *7; <u>Dunlap</u> v. <u>Burge</u>, 583 F.3d at 165; <u>Davis</u> v. <u>Grant</u>, 532 F.3d at 140; <u>Mosby</u> v. <u>Senkowski</u>, 470 F.3d 515, 519 (2d Cir. 2006), <u>cert. denied</u>, 552 U.S. 836, 128 S. Ct. 75 (2007); <u>Hawkins</u> v. <u>Costello</u>, 460 F.3d at 243; <u>Lynn</u> v. <u>Bliden</u>, 443 F.3d at 246; <u>Henry</u> v. <u>Poole</u>, 409 F.3d at 68; <u>Howard</u> v. <u>Walker</u>, 406 F.3d at 122; <u>Cox</u> v. <u>Donnelly</u>, 387 F.3d at 197; <u>Eze</u> v. <u>Senkowski</u>, 321 F.3d at 125; <u>Ryan</u> v. <u>Miller</u>, 303 F.3d 231, 245 (2d Cir. 2002); <u>Loliscio</u> v. <u>Goord</u>, 263 F.3d at 184; <u>Lurie</u> v. <u>Wittner</u>, 228 F.3d at 128-29.

Knowles v. Mirzayance, 129 S. Ct. at 1420.[19] "[T]he range of reasonable judgment can depend in part on the nature of the relevant rule." Yarborough v. Alvarado, 541 U.S. at 663, 124 S. Ct. at 2149.[20] "Even if the state court issues a decision 'contrary to' clearly established Supreme Court law, . . . a petitioner 'cannot obtain relief . . . unless application of a *correct* interpretation of that

---

[19]   However, the Second Circuit has explained "that while '[s]ome increment of incorrectness beyond error is required . . . the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence.'" Jones v. Stinson, 229 F.3d at 119 (quoting Francis S. v. Stone, 221 F.3d 100, 111 (2d Cir. 2000)).; accord, e.g., Brisco v. Ercole, 565 F.3d at 88; Jones v. West, 555 F.3d at 96; Brown v. Alexander, 543 F.3d 94, 100 (2d Cir. 2008) ("[W]e have observed that the "unreasonable application 'standard falls somewhere between merely erroneous and unreasonable to all reasonable jurists.'"); Davis v. Grant, 532 F.3d at 140; Lynn v. Bliden, 443 F.3d at 246; Henry v. Poole, 409 F.3d at 68; Howard v. Walker, 406 F.3d at 122; Rosa v. McCray, 396 F.3d at 219; Cox v. Donnelly, 387 F.3d at 197, 200-01; Eze v. Senkowski, 321 F.3d at 125; Ryan v. Miller, 303 F.3d at 245; Yung v. Walker, 341 F.3d at 110; Loliscio v. Goord, 263 F.3d at 184.

[20]   The Supreme Court explained:

> [T]he range of reasonable judgment can depend in part on the nature of the relevant rule. If a legal rule is specific, the range may be narrow. Applications of the rule may be plainly correct or incorrect. Other rules are more general, and their meaning must emerge in application over the course of time. Applying a general standard to a specific case can demand a substantial element of judgment. As a result, evaluating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.

Yarborough v. Alvarado, 541 U.S. at 663, 124 S. Ct. at 2149; accord, e.g., Renico v. Lett, 130 S. Ct. at 1864; Knowles v. Mirzayance, 129 S. Ct. at 1426 (Where the Supreme Court "standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard."); Portalatin v. Graham, 2010 WL 4055571 at *7; Ortiz v. N.Y.S. Parole in Bronx, N.Y., 586 F.3d at 157; Dunlap v. Burge, 583 F.3d at 166; Hawkins v. Costello, 460 F.3d at 243.

[Supreme Court] decision leads to the conclusion that his rights were violated.'" Cousin v. Bennett, 511 F.3d 334, 339 (2d Cir.), cert. denied, 128 S. Ct. 2910 (2008).

Moreover, the Second Circuit has held "that a state court determination is reviewable under AEDPA if the state decision unreasonably failed to extend a clearly established, Supreme Court defined, legal principle to situations which that principle should have, in reason, governed." Kennaugh v. Miller, 289 F.3d at 45.[21/]

Under the AEDPA, in short, the federal courts "must give the state court's adjudication a high degree of deference." Yung v. Walker, 341 F.3d at 109; accord, e.g., Renico v. Lett, 130 S. Ct. at 1858 ("AEDPA thus imposes a 'highly deferential standard for evaluating state court rulings,' and 'demands that state-court decisions be given the benefit of the doubt.'") (citations omitted); Bell v. Cone, 543 U.S. at 455, 125 S. Ct. at 853; Mosby v. Senkowski, 470 F.3d at 519. "[I]t is the petitioner's burden to demonstrate that the state court applied the relevant clearly established law to the record in an unreasonable manner." Acosta v. Artuz, 575 F.3d 177, 184 (2d Cir. 2009); accord, e.g., Georgison v. Donelli, 588 F.3d at 154.

---

[21/]    Accord, e.g., Bierenbaum v. Graham, 607 F.3d at 47-48; Davis v. Grant, 532 F.3d at 140-41; Tueros v. Greiner, 343 F.3d at 591; Yung v. Walker, 341 F.3d at 109; see Yarborough v. Alvarado, 541 U.S. at 665-66, 124 S. Ct. at 2150-51 ("The petitioner contends that if a habeas court must extend a rationale before it can apply to the facts at hand then the rationale cannot be clearly established at the time of the state-court decision.  There is force to this argument.  Section 2254(d)(1) would be undermined if habeas courts introduced rules not clearly established under the guise of extensions to existing law.  At the same time, the difference between applying a rule and extending it is not always clear.  Certain principles are fundamental enough that when new factual permutations arise, the necessity to apply the earlier rule will be beyond doubt.") (citations omitted).

Even where the state court decision does not specifically refer to either the federal claim or to relevant federal case law, the deferential AEDPA review standard applies:

> For the purposes of AEDPA deference, a state court "adjudicate[s]" a state prisoner's federal claim on the merits when it (1) disposes of the claim "on the merits," and (2) reduces its disposition to judgment.  When a state court does so, a federal habeas court must defer in the manner prescribed by 28 U.S.C. § 2254(d)(1) to the state court's decision on the federal claim – even if the state court does not explicitly refer to either the federal claim or to relevant federal case law.

Sellan v. Kuhlman, 261 F.3d at 312; accord, e.g., Bell v. Cone, 543 U.S. at 455, 125 S. Ct. at 853 ("Federal courts are not free to presume that a state court did not comply with constitutional dictates on the basis of nothing more than a lack of citation."); Early v. Packer, 537 U.S. 3, 8, 123 S. Ct. 362, 365 (2002) (State court not required to cite Supreme Court cases, or even be aware of them, to be entitled to AEDPA deference, "so long as neither the reasoning nor the result of the state-court decision contradicts them."); Wilson v. Mazzuca, 570 F.3d 490, 499 (2d Cir. 2009) ("Where, as here, 'a state court fails to articulate the rationale underlying its rejection of a petitioner's claim, and when that rejection is on the merits, the federal court will focus its review on whether the state court's ultimate decision was an unreasonable application of clearly established Supreme Court precedent.'").[22/]  Even if the federal court holds an evidentiary hearing, the deferential AEDPA

---

[22/]  See also, e.g., Mosby v. Senkowski, 470 F.3d at 519; Hawkins v. Costello, 460 F.3d at 243; Lynn v. Bliden, 443 F.3d at 246; Howard v. Walker, 406 F.3d at 122; Rosa v. McCray, 396 F.3d at 220; Wade v. Herbert, 391 F.3d 135, 140 (2d Cir. 2004) (Appellate Division held claim was "'without merit.'"  "Such a summary determination, even absent citation of federal case law, is a determination 'on the merits' and as such requires the deference specified by § 2254."  Moreover, "if any reasonable ground was available [for the state court's decision], we must assume the [state] court relied on it."); Francolino v. Kuhlman, 365 F.3d 137, 141 (2d Cir.) (Where "the Appellate Division concluded its opinion by stating that it had 'considered and rejected defendants' remaining claims,'" AEDPA deference applies.), cert.
(continued...)

review standard applies.  Wilson v. Mazzuca, 570 F.3d at 501-02 ("Where . . . a district court has performed additional fact finding, the court must then ask whether the state court's decision 'was contrary to, or involved an unreasonable application of, clearly established Federal law,' . . . in light of any newly-discovered facts. . . . [W]e are directed to apply the same AEDPA standard that would otherwise be in force, now in light of the new information that has been obtained through a § 2254(e) hearing.").

Where the state court decision is not clear as to whether it rests on federal law or state procedural law, the Second Circuit in Jimenez v. Walker, 458 F.3d 130, 145-46 (2d Cir. 2006), cert. denied, 549 U.S. 1133, 127 S. Ct. 976 (2007), instructed that the court must "examine the three clues laid out in Coleman, Quirama and Sellan" – that is, "(1) the face of the state-court opinion, (2) whether the state court was aware of a procedural bar, and (3) the practice of state courts in similar circumstances."  Jimenez v. Walker, 458 F.3d at 145 & n.16; accord, e.g., Clark v. Perez, 510 F.3d 382, 394 (2d Cir.), cert. denied, 129 S. Ct. 130 (2008).  Using these three factors, the court should classify the decision as either:

> (1)    fairly appearing to rest primarily on federal law or to be interwoven with federal law or
>
> (2)    fairly appearing to rest primarily on state procedural law.

Absent a clear and express statement of reliance on a state procedural bar, the Harris presumption applies to decisions in the first category and deems them to rest on the merits of the federal claim.  Such decisions are not procedurally barred and

---

22/    (...continued)
      denied, 543 U.S. 872, 125 S. Ct. 110 (2004); Jenkins v. Artuz, 294 F.3d 284, 291 (2d Cir. 2002) ("In Sellan, we found that an even more concise Appellate Division disposition – the word 'denied' – triggered AEDPA deference.").

must be afforded AEDPA deference as adjudications "on the merits" under 28 U.S.C. § 2254(d).  The Harris presumption does not apply to decisions in the second category, which show themselves to rest on an independent state procedural bar.  Nor does it apply to decisions in the first category which contain a clear statement of reliance on a state procedural bar.  No AEDPA deference is due to these decisions, but the state may successfully assert that habeas relief is foreclosed provided that the independent state procedural bar is adequate to support the judgment and that neither cause and prejudice nor a fundamental miscarriage of justice is shown.

       The effect of these rules is to present federal habeas courts with a binary circumstance: we either apply AEDPA deference to review a state court's disposition of a federal claim or refuse to review the claim because of a procedural bar properly raised.  The middle ground . . . does not exist.

Jimenez v. Walker, 458 F.3d at 145-46  (citations & fns. omitted); accord, e.g., Hawkins v. Costello, 460 F.3d at 242 ("In Jimenez v. Walker, we recently made clear that when a state court rejects a petitioner's claim as either unpreserved or without merit, the conclusive presumption is that the adjudication rested on the merits.").  Of course, "[i]f there is no [state court] adjudication on the merits [and no procedural bar], then the pre-AEDPA, de novo standard of review applies."  Cotto v. Herbert, 331 F.3d 217, 230 (2d Cir. 2003); see also Wilson v. Mazzuca, 570 F.3d at 500 n.8; Jimenez v. Walker, 458 F.3d at 145 n.17.

       Finally, "[i]f [the] court finds that the state court engaged in an unreasonable application of established law, resulting in constitutional error, it must next consider whether such error was harmless."  Howard v. Walker, 406 F.3d at 122.

       In addition to the standard of review of legal issues, the AEDPA provides a deferential review standard for state court factual determinations:  "a determination of a factual issue made by a State court shall be presumed to be correct."  28 U.S.C. § 2254(e)(1); accord, e.g., Bierenbaum v. Graham, 607 F.3d at 48; Lynn v. Bliden, 443 F.3d at 246-47; Rosa v. McCray, 396

F.3d at 220.  "The petitioner bears the burden of 'rebutting the presumption of correctness by clear and convincing evidence.'" Parsad v. Greiner, 337 F.3d at 181 (quoting § 2254(e)(1)); accord, e.g., Bierenbaum v. Graham, 607 F.3d at 48 ("A state court's determination of a factual issue is presumed to be correct, and may only be rebutted by clear and convincing evidence."); Brown v. Alexander, 543 F.3d at 100; Lynn v. Bliden, 443 F.3d at 246-47.

## II.   JACKSON'S FIRST THROUGH FIFTH HABEAS GROUNDS ARE UNEXHAUSTED BUT DEEMED EXHAUSTED AND PROCEDURALLY BARRED

### A.   The Exhaustion Doctrine:  Background

Section 2254 codifies the exhaustion requirement, providing that "[a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that – (A) the applicant has exhausted the remedies available in the courts of the State. . . ." 28 U.S.C. § 2254(b)(1)(A).[23/]  As the Supreme Court has made clear, "[t]he exhaustion doctrine is principally designed to protect the state courts' role in the enforcement of federal law and prevent disruption of state judicial proceedings." Rose v. Lundy, 455 U.S. at 518, 102 S. Ct. at 1203; accord, e.g., O'Sullivan v. Boerckel,  526 U.S. at 845, 119 S. Ct. at 1732.

The Second Circuit determines whether a claim has been exhausted by applying a two-step analysis:

---

[23/]    See, e.g., O'Sullivan v. Boerckel, 526 U.S. 838, 842, 119 S. Ct. 1728, 1731 (1999); Rose v. Lundy, 455 U.S. 509, 515-16, 102 S. Ct. 1198, 1201 (1982) ("The exhaustion doctrine existed long before its codification by Congress in 1948" in 28 U.S.C. § 2254.); Picard v. Connor, 404 U.S. 270, 275, 92 S. Ct. 509, 512 (1971); Bossett v. Walker, 41 F.3d 825, 828 (2d Cir. 1994), cert. denied, 514 U.S. 1054, 115 S. Ct. 1436 (1995); Pesina v. Johnson, 913 F.2d 53, 54 (2d Cir. 1990); Daye v. Attorney Gen., 696 F.2d 186, 190-94 (2d Cir. 1982) (en banc), cert. denied, 464 U.S. 1048, 104 S. Ct. 723 (1984).

> First, the petitioner must have fairly presented to an appropriate state court the same federal constitutional claim that he now urges upon the federal courts. . . . Second, having presented his federal constitutional claim to an appropriate state court, and having been denied relief, the petitioner must have utilized all available mechanisms to secure [state] appellate review of the denial of that claim.

Diaz v. Coombe, 97 Civ. 1621, 1997 WL 529608 at *3 (S.D.N.Y. June 12, 1997) (Mukasey, D.J. & Peck, M.J.); accord, e.g., O'Sullivan v. Boerckel, 526 U.S. at 843-48, 119 S. Ct. at 1732-34.

"The exhaustion requirement is not satisfied unless the federal claim has been 'fairly presented' to the state courts."  Daye v. Attorney Gen., 696 F.2d at 191.[24/]  The Second Circuit has held that a federal habeas petitioner must have alerted the state appellate court that a federal constitutional claim is at issue.  E.g., Cox v. Miller, 296 F.3d at 99; Jones v. Vacco, 126 F.3d at 413-14; Grady v. LeFevre, 846 F.2d 862, 864 (2d Cir. 1988); Petrucelli v. Coombe, 735 F.2d 684, 688-89 (2d Cir. 1984); Daye v. Attorney Gen., 696 F.2d at 191.  In Daye, the Second Circuit en banc stated:

> [T]he ways in which a state defendant may fairly present to the state courts the constitutional nature of his claim, even without citing chapter and verse of the Constitution, include (a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis in like fact situations, (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, and (d) allegation of a pattern of facts that is well within the mainstream of constitutional litigation.

---

[24/]   Accord, e.g., O'Sullivan v. Boerckel, 526 U.S. at 844, 119 S. Ct. at 1732; Picard v. Connor, 404 U.S. at 275-76, 92 S. Ct. at 512; Jones v. Keane, 329 F.3d 290, 294-95 (2d Cir.), cert. denied, 540 U.S. 1046, 124 S. Ct. 804 (2003); Cox v. Miller, 296 F.3d 89, 99 (2d Cir. 2002), cert. denied, 537 U.S. 1192, 123 S. Ct. 1273 (2003); Jones v. Vacco, 126 F.3d 408, 413 (2d Cir. 1997).

Daye v. Attorney Gen., 696 F.2d at 194.[25]

        The Supreme Court has confirmed the long-held view of the Second Circuit that "a state prisoner must present his claims to a state supreme [i.e., highest] court in a petition for discretionary review in order to satisfy the exhaustion requirement."  O'Sullivan v. Boerckel, 526 U.S. at 839-40, 119 S. Ct. at 173.[26]

---

[25]    Accord, e.g., Smith v. Duncan, 411 F.3d 340, 348 (2d Cir. 2005); Jackson v. Edwards, 404 F.3d 612, 618 (2d Cir. 2005); Rosa v. McCray, 396 F.3d 210, 217-18 (2d Cir.), cert. denied, 546 U.S. 889, 126 S. Ct. 215 (2005); St. Helen v. Senkowski, 374 F.3d 181, 182-83 (2d Cir. 2004), cert. denied, 543 U.S. 1058, 125 S. Ct. 871 (2005); Cox v. Miller, 296 F.3d at 99; Ramirez v. Attorney Gen., 280 F.3d 87, 95 (2d Cir. 2001); Levine v. Comm'r of Corr. Servs., 44 F.3d 121, 124 (2d Cir. 1995), cert. denied, 520 U.S. 1106, 117 S. Ct. 1112 (1997); Grady v. LeFevre, 846 F.2d at 864; Garofolo v. Coomb, 804 F.2d 201, 206 (2d Cir. 1986); Petrucelli v. Coombe, 735 F.2d at 688.

[26]    Accord, e.g., Rosa v. McCray, 396 F.3d at 217; Galdamez v. Keane, 394 F.3d 68, 73 (2d Cir.), cert. denied, 544 U.S. 1025, 125 S. Ct. 1996 (2005); Calderon v. Keane, 115 F. App'x 455, 457 (2d Cir. 2004); Cotto v. Herbert, 331 F.3d 217, 237 (2d Cir. 2003); Ramirez v. Attorney Gen., 280 F.3d at 94; Jordan v. LeFevre, 206 F.3d 196, 198 (2d Cir. 2000); Morgan v. Bennett, 204 F.3d 360, 369 (2d Cir.), cert. denied, 531 U.S. 819, 121 S. Ct. 59 (2000); Bossett v. Walker, 41 F.3d at 828 ("To fulfill the exhaustion requirement, a petitioner must have presented the substance of his federal claims 'to the highest court of the pertinent state.'"); Grey v. Hoke, 933 F.2d 117, 119 (2d Cir. 1991) ("a petitioner must present his federal constitutional claims to the highest court of the state before a federal court may consider the merits of the petition"); Pesina v. Johnson, 913 F.2d at 54 ("We have held that the exhaustion requirement mandates that federal claims be presented to the highest court of the pertinent state before a federal court may consider the petition," citing Daye); Daye v. Attorney Gen., 696 F.2d at 191 n.3 ("Exhaustion of available state remedies requires presentation of the claim to the highest state court from which a decision can be had.").

**B.**     **Application to Jackson's Claims**

As noted above, Jackson's habeas petition raises eight claims – seven claims raised on direct appeal and an additional claim (of ineffective assistance of trial counsel) raised in his C.P.L. § 440 motion.[27/]  Of the seven claims raised on direct appeal before the First Department, only three were raised to the New York Court of Appeals through appellate counsel's leave letter: the Sandoval claim (Habeas Ground One), the threat evidence claim (Habeas Ground Three), and the challenge to the discretionary persistent felony offender sentencing statute (Habeas Ground Seven).  (Dkt. No. 17: Dannelly Aff. Ex. F: 12/14/07 Ct. App. Leave Letter at 2-9.)  Appellate counsel, however, did attach "a set of the briefs filed in the Appellate Division" to his leave letter. (12/14/07 Ct. App. Leave Letter at 1.)

Merely attaching his First Department briefs is not sufficient to have exhausted Habeas Grounds Two (impeachment with grand jury testimony), Four (uncharged crimes evidence) and Five (insufficiency of the evidence) in the New York Court of Appeals, in light of the lengthy discussion of Habeas Grounds One, Three and Seven in Jackson's leave to appeal letter.  In Grey v. Hoke, the petitioner argued one claim in his leave to appeal letter to the New York Court of Appeals, and also attached his Appellate Division briefs, which had raised that issue plus two others.  Grey v. Hoke, 933 F.2d 117, 120 (2d Cir. 1991).  The Second Circuit held that the claims referred to only in his attached briefs were not exhausted:

---

[27/]     The State concedes that Jackson's ineffective assistance claim (Habeas Ground Six), raised in his C.P.L. § 440 motion, was properly exhausted before the New York courts.  (Dkt. No. 16: State Br. at 43.)

       Petitioner argues that by attaching his Appellate Division brief to his letter application to the Court of Appeals, he presented that court with an opportunity to rule on his sentencing and prosecutorial misconduct claims.  He concedes, however, that his letter application requested that the Court of Appeals review only the search and seizure claim.  The letter made no mention of the sentencing and prosecutorial misconduct claims.   Under these circumstances, we disagree with petitioner's assertion that the Court of Appeals was presented with his sentencing and prosecutorial misconduct claims.

       <u>The fair import of petitioner's submission to the Court of Appeals, consisting of his brief to the Appellate Division that raised three claims and a letter to the Court of Appeals arguing only one of them, was that the other two had been abandoned. The only possible indication that the other two claims were being pressed was the inclusion of a lengthy brief originally submitted to another court.  This did not fairly apprise the court of the two claims.  We decline to presume that the New York Court of Appeals has "a duty to look for a needle in a paper haystack."</u>  For a federal court to hold that a state court had the opportunity to rule on a constitutional claim as to which no ruling was requested, and then to rule on the merits of the claim itself, would undermine the very considerations of comity that the rules of exhaustion were designed to protect.

<u>Grey</u> v. <u>Hoke</u>, 933 F.2d at 120 (emphasis added & citations omitted).

      Subsequent to <u>Grey</u> v. <u>Hoke</u>, in <u>Jordan</u> v. <u>LeFevre</u>, 22 F. Supp. 2d 259, 267 (S.D.N.Y. 1998) (Mukasey, D.J. & Peck, M.J.), <u>aff'd on this ground, rev'd on other grounds</u>, 206 F.3d 196, 198-99 (2d Cir. 2000), the petitioner clearly raised his <u>Batson</u> claim in his letter seeking leave to appeal to the New York Court of Appeals, but, "[a]fter discussing the <u>Batson</u> issue at length, Jordan's counsel asked for leave to appeal '[f]or all of these reasons and the reasons set forth in his Appellate Division briefs,' and noted that '[i]n support of his application, Mr. Jordan relies on this letter and on the briefs he filed in the Appellate Division.'"  <u>Jordan</u> v. <u>LeFevre</u>, 22 F. Supp. 2d at 267.  This Court held the non-<u>Batson</u> claims to be unexhausted, and the Second Circuit affirmed that view, explaining that "arguing one claim in his letter while attaching an appellate brief without explicitly alerting the state court to each claim raised does not fairly present such claims for purposes of the

exhaustion requirement underlying federal habeas jurisdiction . . . . <u>Counsel may not transfer to the state courts the duty to comb through an applicant's appellate brief to seek and find arguments not expressly pointed out in the application for leave</u>." <u>Jordan</u> v. <u>LeFevre</u>, 206 F.3d at 199 (emphasis added). The Second Circuit affirmed the exhaustion issue "substantially for the reasons set out in [this Court's] thorough opinion and order . . . . <u>Jordan</u> v. <u>LeFevre</u>, 22 F. Supp. 2d 259, 266-69 (S.D.N.Y.1998)." <u>Jordan</u> v. <u>LeFevre</u>, 206 F.3d at 199.

      Other Second Circuit[28/] and district court decisions within the Circuit[29/] have

---

[28/]    <u>See</u>, <u>e.g.</u>, <u>Ramirez</u> v. <u>Attorney Gen.</u>, 222 F. App'x 80, 81-82 (2d Cir. 2007) (denying review of petitioner's claim where a "bare citation" to a page of App. Div. briefs in petitioner's application for leave to appeal did not provide a "sufficient factual basis for that claim"); <u>Brown</u> v. <u>Senkowski</u>, 152 F. App'x 15, 18 (2d Cir. 2005) (Petitioner's inclusion of App. Div. briefs to the Court of Appeals "did not alert the Court of Appeals as to the federal nature of his claim"), <u>cert. denied</u>, 546 U.S. 1189, 126 S. Ct. 1375 (2006); <u>Smith</u> v. <u>Duncan</u>, 411 F.3d 340, 345 (2d Cir. 2005) (following <u>Grey</u> v. <u>Hoke</u> in denying petitioner's claim because he had not raised it in his leave to appeal letters to the Court of Appeals although he had attached his App. Div. briefs); <u>DiGuglielmo</u> v. <u>Smith</u>, 366 F.3d 130, 134-35 (2d Cir. 2004) (declining petitioner's request to overrule the <u>Grey</u> v. <u>Hoke</u> and <u>Jordan</u> v. <u>LeFevre</u> principle that merely attaching an appellate brief without explicitly alerting the New York Court of Appeals to each claim raised does not fairly present such claims for exhaustion purposes); <u>DiGuglielmo v. Senkowski</u>, 42 F. App'x 492, 495 (2d Cir. 2002) (leave application that "fully argued several state law claims and then made only a passing reference to other arguments raised in supplemental materials" was "inadequate to alert the New York Court of Appeals to other claims found in his Appellate Division materials" and therefore "'[did] not fairly present such claims for purposes of the exhaustion requirement underlying federal habeas jurisdiction.'") (quoting <u>Jordan</u> v. <u>LeFevre</u>, 206 F.3d at 199); <u>Ramirez</u> v. <u>Attorney Gen.</u>, 280 F.3d 87, 97 (2d Cir. 2001) (citation to petitioner's attached App. Div. brief referring only to "this issue" "was not, therefore, a request 'to consider and review' other issues raised in the referenced points of the brief." "References to attached briefs without more will preserve issues only if the Court of Appeals is clearly informed that the reference is asserting issues in those briefs as bases for granted leave to appeal.").

[29/]    <u>See</u>, <u>e.g.</u>, <u>Hayward</u> v. <u>Brown</u>, 09 Civ. 6495, 2010 WL 2629037 at *27-28 & nn.49-50 (S.D.N.Y. July 1, 2010) (Peck, M.J.) (citing cases); <u>Brown</u> v. <u>Perlman</u>, 07 Civ. 8672, 2008
                                             (continued...)

---

29/    (...continued)
WL 2009220 at *2 & n.36 (S.D.N.Y. May 8, 2008) (Peck, M.J.) (citing cases), report & rec. adopted, 2008 WL 2545066 (S.D.N.Y. June 23, 2008); Hornedo v. Artus, No. 04-CV-3201, 2008 WL 346360 at *9 n.11 (E.D.N.Y. Feb. 6, 2008) (petitioner did not fulfill the exhaustion requirement by merely attaching his App. Div. briefs to his application to the Court of Appeals); Marshall v. McLaughlin, 04 Civ. 10154, 2007 WL 2438380 at *7 (S.D.N.Y. Aug. 24, 2007) (following Jordan); Bailey v. Ercole, 06 Civ. 5811, 2007 WL 4707738 at *11 (S.D.N.Y. Aug. 17, 2007) (merely enclosing App. Div. briefs in leave letter arguing only one claim does not fairly apprise the Court of Appeals that petitioner means to bring all the claims raised in his briefs); Chung v. Filion, No. 03-CV-1913, 2007 WL 749725 at *3 (E.D.N.Y. Mar. 7, 2007) ("Petitioner's letters plainly demonstrate that the New York State Court of Appeals did not have a fair opportunity to consider his claims" when petitioner argued one claim and only made a passing reference to his attached briefs); Fabricio v. Artus, 06 Civ. 2049, 2007 WL 119462 at *4 (S.D.N.Y. Jan. 11, 2007) ("Case law makes clear that where a defendant seeking leave to appeal addresses a specific issue or issues in his leave letter, the mere enclosure of the Appellate Division briefs is insufficient to constitute exhaustion of any additional issues."), report & rec. adopted, 2009 WL 928039 (S.D.N.Y. Mar. 12, 2009); Lopez v. Fischer, 05 Civ. 2558, 2006 WL 2996548 at *5-6 (S.D.N.Y. Oct. 16, 2006); Oquendo v. Senkowski, 452 F. Supp. 2d 359, 367 (S.D.N.Y. 2006) ("When a petitioner's appeal application letter mentions some of his claims while an attached brief details other[s], the claims not mentioned in the application letter are not fairly presented," even where App. Div. briefs are enclosed.); Williams v. Phillips, 433 F. Supp. 2d 303, 317-18 (W.D.N.Y. 2006); Martinez v. Kelly, 01 Civ. 11570, 2005 WL 1863854 at *7 (S.D.N.Y. Aug. 4, 2005), aff'd, No. 05-4714, 253 F. App'x 127, 2007 WL 3256830 (2d Cir. Nov. 6, 2007), cert. denied, 129 S. Ct. 111 (2008); Gillespie v. Miller, 04 Civ. 0295, 2004 WL 1689735 at *11 (S.D.N.Y. July 29, 2004) (Peck, M.J.) (Reference to petitioner's supplemental pro se 1st Dep't brief "is not sufficient to have exhausted the claims in the New York Court of Appeals, especially in light of the lengthy discussion of the two separate claims by his appellate counsel."); Figueroa v. Greiner, 02 Civ. 2126, 2002 WL 31356512 at *12-13 (S.D.N.Y. Oct. 18, 2002) (Peck, M.J.) (merely attaching and mentioning 1st Dep't brief is not sufficient to exhaust claims in the New York Court of Appeals especially in light of lengthy discussion of other claim); Cook v. Pearlman, 212 F. Supp. 2d 258, 263 (S.D.N.Y. 2002) (where petitioner's attached appellate brief raised three grounds for reversal, but his application only argued one of those grounds, the other two claims were not fairly presented to the Court of Appeals); Valdez v. Mazzuca, No. 00-CV-4961, 2002 WL 1364089 at * 2 (E.D.N.Y. June 21, 2002) ("petitioner did not fairly present his ineffective assistance of trial counsel claim to the New York Court of Appeals because petitioner's application for leave to appeal discusses another claim but does not mention the ineffective assistance of trial counsel claim"); Fernandez v. Artuz, 97 Civ. 2989, 2002 WL 977372 at * 2 (S.D.N.Y. May

(continued...)

applied <u>Grey</u> and <u>Jordan</u> to situations where the defendant discussed one or more issues at length and also referred to enclosed Appellate Division briefs, without specifically asking the Court of Appeals to review other issues in the enclosed briefs.

Here, as in <u>Grey</u>, <u>Jordan</u> and their progeny, Jackson's attachment of his First Department briefs is insufficient to put the New York Court of Appeals on notice that it should review the additional claims in his First Department briefs, and would require state courts to look for a "needle in a hay stack" while a petitioner argues "one claim in his letter while attaching an appellate brief without explicitly alerting the state court to each claim." <u>Jordan</u> v. <u>LeFevre</u>, 206 F.3d

---

<u>29/</u>       (...continued)
9, 2002) (Petitioner failed to exhaust all other claims when he "only argued his confrontation claim to the New York Court of Appeals[,] . . . did not refer to any other claim in his leave application[, and] . . . merely stated that the Court of Appeals should grant his leave application '[f]or all of the foregoing reasons stated in appellant's brief.'"), <u>aff'd</u>, 82 F. App'x 48 (2d Cir. 2003), <u>cert. denied</u>, 541 U.S. 950, 124 S. Ct. 1687 (2004); <u>Simpson</u> v. <u>Miller</u>, No. 97-CV-2203, 2002 WL 923913 at *6 (E.D.N.Y. Apr. 30, 2002) (because "petitioner's application for leave to appeal discuss[ed] two other claims but [did] not mention the improper jury instruction and prosecutorial misconduct claims[,]" the latter two claims were not fairly presented to the Court of Appeals); <u>Campos</u> v. <u>Portuondo</u>, 193 F. Supp. 2d 735, 745 (S.D.N.Y. 2002) (Petitioner's "discussion of his single claim at length along with the submission attaching a brief containing additional claims '[did] not fairly apprise the state court of those remaining claims.'"), <u>aff'd</u>, 320 F.3d 185 (2d Cir.), <u>cert. denied</u>, 540 U.S. 958, 124 S. Ct. 415 (2003); <u>Bailey</u> v. <u>People</u>, 01 Civ. 1179, 2001 WL 640803 at *4-5 (S.D.N.Y. June 8, 2001) (Peck, M.J.) (petitioner's "mere enclosure of his Appellate Division briefs in his leave to appeal application, while discussing a single claim at length, is not sufficient" to have exhausted his other claims); <u>Kirby</u> v. <u>Senkowski</u>, 141 F. Supp. 2d 383, 391-93 (S.D.N.Y. 2001) (sufficiency of evidence claim unexhausted where petitioner submitted App. Div. briefs to Court of Appeals but failed to mention that claim anywhere in follow up leave letter which focused on other unrelated claims), <u>aff'd</u>, 61 F. App'x 765 (2d Cir. 2003); <u>Snead</u> v. <u>Artuz</u>, 99 Civ. 2406, 2001 WL 199409 at *3-4 (S.D.N.Y. Feb. 28, 2001) (where petitioner raised only one issue in leave to appeal letter, other issues unexhausted even though discussed in App. Div. brief accompanying letter); <u>Perez</u> v. <u>Greiner</u>, 99 Civ. 11806, 2000 WL 915114 at *3-6 (S.D.N.Y. July 5, 2000) (Peck, M.J.) (lengthy discussion of one issue plus submission of 1st Dep't briefs not sufficient to exhaust the issues raised only in the brief).

at 198-99.  Thus, Jackson did not fairly present Habeas Grounds Two, Four and Five to the New York Court of Appeals.

"'For exhaustion purposes, "a federal habeas court need not require that a federal claim be presented to a state court if it is clear that the state court would hold the claim procedurally barred."'" <u>Reyes</u> v. <u>Keane</u>, 118 F.3d 136, 139 (2d Cir. 1997) (quoting <u>Grey</u> v. <u>Hoke</u>, 933 F.2d at 120) (quoting <u>Harris</u> v. <u>Reed</u>, 489 U.S. 255, 263 n.9, 109 S. Ct. 1038, 1043 n.9 (1989))).[30/]  "In such a case, a petitioner no longer has 'remedies available in the courts of the State' within the meaning of 28 U.S.C. § 2254(b)." <u>Grey</u> v. <u>Hoke</u>, 933 F.2d at 120.  Consequently, such procedurally barred claims are "deemed exhausted" by the federal courts. <u>E.g.</u>, <u>St. Helen</u> v. <u>Senkowski</u>, 374 F.3d at 183; <u>DiGuglielmo</u> v. <u>Smith</u>, 366 F.3d at 135; <u>McKethan</u> v. <u>Mantello</u>, 292 F.3d at 122-23; <u>Ramirez</u> v. <u>Attorney Gen.</u>, 280 F.3d at 94; <u>Reyes</u> v. <u>Keane</u>, 118 F.3d at 139; <u>Bossett</u> v. <u>Walker</u>, 41 F.3d at 828; <u>Washington</u> v. <u>James</u>, 996 F.2d 1442, 1446-47 (2d Cir. 1993), <u>cert. denied</u>, 510 U.S. 1078, 114 S. Ct. 895 (1994); <u>Grey</u> v. <u>Hoke</u>, 933 F.2d at 120-21.

---

[30/]  Accord, <u>e.g.</u>, <u>Castille</u> v. <u>Peoples</u>, 489 U.S. 346, 350, 109 S. Ct. 1056, 1059 (1989) ("It would be inconsistent with [§ 2254(b)], as well as with underlying principles of comity, to mandate recourse to state collateral review whose results have effectively been predetermined"); <u>St. Helen</u> v. <u>Senkowski</u>, 374 F.3d 181, 183 (2d Cir. 2004) ("even if a federal claim has not been presented to the highest state court or preserved in lower state courts under state law, it will be deemed exhausted if it has become procedurally barred under state law."), <u>cert. denied</u>, 543 U.S. 1058, 1255 S. Ct. 871 (2005); <u>DiGuglielmo</u> v. <u>Smith</u>, 366 F.3d at 135 (petitioner's procedurally defaulted claims deemed exhausted where he could no longer obtain state-court review because of his procedural default); <u>McKethan</u> v. <u>Mantello</u>, 292 F.3d 119, 122-23 (2d Cir. 2002) (claims deemed exhausted where they were "procedurally barred for not having been raised in a timely fashion"), <u>cert. denied</u>, 129 S. Ct. 233 (2008); <u>Ramirez</u> v. <u>Attorney Gen.</u>, 280 F.3d at 94; <u>Bossett</u> v. <u>Walker</u>, 41 F.3d 825, 828 (2d Cir. 1994) ("[I]f the petitioner no longer has 'remedies available' in the state courts under 28 U.S.C. § 2254(b), we deem the claims exhausted."), <u>cert. denied</u>, 514 U.S. 1054, 115 S. Ct. 1436 (1995).

As the Second Circuit has explained:

> In New York, to invoke "one complete round of the State's established appellate review process," a criminal defendant must first appeal his or her conviction to the Appellate Division, and then must seek further review of that conviction by applying to the Court of Appeals for a certificate granting leave to appeal.

Galdamez v. Keane, 394 F.3d 68, 74 (2d Cir.) (citation omitted; quoting O'Sullivan v. Boerckel, 526 U.S. 838, 845, 119 S. Ct. 1728, 1732 (1999)), cert. denied, 544 U.S. 1025, 125 S. Ct. 1996 (2005).

In this case, it is clear that Jackson is now barred from raising Habeas Grounds Two, Four and Five before the New York Court of Appeals since he has already used his one opportunity for leave to appeal to that court.  See N.Y. Comp. Codes R. & Regs. tit. 22, § 500.20(a)(2) (permitting only one application for leave to appeal).[31/]  Moreover, New York court rules provide that the leave application "shall indicate . . . the grounds upon which leave to appeal is sought. Particular written attention shall be given to reviewability and preservation of error, identifying and reproducing the particular portions of the record where the questions sought to be reviewed are raised and preserved."  See N.Y. Comp. Codes R. & Regs. tit. 22, § 500.20(a)(4).  "Generally 'we assume that the [New York] Court of Appeals would construe a petitioner's leave application as

---

[31/]  Since these claims are record based, Jackson cannot raise them in a C.P.L. § 440 motion (see C.P.L. § 440.10(2)(c) (barring a collateral attack on claims that could have been raised on direct appeal)), a writ of error coram nobis (see Aparicio v. Artuz, 269 F.3d 78, 87 n.1 (2d Cir. 2001) (coram nobis relief only available for claims of ineffective assistance of appellate counsel)), or a state petition for a writ of habeas corpus (see People ex rel. Thorpe v. Smith, 67 A.D.3d 1135, 1135, 887 N.Y.S.2d 874, 874 (3d Dep't 2009) ("It is well settled that [state] habeas corpus relief is unavailable with respect to matters that could have been raised on direct appeal or in the context of a CPL article 440 motion."), appeal denied, 14 N.Y.3d 705, 899 N.Y.S.2d 129 (2010)).

abandoning claims that the petitioner had pressed to the Appellate Division below' where those claims were not presented to the New York high court for review." Smith v. Duncan, 411 F.3d 340, 345 (2d Cir. 2005). Therefore, Habeas Grounds Two (Sandoval ruling), Four (uncharged crime) and Five (sufficiency of the evidence) should be denied as unexhausted but deemed exhausted and procedurally barred from habeas review.  See, e.g., Washington v. James, 996 F.2d at 1447 ("Because he failed to raise his claim in state court and no longer may do so, his claim is procedurally defaulted.").[32/]

---

[32/]   See also, e.g., Galdamez v. Keane, 394 F.3d at 73-74 ("a petitioner cannot claim to have exhausted his or her remedies by dint of no longer possessing 'the right under the law of the State to raise, by any available procedure, the question presented,' if at some point the petitioner had that right but failed to exercise it.") (citation omitted), cert. denied, 544 U.S. 1025, 125 S. Ct. 1996 (2005); DiGuglielmo v. Smith, 366 F.3d at 135 (Second Circuit affirmed denial of petitioner's habeas claim because "his claims were not properly exhausted and . . . his procedural default is not excusable."); Jones v. Keane, 329 F.3d 290, 296 (2d Cir.) ("[Petitioner] has procedurally defaulted his vagueness claim since New York's procedural rules now bar [petitioner] from raising it in New York courts. Further direct review by the Court of Appeals is no longer available. . . ."), cert. denied, 540 U.S. 1046, 124 S. Ct. 804 (2003); Reyes v. Keane, 118 F.3d at 139 ("Section 440.10(2)(c) of New York's Criminal Procedure Law mandates that the state court deny any 440.10 motion where the defendant unjustifiably failed to argue such constitutional violation on direct appeal despite a sufficient record.") (emphasis added).

     To avoid a procedural default on his unexhausted claims, Jackson would have to "show 'cause' for the default and 'prejudice attributable thereto,' or demonstrate that failure to consider the federal claims will result in a 'fundamental miscarriage of justice,'" i.e., a showing of "actual innocence." Harris v. Reed, 489 U.S. at 262, 109 S. Ct. at 1043 (citations omitted); accord, e.g., Schlup v. Delo, 513 U.S. 298, 324-27, 115 S. Ct. 851, 865-67 (1995); Coleman v. Thompson, 501 U.S. 722, 735, 111 S. Ct. 2546, 2557 (1991); see also, e.g., Messiah v. Duncan, 435 F.3d 186, 195 (2d Cir. 2006); Green v. Travis, 414 F.3d 288, 294 (2d Cir. 2005); Smith v. Duncan, 411 F.3d at 347; DeBerry v. Portuondo, 403 F.3d 57, 64 (2d Cir.), cert. denied, 546 U.S. 884, 126 S. Ct. 225 (2005); St. Helen v. Senkowski, 374 F.3d at 183-84; DiGuglielmo v. Smith, 366 F.3d at 135;  Jones v. Vacco, 126 F.3d 408, 415 (2d Cir. 1997); Glenn v. Bartlett, 98 F.3d 721, 724 (2d Cir. 1996), cert. denied, 520 U.S.

(continued...)

As to the three claims that Jackson raised in his leave letter to the Court of Appeals, only his challenge to the persistent felony offender sentencing statute (Habeas Ground Seven) was raised in federal terms, objecting on Sixth Amendment grounds and citing People v. Rivera, 5 N.Y.3d 61, 800 N.Y.S.2d 51, cert. denied, 546 U.S. 984, 126 S. Ct. 564 (2005), which addressed federal constitutional concerns.  (12/14/07 Ct. App. Leave Letter at 5-9.)  When addressing his Sandoval claim (Habeas Ground One), Jackson's appellate counsel merely relied on two state cases and never mentioned any federal constitutional issues.  (12/14/07 Ct. App. Leave Letter at 3-4.)  In discussing the threat evidence claim (Habeas Ground Three), appellate counsel did not cite any cases and again failed to raise any federal constitutional issues.  (12/14/07 Ct. App. Leave Letter at 4-5.)[33]

---

[32]   (...continued)
1108, 117 S. Ct. 1116 (1997); Velasquez v. Leonardo, 898 F.2d 7, 9 (2d Cir. 1990).  Jackson has not alleged cause and prejudice nor has he made a showing of actual innocence.

[33]   Even before the First Department, Jackson's appellate counsel raised the Sandoval and threat evidence claims solely by relying on state case law.  (See Dannelly Aff. Ex. A: Jackson 1st Dep't Br. at 35-46, 50-52; Dannelly Aff. Ex. D: Jackson 1st Dep't Reply Br. at 2-8, 13.)  While both point headings (and a sentence on page 36 of his brief) referred to denial of "due process right to a fair trial," such references, without more, is not sufficient to fairly alert the state court to a federal constitutional claim.  See, e.g., Petrucelli v. Coombe, 735 F.2d 684, 688 (2d Cir. 1984) (A "mere statement that 'due process' rights have been violated does not necessarily give rise to a specific federal constitutional claim. 'Due process,' like 'fair trial,' can be a catchphrase used by habeas petitioners as part of an allegation about any type of trial court error, including errors in rulings based on state law."); Scullark v. Greiner, 02 Civ. 1834, 2005 WL 3454730 at *2 (S.D.N.Y. Dec. 15, 2005) ("Citation to the due process clause and the Fourteenth Amendment in the point heading of a state appellate court brief can be sufficient to exhaust a petitioner's claims, . . . but mere references to 'due process' and 'fair trial' are insufficient if the argument rests on issues of state law."); Spencer v. McCray, 01 Civ. 8029, 2004 WL 1110244 at *7 (S.D.N.Y. Apr. 30, 2004) ("In his direct appeal, [petitioner] alleged that the Justice's instructions violated his 'due process right to a fair trial,' but he relied exclusively on state law cases which made no reference to the United States Constitution. . . . Indeed, without the proper assertion of a federal constitutional violation,
(continued...)

Since Habeas Grounds One and Three were not raised in federal constitutional terms, these claims also are unexhausted. See, e.g., Daye v. Attorney Gen., 696 F.2d 186, 191 (2d Cir. 1982) (en banc) ("The exhaustion requirement is not satisfied unless the federal claim has been 'fairly presented' to the state courts."), cert. denied, 464 U.S. 1048, 104 S. Ct. 723 (1984); see also cases cited on pages 38-39 above. Since Jackson cannot appeal again to the First Department or Court of Appeals, these claims should be deemed exhausted and procedurally barred. See cases cited on pages 46-47 above.

Accordingly, Habeas Grounds One through Five should be DENIED as unexhausted but deemed exhausted and procedurally barred from habeas review. In any event, as discussed below, these claims are without merit.

III.    JACKSON'S CLAIMS THAT HE WAS DENIED A FAIR TRIAL BASED ON STATE EVIDENTIARY ERRORS DO NOT PROVIDE A BASIS FOR HABEAS RELIEF

Jackson claims that Justice Berkman made four evidentiary errors that violated his right to a fair trial by:  (1) changing the pre-trial Sandoval ruling after Jackson's direct trial testimony (Dkt. No. 17: Dannelly Aff. Ex. A: Jackson 1st Dep't Br. at 35-46); (2) allowing the prosecutor to impeach Jackson with his grand jury testimony that was not inconsistent with his trial testimony (id. at 46-50); (3) allowing evidence that a co-defendant had threatened a witness during trial and denying Jackson's severance motion (id. at 50-52); and (4) allowing evidence of a prior

_____

33/     (...continued)
        [petitioner's] jury instruction claim is not properly exhausted.").

uncharged crimes Jackson committed with a co-defendant (Dannelly Aff. Ex. C: Jackson Pro Se 1st Dep't Br. at 5-8).

**A.    The Habeas Corpus Review Standard for Claims of Error in State Evidentiary Rulings**

"In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." Estelle v. McGuire, 502 U.S. 62, 68, 112 S. Ct. 475, 480 (1991) ("We have stated many times that 'federal habeas corpus relief does not lie for errors of state law.'").  Thus, a habeas petitioner must demonstrate that the allegedly-erroneous state court evidentiary rulings violated an identifiable constitutional right.  See, e.g., Rosario v. Kuhlman, 839 F.2d 918, 924 (2d Cir. 1988) ("The [habeas] court must determine whether the exclusion [of testimony] was an error of constitutional dimension. . . ."); Taylor v. Curry, 708 F.2d 886, 890-91 (2d Cir.) ("Erroneous [state court] evidentiary rulings do not automatically rise to the level of constitutional error sufficient to warrant issuance of a writ of habeas corpus.  Rather, the writ would issue only where petitioner can show that the error deprived her of a fundamentally fair trial.") (emphasis in original), cert. denied, 464 U.S. 1000, 104 S. Ct. 503 (1983).

That is a "heavy burden, for 'generally, rulings by state trial courts on evidentiary issues, even if erroneous, do not rise to the level of a constitutional violation.'" Bonet v. McGinnis, 98 Civ. 6529, 2001 WL 849454 at *2 (S.D.N.Y. July 27, 2001).

The first step in this analysis is to determine whether the state court decision violated a state evidentiary rule, because the proper application of a presumptively constitutional state

evidentiary rule could not be unconstitutional.[34/]   See, e.g., Brooks v. Artuz, 97 Civ. 3300, 2000 WL 1532918 at *6, 9 (S.D.N.Y. Oct. 17, 2000) (petitioner did not demonstrate an error under state evidentiary law, "much less" an error of constitutional magnitude); Jones v. Stinson, 94 F. Supp. 2d at 391-92 (once the habeas court has found that the state court ruling was not erroneous under state law, there is no need to apply a constitutional analysis).[35/]

        Second, the petitioner must allege that the state evidentiary error violated an identifiable constitutional right.  This necessarily eliminates consideration of purely state evidentiary

---

[34/]    This assumes that the petitioner has not attacked the constitutionality of the state evidentiary rule itself.  See, e.g., Hawkins v. Costello, 460 F.3d 238, 244 (2d Cir. 2006) (distinguishing between cases where the trial court deprived the petitioner of a fair trial by improperly applying the state evidentiary rule and cases addressing the constitutionality of the state evidentiary rule itself), cert. denied, 549 U.S. 1215, 127 S. Ct. 1267 (2007); Jones v. Stinson, 94 F. Supp. 2d 370, 387 n.19 (E.D.N.Y.) (distinguishing between cases "where an evidentiary rule was correctly applied as a matter of state law, but is either unconstitutional on its face or violates a constitutional right as applied," and cases where the petitioner took no exception to the constitutionality of the state evidentiary rule, but asserted that the state court decision misapplied the state rule, resulting in a constitutional violation), rev'd on other grounds, 229 F.3d 112 (2d Cir. 2000).

[35/]    See also, e.g., Williams v. Walker, No. 00-CV-5912, 2001 WL 1352105 at *3 (E.D.N.Y. Oct. 31, 2001) (habeas court must first determine if ruling was erroneous under state law, and then whether ruling was of a constitutional magnitude); Coleman v. Greiner, No. 97-CV-2409, 1999 WL 320812 at *5 (E.D.N.Y. May 19, 1999); Till v. Miller, 96 Civ. 4387, 1998 WL 397848 at *4 (S.D.N.Y. July 16, 1998); Mitchell v. Herbert, 97 Civ. 5128, 1998 WL 186766 at *5-6 (S.D.N.Y. Apr. 20, 1998); Copes v. Schriver, 97 Civ. 2284,1997 WL 659096 at *3 (S.D.N.Y. Oct. 22, 1997); Simmons v. Ross, 965 F. Supp. 473, 480 (S.D.N.Y. 1997); Dey v. Scully, 952 F. Supp. 957, 969 (E.D.N.Y. 1997) ("[T]he Court engages in a two part analysis, examining 1) whether the exclusion [of evidence] was error under state law, and 2) whether the error amounted to the denial of the constitutional right to a fundamentally fair trial."); see generally Davis v. Strack, 270 F.3d 111, 123-24 (2d Cir. 2001) (in determining whether failure to give state jury charge violated federal constitution, first question for habeas court is whether the charge was required under New York law, and only if so, was the failure to give the charge of constitutional dimension).

errors not cognizable in the federal system.  See, e.g., Landy v. Costello, No. 97-2433, 141 F.3d

1151 (table), 1998 WL 105768 at *1 (2d Cir. Mar. 9, 1998) ("To the extent [petitioner's] claim is

based on a Rosario violation, it must fail, because a habeas petition can only be granted to remedy

some violation of federal law; the obligation to turn over Rosario material arises under state law.

Thus, the only question is whether the prosecution violated Brady.") (emphasis in original); Arocho

v. Walker, 01 Civ. 1367, 2001 WL 856608 at *3 (S.D.N.Y. July 27, 2001); Ayala v. Hernandez, 712

F. Supp. 1069, 1074 (E.D.N.Y. 1989).

    Third, an erroneous state evidentiary ruling that is asserted to be a constitutional

violation will merit habeas relief only "'where [the] petitioner can show that the error deprived [him]

of a fundamentally fair trial.'"  Rosario v. Kuhlman, 839 F.2d at 925 (emphasis in original).[36/]  The

test for "fundamental fairness" is whether the excluded or improperly admitted evidence, "'evaluated

in the context of the entire record,'"[37/]  "'create[d] a reasonable doubt [regarding petitioner's guilt]

---

[36/]   See also, e.g., Jones v. Stinson, 229 F.3d 112, 120 (2d Cir. 2000); Dunnigan v. Keane, 137 F.3d 117, 125 (2d Cir.) ("The introduction of improper evidence against a defendant does not amount to a violation of due process unless the evidence 'is so extremely unfair that its admission violates fundamental conceptions of justice.'"), cert. denied, 525 U.S. 840, 119 S. Ct. 101 (1998); Collins v. Scully, 755 F.2d 16, 18 (2d Cir. 1985) ("In order to prevail on a [habeas] claim that an evidentiary error deprived the defendant of due process under the Fourteenth Amendment he must show that the error was so pervasive as to have denied him a fundamentally fair trial . . . . ").

[37/]   "If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt." United States v. Agurs, 427 U.S. 97, 112-13, 96 S. Ct. 2392, 2402 (1976).

that did not otherwise exist.'"  Taylor v. Curry, 708 F.2d at 891 (quoting the materiality standard defined in United States v. Agurs, 427 U.S. at 112-13, 96 S. Ct. at 2401-02).[38/]

The "fundamental fairness" standard applies to the erroneous exclusion or admission of evidence.  See, e.g., Dowling v. United States, 493 U.S. 342, 352, 110 S. Ct. 668, 674 (1990) (The introduction of improper evidence does not violate due process unless the evidence "is so extremely unfair that its admission violates 'fundamental conceptions of justice.'");  McKinnon v. Superintendent, Great Meadow Corr. Facility, 355 F. App'x 469, 473 (2d Cir. 2009) ("[U]nless the challenged evidentiary rulings in the state proceedings affect the fundamental fairness of those proceedings, the claims are not properly reviewable . . . .");  Young v. McGinnis, 319 F. App'x 12, 13 (2d Cir. 2009) ("Improperly admitted evidence can constitute a due process violation where it 'is so extremely unfair that its admission violates fundamental conceptions of justice.'");  Cordon v. Greiner, 225 F. App'x 13, 15 (2d Cir. 2007);  Vega v. Portuondo, 120 F. App'x 380, 382 (2d Cir.) ("[T]he admission even of unfairly prejudicial evidence does not violate due process unless, taken in light of the record as a whole, it was sufficiently material to have removed a reasonable doubt that would otherwise have existed as to defendant's guilt."), cert. denied, 546 U.S. 836, 126 S. Ct. 66 (2005);  Dunnigan v. Keane, 137 F.3d at 125 ("For the erroneous admission of . . . unfairly prejudicial evidence to amount to a denial of due process, the item must have been 'sufficiently

---

[38/]     Accord, e.g., Bell v. Ercole, 368 F. App'x 216, 218 (2d Cir. 2010); Rasmussen v. Filion, 164 F. App'x 56, 57 (2d Cir. 2006); Hawkins v. Costello, 460 F.3d at 244; Jones v. Stinson, 229 F.3d at 120; Justice v. Hoke, 90 F.3d 43, 47 (2d Cir. 1996); Johnson v. Ross, 955 F.2d 178, 181 (2d Cir. 1992); Blissett v. Lefevre, 924 F.2d 434, 439 (2d Cir.), cert. denied, 502 U.S. 852, 112 S. Ct. 158 (1991); Collins v. Scully, 755 F.2d at 19; Rosario v. Kuhlman, 839 F.2d at 925.

material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it.'") (quoting Johnson v. Ross, 955 F.2d at 181); Rodriguez v. O'Keefe, No. 96-2699, 122 F.3d 1057 (table), 1997 WL 557622 at *2 (2d Cir. Sept. 9, 1997), cert. denied, 522 U.S. 1123, 118 S. Ct. 1068 (1998); Collins v. Scully, 755 F.2d at 18-19; Roldan v. Artuz, 78 F. Supp. 2d 260, 276 (S.D.N.Y. 2000).[39/]

   The final question is how to apply the AEDPA in the context of a fundamental fairness analysis, an issue addressed by the Second Circuit in Jones v. Stinson, 229 F.3d at 120-21. In Jones, the state appellate court decided that the trial court's evidentiary rulings had not denied the defendant a fair trial. Id. at 116. The Second Circuit held that, although it might have found, under the Agurs standard, that one of the trial court's rulings "create[d] a reasonable doubt that did not otherwise exist," the Second Circuit could not conclude that the excluded testimony "would so certainly have created new ground for reasonable doubt that the appellate division's decision [affirming the trial court's ruling] was objectively unreasonable." Id. at 120. The Second Circuit thus denied habeas relief based on the AEDPA's deferential review standard. Id. at 120-21.

---

[39/] For the reasons stated by Judge Block in Dey v. Scully, "[h]armless error analysis is simply inapplicable to [trial] error that only attains constitutional significance when considered in the context of the entire trial because such analysis inheres in the initial finding that the error was constitutionally significant. A determination that such error was not harmless, after having already concluded that it denied the defendant a fundamentally fair trial, would be tautological." Dey v. Scully, 952 F. Supp. at 974; see also, e.g., Kyles v. Whitley, 514 U.S. 419, 436, 115 S. Ct. 1555, 1567 (1995) ("Agurs . . . opted for its formulation of materiality . . . only after expressly noting that this standard would recognize reversible constitutional error only when the harm to the defendant was greater than the harm sufficient for reversal under Kotteakos."); Washington v. Schriver, 255 F.3d 45, 56-57 (2d Cir. 2001) ("The creation of otherwise non-existent reasonable doubt [under Agurs] satisfies the 'substantial and injurious' standard" under Brecht.) (quoting Jones v. Stinson, 229 F.3d at 120); Coleman v. Greiner, 1999 WL 320812 at *4-5.

### B.  Justice Berkman's Modification of the <u>Sandoval</u> Ruling Did Not Violate Jackson's Right to a Fair Trial

Jackson contends that Justice Berkman violated his right to a fair trial by modifying her <u>Sandoval</u> ruling to allow evidence of Jackson's three prior burglary convictions.  (Dkt. No. 8: Am. Pet. ¶ 13 & Ex. E: Jackson 1st Dep't Br. at 35-46.)  As a result of this ruling, Jackson argues that "[t]he jurors were likely to make the impermissible inference that someone who regularly committed burglaries at a previous time probably had committed the ones for which he was presently charged."  (Jackson's 1st Dep't Br. at 36.)

In rejecting this argument, the First Department ruled:

> The court properly modified its <u>Sandoval</u> ruling to permit the People to inquire about three prior burglaries committed by [Jackson], when [Jackson]'s testimony misleadingly implied that he was a naive novice at the time a codefendant had propositioned him to be a lookout in a burglary that the prosecutor had inquired into under the original <u>Sandoval</u> ruling.  In any event, were we to find that the court erred by making this modification, we would find the error harmless in light of the overwhelming evidence of [Jackson]'s guilt.

<u>People</u> v. <u>Jackson</u>, 45 A.D.3d 433, 433-34, 846 N.Y.S.2d 126, 127 (1st Dep't 2007) (citations omitted), <u>appeal denied</u>, 10 N.Y.3d 812, 857 N.Y.S.2d 45, <u>cert. denied</u>, 129 S. Ct. 462 (2008); <u>see</u> pages 21-22 above.

A "<u>Sandoval</u> ruling is primarily a matter of state evidence law.  Such questions do not implicate federal constitutional rights unless the evidentiary ruling creates such unfairness that a defendant is denied a fundamentally fair trial."  <u>Peterson</u> v. <u>Greene</u>, 06 Civ. 41, 06 Civ. 811, 2008 WL 2464273 at *5 (S.D.N.Y. June 18, 2008) (Lynch, D.J.); <u>see also</u>, <u>e.g.</u>, <u>Idlett</u> v. <u>Andrews</u>, 150 F. App'x 74, 76 (2d Cir. 2005) (even if the trial court's <u>Sandoval</u> ruling was improper, it "did not rise to the level of constitutional error" for habeas purposes); <u>Johnson</u> v. <u>Conway</u>, No. 08-CV-3302,

2010 WL 3942897 at *4 (E.D.N.Y. Oct. 6, 2010) ("A claim based on an alleged <u>Sandoval</u> violation deals with an evidentiary question and presents an issue for habeas relief only if the petitioner establishes that the trial court committed error that constitutes a deprivation of a constitutionally recognized right.").

On direct, Jackson explained his October 1, 1998 burglary arrest by claiming that Lucas had offered to pay him as a lookout.  (<u>See</u> page 13 above.)  As Justice Berkman found and the First Department ruled, Jackson's "testimony misleadingly implied that he was a naive novice at the time a codefendant had propositioned him to be a lookout . . . ." <u>People</u> v. <u>Jackson</u>, 45 A.D.3d at 434, 846 N.Y.S.2d at 127; <u>see</u> page 21 above.  Under New York law, a "<u>Sandoval</u> ruling does not allow a defendant to deceive the jury and be free from confrontation. A defendant who takes the stand is obliged to speak truthfully and accurately." <u>People</u> v. <u>Green</u>, 207 A.D.2d 318, 318, 615 N.Y.S.2d 685, 686 (1st Dep't), <u>appeal denied</u>, 84 N.Y.2d 935, 621 N.Y.S.2d 532 (1994); <u>see also</u>, <u>e.g.</u>, <u>People</u> v. <u>Dickerson</u>, 215 A.D.2d 186, 187-88, 626 N.Y.S.2d 768, 769 (1st Dep't 1995) ("By attempting to portray himself as an innocent man who had been wrongly convicted of robbery, defendant thereby opened the door to impeachment by otherwise precluded inquiry, and it was not improper for the court to permit the prosecutor to question defendant as to the circumstances surrounding his arrest for the robbery.") (citation omitted), <u>aff'd</u>, 87 N.Y.2d 914, 640 N.Y.S.2d 865 (1996).

Even though Jackson was on trial for burglary, Justice Berkman properly allowed the prosecutor to impeach his testimony (that Lucas enticed him to commit burglary) with his prior burglary convictions.  A "defendant cannot shield himself from impeachment simply because he has

specialized in theft-related crimes."  People v. Post, 235 A.D.2d 299, 299, 653 N.Y.S.2d 307, 307 (1st Dep't), appeal denied, 90 N.Y.2d 862, 661 N.Y.S.2d 189 (1997); see also, e.g., Sease v. Goord, 01 Civ. 1378, 2003 WL 23100261 at *5 (S.D.N.Y. Dec. 30, 2003) ("The judge clearly recognized the possibility that the jury would improperly infer that [the petitioner] has a propensity to commit such crimes but determined that the law was clear that he is not entitled to protection because he specializes in a particular kind of crime.").  During summation, the prosecutor properly commented on Jackson's prior convictions, but only for credibility purposes: "Can you believe he tried to tell you that he didn't even know what a burglary was when he went down there with Peter Lucas in 1998 when he had been arrested and convicted for three other burglaries in the years before that?" (Dkt. No. 14: Tr. 5204.)

To the extent Jackson is arguing that Justice Berkman improperly changed her ruling after he had already testified, this claim also is without merit.  While "a trial court's authority to change its Sandoval ruling is limited once defendant has decided to testify in good-faith reliance on the court's pretrial ruling," the analysis changes when a "defendant or a witness for the defense testifies to facts that are in conflict with the precluded evidence.  In such instances, the defense 'opens the door' on the issue in question, and the witness is properly subject to impeachment by the prosecution's use of the otherwise precluded evidence." People v. Fardan, 82 N.Y.2d 638, 646, 607 N.Y.S.2d 220, 224 (1993); see also, e.g., Holder v. Perlman, No. 06 CV 5590, 2009 WL 1491160 at * 6 (E.D.N.Y. May 27, 2009) (quoting Fardan).  Thus, Justice Berkman properly applied New York law.

Additionally, even if the <u>Sandoval</u> modification was erroneous as a matter of state law (which it was not) this evidence did not deprive Jackson of a fundamentally fair trial.  Justice Berkman gave a thorough jury instruction that Jackson's prior convictions could only be used for impeachment and not to show propensity to commit crimes:  "With respect to Mr. Jackson, understand that prior convictions or criminal conduct are not evidence of his guilt in this case or evidence that he is disposed to commit crimes.  You are permitted to consider his convictions to evaluate his truthfulness."  (<u>See</u> page 18 above.)  Justice Berkman also gave an instruction regarding the evidence of the 1998 burglary committed by Jackson and Lucas:

> You've heard evidence of 1998 burglary activity by George Lucas and Trevers Jackson.  This evidence is no proof at all that either of them has the propensity or predisposition to commit any of the crimes charged in this indictment or any other crime.  You must not consider it for this purpose.

> The evidence was permitted as proof of background and/or relationship between Jackson and Lucas which is relevant in your consideration of the enterprise corruption and conspiracy charges.  Consider it only for this purpose.

(<u>See</u> page 18 above.)  There would be no prejudice to Jackson, since the jury is presumed to have followed the court's instructions.  <u>See</u>, <u>e.g.</u>, <u>CSX Transp., Inc.</u> v. <u>Hensley</u>, 129 S. Ct. 2139, 2141 (2009) ("Jurors routinely serve as impartial factfinders in cases that involve sensitive, even life-and-death matters. In those cases, as in all cases, juries are presumed to follow the court's instructions."); <u>United States</u> v. <u>Whitten</u>, 610 F.3d 168, 191 (2d Cir. 2010) ("We presume that juries follow instructions . . . .").[40]

---

[40]   <u>See also</u>, <u>e.g.</u>, <u>Jackson</u> v. <u>Heath</u>, 10 Civ. 3449, 2010 WL 3075557 at *18-19 (S.D.N.Y. Aug. 6, 2010) (Peck, M.J.) (Petitioner was not deprived of a fair trial where the trial judge instructed the jury to disregard the witness's testimony concerning petitioner's uncharged

(continued...)

Furthermore, there was overwhelming evidence of Jackson's guilt.  The testimony of both Jabar Williams and Mark Parson, former members of the burglary crew who testified pursuant to cooperation agreements with the prosecution, established Jackson's role as one of the leaders of the criminal enterprise, including setting up burglaries, soliciting orders from buyers, breaking into the stores and splitting up the money.  (See pages 5-7 above.)  Jackson's leadership role also was established through Williams' testimony that Jackson taught him how to act as a lookout for the group, as well as Parson's testimony that Jackson told him to wear a hat and gloves during the burglaries to protect his identity.  (See pages 6, 7 above.)

Williams further testified that Jackson took part in the three burglaries of 13-15 West Twenty-Seventh Street in Manhattan, entering the location and removing stolen property in garbage bags.  (See page 7 above.)  Williams also testified how the stolen property was sorted and sold to a buyer.  (See page 7 above.)

With respect to the City Streets burglary, Parson detailed how Jackson called him to the store and directed him to place stolen property inside of garbage bags.  (See pages 8-9 above.)  Parson also testified that, after they were arrested and while together in a holding cell, Jackson fabricated a story to explain their presence in the area of the burglary.  (See page 11 above.)  Once

---

40/    (...continued)
crimes; "The jury is presumed to obey the court's instructions.") (& cases cited therein); Kanani v. Phillips, 03 Civ. 2534, 2004 WL 2296128 at *19 (S.D.N.Y. Oct. 13, 2004) (Peck, M.J.) (Petitioner not deprived of a fair trial where "the trial judge gave a very specific limiting charge to the jury to ensure that jurors considered information about the uncharged crimes only for appropriate purposes, and not on [petitioner's] guilt or innocence of the crimes charged in the indictment.") (& cases cited therein), report & rec. adopted, 2005 WL 2431416 (S.D.N.Y. Oct. 3, 2005).

released on bail, Jackson directed Parson to get receipts from stores in the vicinity of City Streets or to pay someone to say that Parson had been in the area. (See page 12 above.)

The cooperating witnesses' testimony as to Jackson's guilt was corroborated by phone records (see page 10 n.8 above), and the discovery of business cards and a paystub of Jackson's business, Compu-All Enterprises, inside vehicles associated with co-defendant Lucas (see page 11 n.9 above).

Thus, even if Justice Berkman erred when she modified her Sandoval ruling (which she did not), the thorough jury instructions and overwhelming evidence of Jackson's guilt prevented any error from depriving Jackson of a fundamentally fair trial.  See, e.g., Reyes v. Ercole, No. 08-CV-4749, 2010 WL 2243360 at *10 (E.D.N.Y. June 1, 2010) (Petitioner was not deprived of a fundamentally fair trial "given the strong, indeed overwhelming, evidence against him."); Fuentes v. Ebert,  06 Civ. 5813, 2009 WL 1755500 at *16 (S.D.N.Y. June 22, 2009) ("[T]he strength of the evidence against Petitioner militates against any finding that the prosecutor's remarks in summation, even if inappropriate, caused Petitioner actual prejudice."); Clanton v. Rivera, 06 Civ. 4756, 2008 WL 2839712 at *21 (S.D.N.Y. July 22, 2008) (Peck, M.J.) (Even if state court erred in admitting evidence of uncharged robbery, "any such error did not deprive [petitioner] of a fundamentally fair trial, given the strong evidence against him."), report & rec. adopted, 2010 WL 1685414 (S.D.N.Y. Apr. 22, 2010); Kanani v. Phillips, 2004 WL 2296128 at *19 (evidence errors did not deprive petitioner of a fundamentally fair trial where there was strong evidence of his guilt); Oakley v. Artuz, No. 95 CV 2088, 1999 WL 325362 at *2 (E.D.N.Y. May 18, 1999) (Prior crime evidence did not warrant reversal where the "record contained overwhelming evidence of Petitioner's guilt.");

Ayala v. Portuondo, 75 F. Supp. 2d 194, 196 (S.D.N.Y. 1999) (Parker, D.J.) ("In view of the overwhelming evidence of [petitioner]'s guilt, this [uncharged crimes] evidence cannot even if it had been erroneously admitted, be said to have denied [petitioner] a fair trial."); Diaz v. Garvin, 92 Civ. 4778, 1995 WL 459250 at *3 (S.D.N.Y. Aug. 3, 1995) (In case with overwhelming guilt against defendant, challenged uncharged crimes evidence "was not crucial, critical, or highly significant to petitioner's conviction, and therefore its admission did not deprive petitioner of a fair trial. . . . "); People v. Johnson, 280 A.D.2d 683, 684, 721 N.Y.S.2d 108, 109 (2d Dep't 2001) ("[I]n light of the overwhelming evidence of the defendant's guilt [in rape and sexual assault trial], any error in the admission of this [uncharged violent crime] evidence was harmless."), appeal denied, 97 N.Y.2d 756, 742 N.Y.S.2d 616 (2002).

      Accordingly, Jackson's Sandoval habeas claim should be DENIED as without merit, as well as unexhausted (as discussed in Point II.B. above).

### C.    Impeachment With Jackson's Grand Jury Testimony Did Not Violate His Right to a Fair Trial

      Jackson claims that Justice Berkman improperly allowed the prosecutor to impeach him with his grand jury testimony even though it was not inconsistent with his trial testimony.  (Dkt. No. 8: Am. Pet. ¶ 13 & Ex. E: Jackson 1st Dep't Br. at 46-50.)

      The First Department rejected this claim:

> The court properly permitted the prosecutor to impeach [Jackson]'s trial testimony by means of portions of his grand jury testimony, including significant omissions, since the circumstances were such as to raise a jury question as to whether there was an inconsistency.  [Jackson] was free to argue that there was no inconsistency, and were we to find any error we would once again find it harmless.

People v. Jackson, 45 A.D.3d 433, 434, 846 N.Y.S.2d 126, 127-28 (1st Dep't 2007) (citations omitted), appeal denied, 10 N.Y.3d 812, 857 N.Y.S.2d 45, cert. denied, 129 S. Ct. 462 (2008); see page 22 above.

   In order to prevail on a habeas claim relating to a state court's evidentiary ruling, Jackson would first need to show that the ruling violated a New York evidentiary rule.  (See Point III.A. above.)  Under New York law, "[i]t is well established that a witness' prior inconsistent statements may be used to impeach his trial testimony."  People v. Bornholdt, 33 N.Y.2d 75, 88, 350 N.Y.S.2d 369, 379 (1973), cert. denied, 416 U.S. 905, 94 S. Ct. 1609 (1974).  This includes inconsistencies based on "unnatural" omissions from prior statements.  See, e.g., People v. Savage, 50 N.Y.2d 673, 679, 431 N.Y.S.2d 382, 384-385 ("It is an elementary rule of evidence, and of common sense, in our State and almost every other jurisdiction, that, when given circumstances make it most unnatural to omit certain information from a statement, the fact of the omission is itself admissible for purposes of impeachment . . . ."), cert. denied, 449 U.S. 1016, 101 S. Ct. 577 (1980); People v. Bornholdt, 33 N.Y.2d at 88, 350 N.Y.S.2d at 379 ("And the test of inconsistency, we have said, is not limited to outright contradictions between a witness' prior statements and his trial testimony; it includes, as well, omitting to mention critical facts at the prior time, which facts are later related at trial.").

   Jackson testified at trial that, in the early morning of November 24, 2001, he started driving with his wife to the Bronx to pick up William Keitt in order to get Keitt's help fixing a sewage problem.  (See page 14 above.)  In his grand jury testimony, however, Jackson never mentioned Keitt.  (See pages 16-17 above.)  Jackson claims this impeachment was improper since

in the grand jury, "Jackson was not asked about Keitt, nor could he have been expected to discuss his plans to pick up Keitt, which was utterly irrelevant to his presence in Manhattan." (Jackson 1st Dep't Br. at 48.)  While it usually must "be shown that at the prior time the witness' attention was called to the matter and that he was specifically asked about the facts embraced in the question propounded at trial," People v. Bornholdt, 33 N.Y.2d at 88, 350 N.Y.S.2d at 380, this requirement has limited application when dealing with prior grand jury testimony:

> As the Bornholdt rationale notes, "human experience recogniz[es] that unless asked directly about a matter a person may quite normally omit it from a narrative description," but that rationale has only limited applicability to the testimony of a defendant before the Grand Jury, where the defendant is afforded an opportunity to attempt to forestall indictment by presenting any relevant and competent exculpatory information that may be available, not limited to facts that the examining Assistant District Attorney chooses to elicit.

People v. Montalvo, 285 A.D.2d 384, 385, 728 N.Y.S.2d 448, 448 (1st Dep't) (citations omitted), appeal denied, 96 N.Y.2d 941, 733 N.Y.S.2d 381 (2001).

The fact that Jackson had initially intended to go to the Bronx to pick up Keitt was an integral part of his narrative.  At trial, Jackson explained that he had traveled via the Lincoln Tunnel, rather than the Holland Tunnel, because he had been on his way to pick up Keitt when he learned that Parson was in Manhattan.  (See Jackson 1st Dep't Br. at 42-43.)  Consequently, the Keitt element would have been a natural part of Jackson's narrative, yet he omitted it before the grand jury.  Accordingly, Justice Berkman's ruling correctly applied New York law in allowing impeachment by omission.

Even if Justice Berkman erroneously applied state law (which she did not), the overwhelming evidence of Jackson's guilt prevented this ruling from depriving Jackson of a fundamentally fair trial.  (See pages 59-61 above & cases cited therein.)

Accordingly, Jackson's impeachment habeas claim should be DENIED as without merit, as well as unexhausted (as discussed in Point II.B. above).

### D.    Justice Berkman Properly Allowed Evidence of a Co-defendant's Threat Towards a Prosecution Witness

Jackson claims that Justice Berkman denied his right to a fair trial by allowing evidence that a co-defendant had threatened a prosecution witness during trial, without granting him a severance.  (Dkt. No. 8: Am. Pet. ¶ 13 & Ex. E: Jackson 1st Dep't Br. at 50-52.)

The First Department rejected this claim, holding:

> The court properly admitted evidence that a jointly tried codefendant had threatened a witness during the trial. Such evidence was "highly probative" of that codefendant's consciousness of guilt, and the court's thorough instructions were sufficient to prevent any prejudice to [Jackson]. The court also properly denied [Jackson]'s severance motion.

People v. Jackson, 45 A.D.3d 433, 434, 846 N.Y.S.2d 126, 128 (1st Dep't 2007) (citation omitted), appeal denied, 10 N.Y.3d 812, 857 N.Y.S.2d 45, cert. denied, 129 S. Ct. 462 (2008); see page 22 above.

Under New York law, evidence that a defendant threatened a witness is admissible as it is "highly probative of [the defendant's] consciousness of guilt."  See, e.g., People v. Torres, 61 A.D.3d 489, 490, 878 N.Y.S.2d 673, 675 (1st Dep't) ("We reject [defendant's] argument that his threat to kill a witness should not have been admitted; that evidence was highly probative of his consciousness of guilt."), appeal denied, 12 N.Y.3d 921, 884 N.Y.S.2d 702 (2009); People v.

Rosario, 309 A.D.2d 537, 538, 765 N.Y.S.2d 320, 322 (1st Dep't) ("The court properly admitted evidence from which the jury could reasonably conclude that defendant made an implied threat to harm the People's main witness if he did not provide favorable testimony, since this evidence was highly probative of defendant's consciousness of guilt."), appeal denied, 1 N.Y.3d 579, 775 N.Y.S.2d 795 (2003).

Even where (as in this case) there are multiple defendants on trial, evidence of a threat made by one defendant is properly admitted where the trial court instructs the jury that the evidence may be used only against that defendant.  See, e.g., People v. Paulino, 187 A.D.2d 736, 736, 590 N.Y.S.2d 532, 533 (2d Dep't 1992) ("The defendant was not unduly prejudiced by the admission of testimony regarding his codefendant's threats to a witness, since the trial court instructed the jury that the evidence was only to be considered as evidence of the codefendant's consciousness of guilt and was not to be used as direct evidence against the defendant."), appeal denied, 81 N.Y.2d 792, 594 N.Y.S.2d 739 (1993).

As part of her charge, Justice Berkman made it clear that the testimony that co-defendant Coleman had threatened Jabar Williams was admissible only against Coleman and not the other defendants:

> The People have introduced evidence of certain remarks allegedly made by Mr. Coleman to and about Mr. Williams during the time that Mr. Williams was testifying after the court session.

> If you find Mr. Williams' testimony credible in this respect, you may consider it both in evaluating his manner of testifying, but what we call his demeanor on the stand, which is a factor you may consider in evaluating the testimony of any witness and also as supporting an inference of Mr. Coleman's consciousness of guilt.

Now, whether this evidence, if you find it credible, does, in fact, reflect that Mr. Coleman had a guilty mind and if so, what weight you should give this evidence, is a question of fact for you to decide.

First, you have to decide whether you accept and believe the evidence. Then, you, have to decide whether the evidence does, in fact, establish a consciousness of guilt on Mr. Coleman's part.  Understand that even an innocent person may resort to conduct for the purposes of avoiding conviction.  For this reason, if you find an innocent explanation from the nature of the conduct and from the evidence that you've heard in the case, you must disregard this evidence totally.

Only if you find that this conduct was solely motivated by Mr. Coleman's consciousness of guilt may you consider it in determining whether his guilt has been proved beyond a reasonable doubt.

Also understand that even if you accept this evidence and conclude that it shows consciousness of guilt, that kind of evidence has slight value.  Standing alone it's never sufficient for a finding of guilt.  You have the right to consider it together with all the rest of the evidence in determining whether the evidence establishes his guilt beyond a reasonable doubt.

(Dkt. No. 14: Tr. 5362-64; see pages 18-19 above.)  Justice Berkman also charged the jury that they were required to "deliberate separately as to each defendant and render a separate verdict as to each defendant."  (Tr. 5351, 5397, quoted on page 17 above.)  Given this elaborate charge, admission of threat testimony was proper under New York law.

Moreover, even if Justice Berkman erred in admitting the threat evidence at trial (which she did not), Jackson was not deprived of a fundamentally fair trial since there was overwhelming evidence of his guilt.  (See pages 59-61 above & cases cited therein.)[41]

---

[41]    In the "POINT III" argument heading of Jackson's First Department brief, but not further developed in the body of the argument, Jackson's appellate counsel further claimed that Justice Berkman erred when she denied his severance motion after allowing evidence of the co-defendant's threats.  (Jackson 1st Dep't Br. at 50.)  "To grant federal habeas corpus relief on the basis of an improper denial of severance, a federal court must find that the joinder was
                                                                                            (continued...)

Accordingly, Jackson's threat evidence habeas claim should be <u>DENIED</u> as without merit, as well as unexhausted (as discussed in Point II.B. above).

**E.    The Admission of Uncharged Crimes Evidence Did Not Violate Johnson's Right to a Fair Trial**

Jackson claims that Justice Berkman's pre-trial ruling deprived him of a fair trial by erroneously allowing the prosecutor to admit evidence of prior burglaries that Jackson committed with co-defendant Lucas.  (Dkt. No. 8: Am. Pet. ¶ 13 & Ex. E: Jackson Pro Se 1st Dep't Br. at 3-8.)

As an initial matter, the First Department ruled that Jackson's uncharged crimes claim was unpreserved.  <u>People</u> v. <u>Jackson</u>, 45 A.D.3d 433, 434, 846 N.Y.S.2d 126, 128 (1st Dep't 2007), <u>appeal denied</u>, 10 N.Y.3d 812, 857 N.Y.S.2d 45, <u>cert. denied</u>, 129 S. Ct. 462 (2008); <u>see</u> page 22 above.[42/]  Unlike the situation where the state court holds that a claim was either unpreserved or without merit, which the Second Circuit has found is usually too ambiguous to preclude habeas

---

[41/]    (...continued)
so prejudicial as to deny the petitioner a fair trial.  <u>Funches</u> v. <u>Walsh</u>, 05 Civ. 2839, 2006 WL 1063287 at *8 (S.D.N.Y. Apr. 21, 2006), <u>aff'd</u>, 264 F. App'x 45 (2d Cir.), <u>cert. denied</u>, 553 U.S. 1022, 128 S. Ct. 2087 (2008).  As noted above, Justice Berkman properly allowed the evidence of threats, her curative instructions prevented any prejudice to Jackson, and the overwhelming evidence of Jackson's guilt prevented any evidentiary error from depriving him of a fair trial.

[42/]    Jackson's pro se First Department brief raised two issues:  (1)  Justice Berkman erroneously allowed evidence of uncharged crimes that Jackson had committed with a co-defendant (Jackson Pro Se 1st Dep't Br. at 5-8); and (2) the evidence was insufficient to establish the crime of enterprise corruption and the jury's verdict was against the weight of the evidence (Jackson Pro Se 1st Dep't Br. at 9-13).   The First Department rejected Jackson's sufficiency/weight argument and found that Jackson's "remaining pro se argument is unpreserved and we decline to review it in the interest of justice.  Were we to review this claim, we would find it without merit."  <u>People</u> v. <u>Jackson</u>, 45 A.D.3d at 434, 846 N.Y.S.2d at 128; <u>see</u> page 22 above.  As Jackson's uncharged crimes claim was the "remaining pro se argument," the First Department found it unpreserved.

review, e.g., Galarza v. Keane, 252 F.3d 630, 637 (2d Cir. 2001), here the First Department explicitly found Jackson's uncharged crime claim "unpreserved."  The fact that the First Department also stated the conclusion it would reach on the merits if it were to review the claim does not change the result.  See, e.g., Green v. Travis, 414 F.3d 288, 294 (2d Cir. 2005) ("'[F]ederal habeas review is foreclosed when a state court has expressly relied on a procedural default as an independent and adequate state ground, even where the state court has also ruled in the alternative on the merits of the federal claim.'"); Fama v. Comm'r of Corr. Servs., 235 F.3d 804, 810-11 & n.4 (2d Cir. 2000) ("where a state court says that a claim is 'not preserved for appellate review' and then ruled 'in any event' on the merits, such a claim is not preserved"); Glenn v. Bartlett, 98 F.3d 721, 724-25 (2d Cir. 1996) (state decision which denied prosecutorial misconduct claim as not preserved for appellate review represented an independent and adequate state procedural ground even though court addressed merits of claim "in the interests of justice"), cert. denied, 520 U.S. 1108, 117 S. Ct. 1116 (1991); Velasquez v. Leonardo, 898 F.2d 7, 9 (2d Cir. 1990) (state decision which denied claims as procedurally barred but then alternatively addressed merits rested on adequate and independent state grounds).

Thus, the First Department's decision as to Jackson's uncharged crimes claim unambiguously rested on a state procedural ground.  Consequently, the First Department's finding provides an independent and adequate state bar that prevents this Court from granting habeas relief. See, e.g., Butler v. Cunningham, 313 F. App'x 400, 401 (2d Cir. 2009) ("The New York court's finding that [petitioner's] claim was unpreserved for appellate review is an independent and adequate state ground that bars a federal court from granting habeas relief."); White v. Artus, 05 Civ. 465,

2010 WL 2024879 at *7 (S.D.N.Y. May 20, 2010) ("A determination that a claim is unpreserved
constitutes an independent and adequate state ground that bars a federal court from granting habeas
relief.").[43]

     In addition, this claim is meritless.  Under New York law, evidence of uncharged
crimes is generally inadmissable so that the jury does not convict the defendant based on a perceived
predisposition towards criminal conduct that is deserving of punishment rather than for guilt of the
charged offense. E.g., People v. Molineux, 168 N.Y. 264, 291, 61 N.E. 286 (1901); see, e.g., United
States v. Gelzer, 50 F.3d 1133, 1139 (2d Cir.1995); United States v. Concepcion, 983 F.2d 369, 392
(2d Cir.1992), cert. denied, 510 U.S. 856, 114 S.Ct. 163 (1993).[44]

     "However, when the evidence of the other crimes is relevant to an issue other than
the defendant's criminal tendency, it may be admitted on the basis of an exception to the general

---

[43]    For further analysis of the independent and adequate state ground procedural bar doctrine,
see, e.g., Hayward v. Brown, 09 Civ. 6495, 2010 WL 2629037 at *10-15 (S.D.N.Y. July 1,
2010) (Peck, M.J.) (& cases cited therein).

[44]    See also, e.g., People v. Alvino, 71 N.Y.2d 233, 241, 525 N.Y.S.2d 7, 11 (1987); People v.
Beam, 57 N.Y.2d 241, 250, 455 N.Y.S.2d 575, 579-80 (1982); People v. Ventimiglia, 52
N.Y.2d 350, 359, 438 N.Y.S.2d 261, 264 (1981); People v. Allweiss, 48 N.Y.2d 40, 46-47,
421 N.Y.S.2d 341, 344 (1979); People v. Vails, 43 N.Y.2d 364, 368, 401 N.Y.S.2d 479, 481
(1977); People v. Condon, 26 N.Y.2d 139, 143, 309 N.Y.S.2d 152, 154 (1970); People v.
Davis, 259 A.D.2d 706, 687 N.Y.S.2d 653, 654 (2d Dep't), appeal denied, 93 N.Y.2d 1016,
697 N.Y.S.2d 575 (1999); People v. Kanston, 192 A.D.2d 721, 721, 597 N.Y.S.2d 152, 153
(2d Dep't), appeal denied, 81 N.Y.2d 1074, 601 N.Y.S.2d 594 (1993); People v. Pons, 159
A.D.2d 471, 473, 552 N.Y.S.2d 344, 345 (2d Dep't), appeal denied, 76 N.Y.2d 741, 558
N.Y.S.2d 902 (1990); People v. Battles, 83 A.D.2d 164, 166, 443 N.Y.S.2d 932, 934 (4th
Dep't 1981); People v. Le Grand, 76 A.D.2d 706, 708-09, 431 N.Y.S.2d 850, 852 (2d Dep't
1980).

rule, but only for the limited purpose for which it is relevant."  People v. Beam, 57 N.Y.2d at 250,

455 N.Y.S.2d at 579-80.[45/]

    "Even then, such evidence is admissible only upon a trial court finding that its

probative value for the jury outweighs the risk of undue prejudice to the defendant."  People v. Till,

87 N.Y.2d at 836-37, 637 N.Y.S.2d at 682; accord, e.g., People v. Alvino, 71 N.Y.2d at 241-42, 525

N.Y.S.2d at 11.

    In People v. Molineux, the New York Court of Appeals "stated what has come to be

known as the five Molineux exceptions to the rule forbidding introduction of evidence of similar

crimes."  People v. Beam, 57 N.Y.2d at 250, 455 N.Y.S.2d at 580.  The New York Court of Appeals

in Molineux held that "[g]enerally speaking, evidence of other crimes is competent to prove the

specific crime charged when it tends to establish (1) motive; (2) intent; (3) the absence of mistake

or accident; (4) a common scheme or plan embracing the commission of two or more crimes so

related to each other that proof of one tends to establish the others; (5) the identity of the person

charged with the commission of the crime on trial."  People v. Molineux, 168 N.Y. at 293, 61 N.E.

at 286.[46/]  This list of exceptions is "illustrative and not exhaustive," People v. Rojas, 97 N.Y.2d 32,

---

[45/]   Accord, e.g., People v. Till, 87 N.Y.2d 835, 837, 637 N.Y.S.2d 681, 682 (1995); People v. Alvino, 71 N.Y.2d at 241-42, 525 N.Y.S.2d at 11; People v. Ventimiglia, 52 N.Y.2d at 359-60, 438 N.Y.S.2d at 264; People v. Allweiss, 48 N.Y.2d at 46-47, 421 N.Y.S.2d at 344; People v. Vails, 43 N.Y.2d at 368, 401 N.Y.S.2d at 482; People v. Condon, 26 N.Y.2d at 143, 309 N.Y.S.2d at 154; People v. Molineux, 168 N.Y. at 293, 61 N.E. 286.

[46/]   Accord, e.g., People v. Alvino, 71 N.Y.2d at 242, 525 N.Y.S.2d at 11; People v. Ventimiglia, 52 N.Y.2d at 359, 438 N.Y.S.2d at 264; People v. Allweiss, 48 N.Y.2d at 47, 421 N.Y.S.2d at 344; People v. Vails, 43 N.Y.2d at 368, 401 N.Y.S.2d at 482; People v. Condon, 26 N.Y.2d at 143, 309 N.Y.S.2d at 155.

37, 735 N.Y.S.2d 470, 473 (2001), and evidence that is necessary to provide "background material" or to "'complete the narrative of the episode'" has also become a recognized exception.  People v. Till, 87 N.Y.2d at 837, 637 N.Y.S.2d at 682 (citing People v. Gines, 36 N.Y.2d 932, 932-33, 373 N.Y.S.2d 543, 543 (1975)); see People v. Tosca, 98 N.Y.2d 660, 661, 746 N.Y.S.2d 276, 276 (2002) (background information about "how and why the police pursued and confronted defendant" admissible); People v. Then, 248 A.D.2d 159, 159, 670 N.Y.S.2d 182, 183 (1st Dep't) ("Evidence of the criminal conduct of a severed codefendant was properly admitted as highly probative of defendant's possession as well as being necessary to complete the narrative of events leading to defendant's arrest.") (citations omitted), appeal denied, 92 N.Y.2d 906, 680 N.Y.S.2d 71 (1998); People v. Henry, 166 A.D.2d 720, 720, 561 N.Y.S.2d 297, 298 (2d Dep't 1990) ("evidence of unconnected, uncharged criminal conduct . . . is also admissible to complete the narrative of the crime charged, provided its probative value outweighs any possible prejudice."), appeal denied, 77 N.Y.2d 907, 569 N.Y.S.2d 939 (1991).

        In allowing evidence that Jackson and co-defendant Lucas had committed burglaries together in 1998, Justice Berkman stated that this evidence is "admissible really only to show how the conspiracy, the enterprize [sic] formed and how the two gentlemen formed their . . . business relationship together."  (Dkt. No. 10: VH. 4; see page 4 above.)

        As part of the People's case, Police Officer Kenneth Baker testified that, on October 1, 1998, Jackson, Lucas and others were arrested after they were caught burglarizing a Manhattan building.  (See page 5 above.)  In the middle of this testimony, Justice Berkman instructed the jury as follows:

> I've told you this before, the October 1[], 1998 incident is not part of the charges, directly part of the charges in this indictment you are to consider.  As I indicated at the very beginning of this trial, . . . the uncharged crime that you are hearing about is not -- you may not consider it as what the lawyers call propensity evidence.  I'm permitting it because you are to consider it in connection with the Enterprise Corruption charge which is part of the indictment, the relationship of Mr. Jackson and Lucas, and for that limited purpose only.

(Dkt. No. 12: Baker: Tr. 2718.)  At the end of Officer Baker's testimony, Justice Berkman gave the jury another limiting instruction pertaining to this evidence: "I'll just remind you that what you just heard about is not one of the pattern acts charged in this case and it's not part of the enterprise charged here, but it's relevant to some imminent issue.  We will talk about that more in my instructions."  (Tr. 2746-47.)

During her final jury charge, Justice Berkman instructed the jury regarding the evidence of the uncharged prior burglaries committed by Jackson and Lucas:

> You've heard evidence of 1998 burglary activity by George Lucas and Trevers Jackson.  This evidence is no proof at all that either of them has the propensity or predisposition to commit any of the crimes charged in this indictment or any other crime.  You must not consider it for this purpose.

> The evidence was permitted as proof of background and/or relationship between Jackson and Lucas which is relevant in your consideration of the enterprise corruption and conspiracy charges. Consider it only for this purpose.

(Dkt. No. 14: Charge: Tr. 5352-53; see page 18 above.)

Given that the uncharged crimes evidence helped the jury understand the relationship between Jackson and Lucas, it was properly admitted under New York law.  See, e.g., People v. Alicea, 33 A.D.3d 326, 327, 821 N.Y.S.2d 584, 585 (1st Dep't) ("This [uncharged crime] evidence explained the relationship of the parties and allowed the jury to understand why [the defendant] could give such an order and expect it to be carried out, and why the order was obeyed, which

reflected on the believability of the People's witnesses.") (citations omitted), <u>appeal denied</u>, 7

N.Y.3d 923, 827 N.Y.S.2d 692 (2006); <u>People</u> v. <u>Person</u>, 26 A.D.3d 292, 293, 810 N.Y.S.2d 68,

69 (1st Dep't 2006) ("The evidence of three prior robberies, and one uncompleted robbery,

perpetrated by defendant with one of the testifying accomplices, explained defendant's relationship

with that accomplice and why he chose him to carry out the charged crime."), <u>aff'd</u>, 8 N.Y.3d 973,

836 N.Y.S.2d 531 (2007).

   Even if Justice Berkman erred when she allowed the uncharged crimes evidence

(which she did not), the thorough jury instructions and the overwhelming evidence of Jackson's guilt

prevented any error from depriving Jackson of a fundamentally fair trial.  <u>See</u>, <u>e.g.</u>, <u>Johnson</u> v.

<u>Artus</u>, 09 Civ. 9483, 2010 WL 3377451 at *21 (S.D.N.Y. Aug. 26, 2010) (Peck, M.J.) ("Given the

strong evidence against [petitioner], the minimal questions about (and answers denying) the

uncharged crimes, and the proper admission of evidence of [petitioner's] prior drug conviction, the

prosecution's brief inquiry into [petitioner's] 'uncharged crimes' did not deprive him of a

fundamentally fair trial."); <u>see also</u> cases cited on pages 60-61 above.

   Finally, even assuming Jackson was able to successfully argue that Justice Berkman

misapplied New York law in allowing evidence of uncharged crimes, he still would not be eligible

for habeas relief because there is no Supreme Court precedent that such evidence gives rise to a

constitutional violation.  <u>See</u>, <u>e.g.</u>, <u>Mercedes</u> v. <u>McGuire</u>, No. 08-CV-299, 2010 WL 1936227 at *8

(E.D.N.Y. May 12, 2010) (Appellate Division's rejection of petitioner's claim, that the use of

uncharged crimes violated his due process rights, was neither contrary to, nor an unreasonable

application of, clearly established Supreme Court precedent because "the Supreme Court has never

held that a criminal defendant's due process rights are violated by the introduction of prior bad acts or uncharged crimes."); Romero v. Rock, 08 Civ. 7791, 2010 WL 908844 at *13 (S.D.N.Y. Feb. 2, 2010) (Because "the Supreme Court has yet to establish clearly 'when the admission of prior crimes under state evidentiary laws can constitute a federal due process violation'" the trial court's "decision to admit [such] evidence subject to limiting instructions cannot be said to be 'contrary to' or an 'unreasonable application of' clearly-established federal law."); Tingling v. Donelli, 07 Civ. 1833, 2008 WL 4724567 at *9 (S.D.N.Y. Oct. 24, 2008) ("Not only would Petitioner's claim fail if analyzed under the Second Circuit precedent cited above, but, under AEDPA, it would also fail . . . as the Supreme Court has not directly held that due process is violated by the introduction at trial of evidence of a defendant's uncharged crimes."); Jones v. Conway, 442 F. Supp. 2d 113, 131 (S.D.N.Y. 2006) ("Given that the Supreme Court has not held that the use of uncharged crimes would violate the Due Process Clause, the Appellate Division's rejection of this claim is hardly either contrary to or an unreasonable application of clearly established Supreme Court law.").

Accordingly, Jackson's uncharged crimes habeas claim should be DENIED as barred by an independent and adequate state ground, and also as meritless.

## IV.   JACKSON'S SUFFICIENCY AND WEIGHT OF THE EVIDENCE CLAIMS SHOULD BE DENIED

### A.   Jackson's Sufficiency of the Evidence Claim is Meritless

Jackson claims that the evidence at trial was legally insufficient to establish his guilt of enterprise corruption.  (Dkt. No. 8: Am. Pet. Ex. E: Jackson Pro Se 1st Dep't Br. at 9-13).  The First Department denied this claim, finding the "verdict was based on legally sufficient evidence."

People v. Jackson, 45 A.D.3d 433, 434, 846 N.Y.S.2d 126, 128 (1st Dep't 2007), appeal denied, 10 N.Y.3d 812, 857 N.Y.S.2d 45, cert. denied, 129 S. Ct. 462 (2008); see page 22 above.

"'[T]he Due Process Clause of the Fourteenth Amendment protects a defendant in a criminal case against conviction 'except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.'" Jackson v. Virginia, 443 U.S. 307, 315, 99 S. Ct. 2781, 2787 (1979) (quoting In re Winship, 397 U.S. 358, 364, 90 S. Ct. 1068, 1073 (1970)).  However, "a properly instructed jury may occasionally convict even when it can be said that no rational trier of fact could find guilt beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. at 317, 99 S. Ct. at 2788.  Accordingly, "in a challenge to a state criminal conviction brought under 28 U.S.C. § 2254 – if the settled procedural prerequisites for such a claim have otherwise been satisfied – the applicant is entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. at 324, 99 S. Ct. at 2791-92.

The petitioner bears a very heavy burden:

> [T]he standard for appellate review of an insufficiency claim placed a  "very heavy burden" on the appellant.  Our inquiry is whether the jury, drawing reasonable inferences from the evidence, may fairly and logically have concluded that the defendant was guilty beyond a reasonable doubt.  In making this determination, we must view the evidence in the light most favorable to the government, and construe all permissible inferences in its favor.

United States v. Carson, 702 F.2d 351, 361 (2d Cir.) (citations omitted), cert. denied, 462 U.S. 1108, 103 S. Ct. 2457 (1983).

The habeas court's review of the jury's findings is limited:

> [T]his inquiry does not require a court to "ask itself whether <u>it</u> believes that the evidence at the trial established guilt beyond a reasonable doubt."  Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.

<u>Jackson</u> v. <u>Virginia</u>, 443 U.S. at 318-19, 99 S. Ct. at 2789 (citations omitted).

The <u>Jackson</u> v. <u>Virginia</u> "standard must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law." <u>Jackson</u> v. <u>Virginia</u>, 443 U.S. at 324 n.16, 99 S. Ct. at 2792 n.16; <u>accord</u>, <u>e.g.</u>, <u>Green</u> v. <u>Abrams</u>, 984 F.2d 41, 44-45 (2d Cir. 1993) ("In considering a petition for a writ of habeas corpus based on insufficient evidence to support a criminal conviction in the state courts, a federal court must look to state law to determine the elements of the crime.").[47]

Jackson was convicted of enterprise corruption under Penal Law § 460.20, which provides as follows:

> 1.  A person is guilty of enterprise corruption when, having knowledge of the existence of a criminal enterprise and the nature of its activities, and being employed by or associated with such enterprise, he:
>
>> (a) intentionally conducts or participates in the affairs of an enterprise by participating in a pattern of criminal activity[.]

Penal Law § 460.20(1)(a).  A defendant "participat[es] in a pattern of criminal activity" when he commits three criminal acts "with intent to participate in or advance the affairs of the criminal

---

[47]    For further discussion of the sufficiency of the evidence standard, <u>see</u>, <u>e.g.</u>, <u>Mitchell</u> v. <u>Artus</u>, 07 Civ. 4688, 2008 WL 2262606 at *18-19 (S.D.N.Y. June 2, 2008) (Peck, M.J.) (& cases cited therein), <u>report & rec. adopted</u>, 2008 WL 3884373 (S.D.N.Y. Aug. 21, 2008).

enterprise,"[48] with two of the three acts being felonies other than conspiracy.   Penal Law § 460.20(2)(a).  In addition, two of the acts, including one felony, must have been committed within five years of the "commencement of the criminal action," and each act must have occurred within three years of a prior act.  Penal Law § 460.20(2)(b), (c).  A "pattern of criminal activity" also requires, inter alia, that the three or more criminal acts are "either:  (i) related to one another through a common scheme or plan or (ii) were committed, solicited, requested, importuned or intentionally aided by persons acting with the mental culpability required for the commission thereof and associated with or in the criminal enterprise."  Penal Law § 460.10(4)(c).

Jackson does not challenge the sufficiency of the evidence as it relates to the pattern acts that he committed.  Rather, Jackson claims that the evidence was insufficient to prove that he "intended to further the affairs of the enterprise through a pattern of criminal acts that [were] 'either: (i) related to one another through a common scheme or plan or (ii) were committed, solicited, requested, importuned or intentionally aided by persons acting with the mental culpability required for the commission thereof and associated with or in the criminal enterprise.'"  (Jackson Pro Se 1st Dep't Br. at 11, quoting Penal Law § 460.10(4)(c)).

Jackson cites the testimony of Detectives Robert Moulden and Joseph Sweeney that they had conducted surveillance of Jackson during 2002, but never observed Jackson committing a burglary or possessing stolen property.  (Jackson Pro Se 1st Dep't Br. at 10-11.)  Jackson also

---

[48]    "Criminal enterprise" is defined under New York law as "a group of persons sharing a common purpose of engaging in criminal conduct, associated in an ascertainable structure distinct from a pattern of criminal activity, and with a continuity of existence, structure and criminal purpose beyond the scope of individual criminal incidents."   Penal Law § 460.10(3).

relies on the fact that "the vast majority of the witnesses at [his] trial testified to incidents and investigations in which [Jackson] was not involved," and argues that "the People have never claimed that he was implicated in any criminal activity after his [November 21, 2004] arrest . . . ." (Jackson Pro Se 1st Dep't Br. at 11.)

Jackson, however, fails to acknowledge all the evidence implicating him in this criminal enterprise.  Through the testimony of cooperating witnesses Jabar Williams and Mark Parson, Jackson's role was established as one of the two leaders of the criminal enterprise, including setting up burglaries, soliciting orders from buyers, breaking into the stores, and splitting up the money.  (See pages 5-7 above.)  Jackson also instructed Lucas and others how to conduct the burglaries.  (See page 7 above.)  Williams further testified that Jackson took part in the three burglaries of 13-15 West Twenty-Seventh Street in Manhattan, entering the location and removing stolen property in garbage bags.  (See page 7 above.)  Williams testified how the stolen property was sorted and sold to a buyer.  (See page 7 above.)  Williams also described how Jackson showed up at the Nine West burglary and removed stolen property in garbage bags.  (See page 8 above.)  Additionally, Parson testified that Jackson called him to the City Streets burglary and directed him to place stolen property inside of garbage bags.  (See pages 8-9 above.)

Viewing this evidence in the light most favorable to the prosecution, a rational jury could have found, beyond a reasonable doubt, that Jackson committed these burglaries in the furtherance of the  criminal enterprise and therefore was guilty of enterprise corruption.  See, e.g., Besser v. Walsh, 02 Civ. 6775, 2003 WL 22093477 at *20 (S.D.N.Y. Sept. 10, 2003) (Peck, M.J.) (evidence that petitioner cashed bad checks in a store only after a fellow member of the Columbo

79

crime family threatened the store's owner in order to make him cash the checks was sufficient to prove intent to advance the affairs of the criminal enterprise), report & rec. adopted, 2003 WL 22846044 (S.D.N.Y. Dec. 2, 2003) (Kaplan, D.J.); People v. Cantarella, 160 Misc. 2d 8, 20-21, 606 N.Y.S.2d 942, 950-51 (Sup. Ct. N.Y. Co. 1993) (evidence that a defendant was told about the distribution of profits from his criminal activity to members of his criminal enterprise was sufficient to prove his intent to further the enterprise.).[49/]

      Viewing the evidence in the light most favorable to the prosecution, as the Court must, Jackson's sufficiency of the evidence habeas claim should be DENIED.

     **B.**    **Jackson's Weight of the Evidence Claim is Not Cognizable on Habeas Review**

      Jackson further claims that the jury's verdict was against the weight of the evidence. (Dkt. No. 8: Am. Pet. Ex. E: Jackson Pro Se 1st Dep't Br. at 13.).  This claim is not cognizable on habeas review.

      A challenge to a verdict based on the weight of the evidence differs from one based on the sufficiency of the evidence:  "'[T]he "weight of the evidence" argument is a pure state law claim grounded in New York Criminal Procedure Law § 470.15(5), whereas a legal sufficiency claim is based on federal due process principles.'"  Woullard v. Phillips, 04 Civ. 2225, 2007 WL 1958971 at *7 (S.D.N.Y. July 6, 2007) (quoting Garbez v. Greiner, 01 Civ. 9865, 2002 WL 1760960

---

[49/]    Cf., e.g., Barone v. Williams, No. CV-96-5898, 1997 WL 785611 at *5 (E.D.N.Y. Dec. 8, 1997) (defendant's "relationship to a 'Criminal Enterprise'" sufficiently proven by evidence that he had an "intimate association" with members of the Bonnano crime family during his management of the corrupt enterprise Union News and that he co-owned Union News with a "made" member of the crime family).

at *8 (S.D.N.Y. July 30, 2002) (citing <u>People</u> v. <u>Bleakley</u>, 69 N.Y.2d 490, 515 N.Y.S.2d 761 (1987), <u>report & rec. adopted</u>, 2007 WL 2542433 (S.D.N.Y. Sept. 6, 2007)).[50]

       It is well-settled that a weight of the evidence claim is not cognizable on federal habeas review.  <u>E.g.</u>, <u>McKinnon</u> v. <u>Superintendent, Great Meadow Corr. Facility</u>, 355 F. App'x 469, 475 (2d Cir. 2009) ("[T]he argument that a verdict is against the weight of the evidence states a claim under state law, which is not cognizable on habeas corpus."); <u>Young</u> v. <u>Kemp</u>, 760 F.2d 1097, 1105 (11th Cir. 1985) ("A federal habeas court has no power to grant habeas corpus relief because it finds that the state conviction is against the 'weight' of the evidence . . ."), <u>cert. denied</u>, 476 U.S. 1123, 106 S. Ct. 1991 (1986); <u>Ex parte Craig</u>, 282 F. 138, 148 (2d Cir. 1922) ("a writ of habeas corpus cannot be used to review the weight of evidence . . ."), <u>aff'd</u>, <u>sub nom.</u> <u>Craig</u> v. <u>Hecht</u>, 263

---

[50]     The New York Court of Appeals in <u>Bleakley</u> explained the difference as follows:

> Although the two standards of intermediate appellate review – legal sufficiency and weight of evidence – are related, each requires a discrete analysis. For a court to conclude . . . that a jury verdict is supported by sufficient evidence, the court must determine whether there is any valid line of reasoning and permissible inferences which could lead a rational person to the conclusion reached by the jury on the basis of the evidence at trial and as a matter of law satisfy the proof and burden requirements for every element of the crime charged.  If that is satisfied, then the verdict will be upheld by the intermediate appellate court on that review basis.

> To determine whether a verdict is supported by the weight of the evidence, however, the appellate court's dispositive analysis is not limited to that legal test.  Even if all the elements and necessary findings are supported by some credible evidence, the court must examine the evidence further.  If based on all the credible evidence a different finding would not have been unreasonable, then the appellate court must, like the trier of fact below, "weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony."

<u>People</u> v. <u>Bleakley</u>, 69 N.Y.2d at 495, 515 N.Y.S.2d at 763 (citations omitted).

U.S. 255, 44 S. Ct. 103 (1923); <u>Flores</u> v. <u>Ercole</u>, No. 06-CV-6751, 2010 WL 1329036 at *8

(E.D.N.Y.  Mar. 31, 2010); <u>Torres</u> v. <u>Fisher</u>, 06 Civ. 6579, 2010 WL 1338088 at *4 (S.D.N.Y.

Mar. 31, 2010); <u>Hyatt</u> v. <u>Bellnier</u>, 09 Civ. 6594, 2009 WL 3423359 at *10 & n.22 (S.D.N.Y. Oct. 23,

2009) (Peck, M.J.) (& cases cited therein); <u>Woullard</u> v. <u>Phillips</u>, 2007 WL 1958971 at *7; <u>Nelson</u>

v. <u>Sears</u>, 05 Civ. 10341, 2006 WL 775123 at *8-9 (S.D.N.Y. Mar. 28, 2006) (Peck, M.J.); <u>Rodriguez</u>

v. <u>Senkowski</u>, 03 Civ. 3314, 2004 WL 503451 at *26-27 & n.33 (S.D.N.Y. Mar. 15, 2004) (Peck,

M.J.) (& cases cited therein); <u>Garbez</u> v. <u>Greiner</u>, 2002 WL 1760960 at *8 ("by raising a 'weight of

the evidence' argument, [petitioner] does not present to this Court a federal claim as required by 28

U.S.C. § 2254(a).  Instead, [petitioner] raises an error of state law, which is not available for habeas

corpus review."); <u>Lemons</u> v. <u>Parrott</u>, 01 Civ. 9366, 2002 WL 850028 at *3 (S.D.N.Y. May 2, 2002)

("[W]e have no authority to review a weight of the evidence argument because it is a state law

claim."); <u>McBride</u> v. <u>Senkowski</u>, 98 Civ. 8663, 2002 WL 523275 at *4 n.2 (S.D.N.Y. Apr. 8, 2002)

(weight of evidence is not cognizable on habeas review).[51/]

---

[51/]     See also, e.g., <u>Guillen</u> v. <u>Powers</u>, No. 07 CV 5348, 2009 WL 1106936 at *6 (E.D.N.Y.
Apr. 23, 2009); <u>Venable</u> v. <u>Walsh</u>, No. 05-CV-84, 2009 WL 750230 at *9 (E.D.N.Y.
Mar. 19, 2009); <u>Guerrero</u> v. <u>Tracey</u>, 425 F. Supp. 2d 434, 447 (S.D.N.Y. 2006); <u>Feliz</u> v.
<u>Conway</u>, 378 F. Supp. 2d 425, 430 n.3 (S.D.N.Y. 2005); <u>Glisson</u> v. <u>Mantello</u>, 287 F. Supp.
2d 414, 441 (S.D.N.Y. 2003); <u>Pitter</u> v. <u>Fischer</u>, 234 F. Supp. 2d 342, 349 n.6 (S.D.N.Y.
2002); <u>Correa</u> v. <u>Duncan</u>, 172 F. Supp. 2d 378, 381 (E.D.N.Y. 2001) ("'weight of the
evidence' argument is a pure state law claim grounded in New York Criminal Procedure Law
§ 470.15(5), whereas a legal sufficiency claim is based on federal due process principles.
Accordingly, the Court is precluded from considering the [weight of the evidence] claim.")
(citations omitted); <u>Peralta</u> v. <u>Bintz</u>, 00 Civ. 8935, 2001 WL 800071 at *5 (S.D.N.Y. July
16, 2001) (Petitioner "raises only the state law issue of whether the weight of the evidence
supported his conviction. Because [petitioner] raises no cognizable federal issue, his petition
must be denied."); <u>Kearse</u> v. <u>Artuz</u>, 99 Civ. 2428, 2000 WL 1253205 at *1 (S.D.N.Y.
Sept. 5, 2000) ("Disagreement with a jury verdict about the weight of the evidence is not
(continued...)

Accordingly, Jackson's sufficiency and weight of the evidence habeas claims should

be <u>DENIED</u>.

## V.   JACKSON'S INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS SHOULD BE DENIED

### A.   The Strickland v. Washington Standard on Ineffective Assistance of Counsel

In <u>Strickland</u> v. <u>Washington</u>, 466 U.S. 668, 104 S. Ct. 2052 (1984), the Supreme

Court announced a two-part test to determine if counsel's assistance was ineffective:   "First, the

defendant must show that counsel's performance was deficient.   This requires showing that counsel

made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant

by the Sixth Amendment."   <u>Id.</u> at 687, 104 S. Ct. at 2064.[52/]   This performance is to be judged by an

objective standard of reasonableness.   <u>Strickland</u> v. <u>Washington</u>, 466 U.S. at 688, 104 S. Ct. at

2064.[53/]

> Judicial scrutiny of counsel's performance must be highly deferential.   It is all too
> tempting for a defendant to second-guess counsel's assistance after conviction . . . .

---

[51/]   (...continued)
grounds for federal habeas corpus relief."); <u>Rodriguez</u> v. <u>O'Keefe</u>, 96 Civ. 2094, 1996 WL
428164 at *4 (S.D.N.Y. July 31, 1996) ("A claim that the verdict was against the weight of
the evidence is not cognizable on <u>habeas</u> review."), <u>aff'd</u>, No. 96-2699, 122 F.3d 1057 (table)
(2d Cir. Sept. 9, 1997), <u>cert. denied</u>, 522 U.S. 1123, 118 S. Ct. 1068 (1998); <u>cf.</u> <u>Maldonado</u>
v. <u>Scully</u>, 86 F.3d 32, 35 (2d Cir. 1996) (dismissing habeas claim; "assessments of the
weight of the evidence or the credibility of witnesses are for the jury and not grounds for
reversal on appeal; we defer to the jury's assessments of both of these issues").

[52/]   <u>Accord</u>, <u>e.g.</u>, <u>Wiggins</u> v. <u>Smith</u>, 539 U.S. 510, 521, 123 S. Ct. 2527, 2535 (2003); <u>Bell</u> v.
<u>Miller</u>, 500 F.3d 149, 156-57 (2d Cir. 2007); <u>Henry</u> v. <u>Poole</u>, 409 F.3d 48, 62-63 (2d Cir.
2005), <u>cert. denied</u>, 547 U.S. 1040, 126 S. Ct. 1622 (2006).

[53/]   <u>Accord</u>, <u>e.g.</u>, <u>Wiggins</u> v. <u>Smith</u>, 539 U.S. at 521, 123 S. Ct. at 2535; <u>Bell</u> v. <u>Cone</u>, 535 U.S.
685, 695, 122 S. Ct. 1843, 1850 (2002); <u>Henry</u> v. <u>Poole</u>, 409 F.3d at 63.

> A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time . . . .  [A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

Strickland v. Washington, 466 U.S. at 689, 104 S. Ct. at 2065 (citation omitted).[54]  As the Second

Circuit recently stated, ineffective assistance claims "are quite often the law's equivalent of 'buyer's

remorse' or 'Monday morning quarterbacking'. . . . Decisions by criminal defense counsel are often

choices among bad alternatives . . . ."  Mui v. United States, 614 F.3d 50, 57 (2d Cir. 2010).

      Second, the defendant must show prejudice from counsel's performance.  Strickland

v. Washington, 466 U.S. at 687, 104 S. Ct. at 2064.  The "question is whether there is a reasonable

probability that, absent the errors, the fact finder would have had a reasonable doubt respecting

guilt."  Id. at 695, 104 S. Ct. at 2068-69.  Put another way, the "defendant must show that there is

a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

would have been different."  Id. at 694, 104 S. Ct. at 2068.[55]

---

[54]    Accord, e.g., Bell v. Cone, 535 U.S. at 698, 122 S. Ct. at 1852; Bierenbaum v. Graham, 607 F.3d 36, 50-51 (2d Cir. 2010); Bell v. Miller, 500 F.3d at 156-57; Henry v. Poole, 409 F.3d at 63; Aparicio v. Artuz, 269 F.3d 78, 95 (2d Cir. 2001); Sellan v. Kuhlman, 261 F.3d 303, 315 (2d Cir. 2001).

[55]    See also, e.g., Wiggins v. Smith, 539 U.S. at 534, 123 S. Ct. at 2542; Bell v. Cone, 535 U.S. at 695, 122 S. Ct. at 1850; Mosby v. Senkowski, 470 F.3d 515, 519 (2d Cir. 2006), cert. denied, 552 U.S. 836, 128 S. Ct. 75 (2007); Henry v. Poole, 409 F.3d at 63-64; Aparicio v. Artuz, 269 F.3d at 95; Sellan v. Kuhlman, 261 F.3d at 315; DeLuca v. Lord, 77 F.3d 578, 584 (2d Cir.), cert. denied, 519 U.S. 824, 117 S. Ct. 83 (1996).

"[A] reasonable probability is a probability sufficient to undermine confidence in the
(continued...)

The Supreme Court has counseled that these principles "do not establish mechanical rules."  Strickland v. Washington, 466 U.S. at 696, 104 S. Ct. at  2069.  The focus of the inquiry should be on the fundamental fairness of the trial and whether, despite the strong presumption of reliability, the result is unreliable because of a breakdown of the adversarial process.  Id.

Any counsel errors must be considered in the "aggregate" rather than in isolation, as the Supreme Court has directed courts "to look at the 'totality of the evidence before the judge or jury.'" Lindstadt v. Keane, 239 F.3d 191, 199 (2d Cir. 2001) (quoting Strickland v. Washington, 466 U.S. at 695-96, 104 S. Ct. at 2069); accord, e.g., Rodriguez v. Hoke, 928 F.2d 534, 538 (2d Cir. 1991).

---

55/      (...continued)
outcome."  Strickland v. Washington, 466 U.S. at 694, 104 S. Ct. at 2068; accord, e.g., Wiggins v. Smith, 539 U.S. at 534, 123 S. Ct. at 2542;  Bierenbaum v. Graham, 607 F.3d at 51.  The phrase "reasonable probability," despite its language, should not be confused with "probable" or "more likely than not."  Strickler v. Greene, 527 U.S. 263, 289-91, 119 S. Ct. 1936, 1952-53 (1999); Kyles v. Whitley, 514 U.S. 419, 434, 115 S. Ct. 1555, 1565-66 (1995); Nix v. Whiteside, 475 U.S. 157, 175, 106 S. Ct. 988, 998 (1986) ("a defendant need not establish that the attorney's deficient performance more likely than not altered the outcome in order to establish prejudice under Strickland"); Strickland v. Washington, 466 U.S. at 694, 104 S. Ct. at 2068 ("The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome.").  Rather, the phrase "reasonable probability" seems to describe a fairly low standard of probability, albeit somewhat more likely than a "reasonable possibility."  Strickler v. Greene, 527 U.S. at 291, 119 S. Ct. at 1953; cf. id. at 297-301, 119 S. Ct. at 1955-58 (Souter, J., concurring & dissenting) (arguing that any difference between "reasonable probability" and "reasonable possibility" is "slight").

The Supreme Court also made clear that "there is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." Strickland v. Washington, 466 U.S. at 697, 104 S. Ct. at 2069.[56/]

In addition, the Supreme Court has counseled that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. . . .  In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." Strickland v. Washington, 466 U.S. at 690-91, 104 S. Ct. at 2066.[57/]

As the Second Circuit noted:  "The Strickland standard is rigorous, and the great majority of habeas petitions that allege constitutionally ineffective counsel founder on that

---

[56/]   Accord, e.g., Smith v. Robbins, 528 U.S. 259, 286 n.14, 120 S. Ct. 746, 764 n.14 (2000).

[57/]   See also, e.g., Yarborough v. Gentry, 540 U.S. 1, 5-6, 124 S. Ct. 1, 4 (2003); Engle v. Isaac, 456 U.S. 107, 134, 102 S. Ct. 1558, 1575 (1982) ("We have long recognized . . . that the Constitution guarantees criminal defendants only a fair trial and a competent attorney. It does not insure that defense counsel will recognize and raise every conceivable constitutional claim."); Jackson v. Leonardo, 162 F.3d 81, 85 (2d Cir. 1998) ("In reviewing Strickland claims, courts are instructed to 'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance' and that counsel's conduct was not the result of error but derived instead from trial strategy. We are also instructed, when reviewing decisions by counsel, not to 'second-guess reasonable professional judgments and impose on . . . counsel a duty to raise every "colorable" claim' on appeal.") (citations omitted); Mayo v. Henderson, 13 F.3d 528, 533 (2d Cir.) (a reviewing court "may not use hindsight to second-guess [counsel's] strategy choices"), cert. denied, 513 U.S. 820, 115 S. Ct. 81 (1994).

standard." <u>Lindstadt</u> v. <u>Keane</u>, 239 F.3d at 199; <u>accord</u>, <u>e.g.</u>, <u>Bierenbaum</u> v. <u>Graham</u>, 607 F.3d 50-51; <u>Bell</u> v. <u>Miller</u>, 500 F.3d at 156-57.

##### 1.    Strickland and the AEDPA Review Standard

For purposes of this Court's AEDPA analysis, "the <u>Strickland</u> standard . . . is the relevant 'clearly established Federal law, as determined by the Supreme Court of the United States.'" <u>Aparicio</u> v. <u>Artuz</u>, 269 F.3d 78, 95 & n.8 (2d Cir. 2001) (quoting 28 U.S.C. § 2254(d)(1)).[58/] "For AEDPA purposes, a petitioner is not required to further demonstrate that his particular theory of ineffective assistance of counsel is also 'clearly established.'" <u>Aparicio</u> v. <u>Artuz</u>, 269 F.3d at 95 n.8. "For [petitioner] to succeed, however, he must do more than show that he would have satisfied <u>Strickland</u>'s test if his claim were being analyzed in the first instance, because under § 2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied <u>Strickland</u> incorrectly. . . . Rather, he must show that the [First Department] applied <u>Strickland</u> to the facts of his case in an objectively unreasonable manner." <u>Bell</u> v. <u>Cone</u>, 535 U.S. at 698-99, 122 S. Ct. at 1852; <u>see also</u>, <u>e.g.</u>, <u>Yarborough</u> v. <u>Gentry</u>, 540 U.S. 1, 5, 124 S. Ct. 1, 4 (2003); <u>Mosby</u> v. <u>Senkowski</u>, 470 F.3d at 519.

---

[58/]    See also, <u>e.g.</u>, <u>Wiggins</u> v. <u>Smith</u>, 539 U.S. 510, 521-22, 123 S. Ct. 2527, 2535 (2003); <u>Bell</u> v. <u>Cone</u>, 535 U.S. 685, 698, 122 S. Ct. 1843, 1852 (2002); <u>Mosby</u> v. <u>Senkowski</u>, 470 F.3d 515, 518-19 (2d Cir. 2006), <u>cert. denied</u>, 552 U.S. 836, 128 S. Ct. 75 (2007); <u>Sellan</u> v. <u>Kuhlman</u>, 261 F.3d 303, 315 (2d Cir. 2001).

**B.     Application of the Strickland Standard to Jackson's Ineffective Assistance of Trial Counsel Claims**

       **1.     Trial Counsel Was Not Ineffective For Failing to Investigate Jackson's Alibi and Timely Serve Alibi Notice**

Jackson claims that his trial counsel was ineffective for failing to investigate and raise an alibi defense for the September 29, 2001 burglary of a Nine West store.  (Dkt. No. 8: Am. Pet. ¶ 13 & Ex. F: Jackson 440 Aff. ¶¶ 2, 12, 16, 28-39, 42-45 & Jackson 440 Br. at 1-7; see page 23 above.)  Jackson claimed that he had informed his attorney before trial that he could not have participated in that burglary because "he was returning from [his grandmother's] funeral in Virginia." (Jackson 440 Aff. ¶¶ 28-29; see page 23 above.)

Justice Berkman rejected this claim, noting that "all [Jackson] offers to prove the lack of investigation by counsel is [Jackson's] statement that 'there is nothing in the [trial lawyer's case] file generated by trial counsel indicating that any investigation or inquires [sic] to[ok] place in reference to the claims herein.'"  People v. Jackson, No. 1430/03, 26 Misc. 3d 1236(A) (table), 2010 WL 932601 at *2 (Sup. Ct. N.Y. Co. 2010); see pages 23-24 above.  While claiming he had informed trial counsel of his alibi, Jackson's submissions only established that his counsel was given the name and address of Jackson's ex-wife[59] and sister, but did not establish "what either of these women would have said about [Jackson]'s return to New York or what if anything they told the lawyer about it."  People v. Jackson, 2010 WL 932601 at *4; see pages 24-25 above.  "Most

---

[59]     Justice Berkman found "the reason the lawyer would not rely on [Jackson's ex-wife] for this 'alibi' is obvious: according to the trial evidence, she accompanied [Jackson] to the scene of the Nine West burglary and she had already lied to authorities to get her husband out of jail." People v. Jackson, 2010 WL 932601 at *4; see page 25 n.11 above.

importantly, neither [Jackson] nor any of the witness statements annexed to this motion provides any sworn statement about how and when [Jackson] actually returned to the New York City area." People v. Jackson, 2010 WL 932601 at *3; see page 24 above.

Even assuming Jackson's trial counsel did not investigate this alibi defense, this decision was reasonable.  First, Jackson's alleged alibi did not account for the time that the September 29, 2001, burglary occurred.  As Justice Berkman noted, "the burglaries were normally committed in the middle of the night."  People v. Jackson, 2010 WL 932601 at *3; see page 25 above.[60/]  Thus, Jackson's statement to his defense attorney that "I was not in New York from September 21 to 29, 2001" (see Jackson 440 Aff. Ex. G: Jackson Letter to Counsel) did not clearly establish an alibi, since Jackson could have returned to New York early that morning to participate in the burglary.  Additionally, Jackson's alibi is not supported by the witness statements he submitted as they "relate to September 27 and a few also to September 28, but the latter without specifying a time of day, a vital omission" and therefore "do not provide an alibi for the time of the Nine West burglary, not even enough to establish that it was unlikely that [Jackson] could have returned to New York to participate in that crime."  People v. Jackson, 2010 WL 932601 at *2; see page 24 above.

Furthermore, Jackson's E-ZPass records show that his account was used "on September 29, starting at 2:41 a.m. in Delaware, going through the Lincoln Tunnel at 6:10 a.m., and re-entering the Turnpike around 8:00 a.m." People v. Jackson, 2010 WL 932601 at *3; see page 25 above; see also  Jackson 440 Aff. Ex. J: Jackson E-ZPass Records.  The fact that Jackson entered

---

[60/]   For example, on November 24, 2001, Jackson called Parson at about 4:00 a.m. to participate in the City Streets burglary.  (See pages 8-9 above.)

Manhattan at 6:10 a.m. is consistent with the trial testimony that Jackson arrived at the Nine West location "[a]bout two, two and a half hours" after Lucas and other individuals had entered the location.  (See page 8 above.)  Accordingly, Justice Berkman's factual determination that Jackson's purported alibi failed to establish that he was not at the scene of the crime, see People v. Jackson, 2010 WL 932601 at *2, 3; see page 24 above, was not an unreasonable determination of the facts and is entitled to a presumption of correctness under AEDPA.  See, e.g., James v. Greiner,  No. 99-2513, 205 F.3d 1323 (table), 2000 WL 233696 at *1 (2d Cir. Feb. 16, 2000) ("We find that [petitioner] has not rebutted with clear and convincing evidence the presumption of correctness that attaches to the state court's findings that his purported alibis-the testimony of his girlfriend and employers and his employee time records-would not establish that petitioner was elsewhere at the time the crimes to which he pleaded guilty were committed.").

Second, and most importantly, the enterprise corruption count included pattern acts that Jackson committed during six separate burglaries.  (E.g., Tr. 5406-08, 5565-71.)  As Justice Berkman noted, "the decision not to put in a dubious alibi to only one of six alleged burglaries in which [Jackson] allegedly participated is hardly surprising."  People v. Jackson, 2010 WL 932601 at *4; see page 25 above.  Therefore, trial counsel's decision to not further investigate and present the alibi defense was neither unreasonable nor prejudicial to Jackson, and Justice Berkman's decision was not contrary to or an unreasonable application of Supreme Court precedent.  See, e.g., Matthews v. Mazzuca, 120 F.App'x 856, 858 (2d Cir. 2005) (denying ineffective assistance claim since there was no "reasonable probability" that the alibi defense "would have yielded a different verdict" because the alibi did not account for the estimated time of the burglary.); Curry v. Burge,

90

03 Civ. 0901, 2007 WL 3097165 at *13 (S.D.N.Y. Oct. 23, 2007) (Peck, M.J.) ("This Court finds that it was a reasonable strategic decision for [defense counsel] not to further investigate witnesses who were not being called by the prosecution, . . . and who in counsel's view would have undermined his trial strategy and been harmful to the defense case.") (fn. omitted), report & rec. adopted, 2007 WL 4098115 (S.D.N.Y. Nov. 16, 2007) (Kaplan, D.J.); Tellier v. United States, 97 Civ. 8747, 2006 WL 2707371 at *4 (S.D.N.Y. Sept. 20, 2006) (Petitioner was not prejudiced by trial counsel's failure to investigate and present an alibi defense to two homicides where the crimes "were just two of over a dozen predicate acts set forth in the racketeering charge in the indictment."); United States v. Pungitore, 15 F. Supp. 2d 705, 730-31 (E.D. Pa. 1998) (Trial counsel's failure to present an alibi defense to a homicide where it was only part of the "ample evidence" that supported petitioner's RICO conviction was a reasonable tactical decision that did not prejudice petitioner.); United States v. Romero, 91 Cr. 586, 1993 WL 485677 at *8 (S.D.N.Y. Nov. 22, 1993) (defense attorney's decision not to interview alibi witnesses was reasonable since their testimony "could not conclusively establish that [the defendant] was not travelling back and forth between Detroit and New York during the period he was alleged to have participated in certain narcotics activities in New York."), aff'd, 54 F.3d 56 (2d Cir. 1995), cert. denied, 517 U.S. 1149, 116 S. Ct. 1449 (1996).

   Accordingly, Jackson's claim that counsel was ineffective for failing to investigate his alibi should be DENIED.

### 2.  Trial Counsel's Cross-Examination of Witnesses Was Not Ineffective

   Jackson also alleges that his trial counsel failed to properly cross-examine cooperating witness Jabar Williams concerning his testimony that Jackson stored stolen goods in

Jackson's basement at 439 Maple even though, according to Jackson, he did not live at that address at the relevant time and his basement ceiling was too low for storage.  (Dkt. No. 8: Am. Pet. ¶ 13 & Ex. F: Jackson 440 Aff. ¶¶ 39-41, 45 & Jackson 440 Br. at 5; see page 23 above.)  Jackson further argues that counsel failed to effectively cross-examine eyewitness Miguel Pelaez about his inability to identify Jackson in court.  (Jackson 440 Aff. ¶¶ 42-45; see page 23 above.)

"The decision 'whether to engage in cross-examination, and if so to what extent and in what manner' is generally viewed as a strategic decision left to the sound discretion of trial counsel."  Lavayen v. Duncan, 311 F. App'x 468, 471 (2d. Cir.), cert. denied, 130 S. Ct. 112 (2009); see, e.g., Dunham v. Travis, 313 F.3d 724, 732 (2d Cir. 2002) ("Decisions about 'whether to engage in cross-examination, and if so to what extent and in what manner, are . . . strategic in nature' and generally will not support an ineffective assistance claim.").[61]

In denying Jackson's claim, Justice Berkman found:

The testimony was not that proceeds were stored by the burglars in whatever New Jersey house they visited in June 2001, and if Williams was mistaken as to the address (Myrtle as opposed to Maple, perhaps) or ownership of the home, that would hardly deal the fatal blow to his credibility that hours of cross-examination by multiple defense lawyers did not.

People v. Jackson, No. 1430/03, 26 Misc. 3d 1236(A) (table), 2010 WL 932601 at *4 (Sup. Ct. N.Y. Co. 2010); see page 26 above.

---

[61]    See also, e.g., Cassie v. Graham, 06 Civ. 5536, 2007 WL 506754 at *23 (S.D.N.Y. Jan. 31, 2007) (Peck, M.J.), report & rec. adopted, 2009 WL 362134 (S.D.N.Y. Feb. 10, 2009); Llanos v. Goord, 06 Civ. 0261, 2006 WL 1981749 at *16 (S.D.N.Y. July 14, 2006) (Peck, M.J.), report & rec. adopted, 555 F. Supp. 2d 454 (S.D.N.Y. May 27, 2008).

Considering that Williams was cross-examined by five attorneys over two days (see Dkt. Nos. 12-13: Tr. 3179-304, 3328-517, 3578-92), trial counsel's failure to question Williams on this minor point was not unreasonable nor ineffective conduct.  See, e.g., Lavayen v. Duncan, 311 F. App'x at 471 (failure to pursue cross-examination on relatively small inconsistencies in a witness's prior statements did not establish constitutional error in light of other impeachment during cross-examination); Lynn v. Bliden, 443 F.3d 238, 251 (2d Cir. 2006) (trial counsel's failure to cross-examine a witness about a prior inconsistent statement did not render him ineffective considering the other cross-examination attacking the witness' credibility), cert. denied, 549 U.S. 1257, 127 S. Ct. 1383 (2007).

Jackson's claim that trial counsel was ineffective for failing to properly cross-examine Pelaez is frivolous.  Pelaez, the superintendent of the City Streets building, testified on direct that he could not identify any of the men he had seen the morning of the burglary.  (See page 9 n.7 above.)  It was only through Parson's testimony that the jury learned that Jackson was one of the men Pelaez had seen.  (See page 9 n.7 above.)  As Justice Berkman found, once Pelaez testified on direct that he could not identify Jackson, "cross-examining him on his identification of the various actors at the time of the arrest seems hardly designed to help the defense."  People v. Jackson, 2010 WL 932601 at *4; see page 26 above.  This Court agrees.  See, e.g., Eckstein v. Kingston, 460 F.3d 844, 849-50 (7th Cir. 2006) (Trial counsel's failure to cross-examine a witness about her mental illness did not prejudice petitioner where the witness had already testified on direct that she was clinically depressed and "more evidence about [the witness's] mental state would not have created a reasonable probability of a different verdict."); Hedrick v. True, 443 F.3d 342, 357 (4th Cir.)

93

(Petitioner was not prejudiced by trial counsel's failure to cross-examine an accomplice about "his felony convictions and prior inconsistent statements.  As both were adduced on direct examination, further questioning on these points would have been redundant.") (citation omitted), cert. denied, 548 U.S. 928, 127 S. Ct. 10 (2006); Love v. McCray, 165 F. App'x 48, 50 (2d Cir. 2006) ("Counsel's performance cannot be deemed objectively unreasonable because he failed to pursue cumulative impeachment."  Moreover, petitioner "cannot demonstrate that he was prejudiced by counsel's" failure to preserve the cumulative impeachment, "regardless of whether that omission was a product of calculated strategy or negligent oversight.").  In any event, Justice Berkman's decision is not an unreasonable application of the Strickland standard.

Accordingly, Jackson's claim that trial counsel was ineffective for failing to properly cross-examine witnesses should be DENIED.

## VI.   JACKSON'S CONSTITUTIONAL CHALLENGE TO NEW YORK'S PERSISTENT FELONY OFFENDER STATUTE IS MERITLESS

Jackson claims that New York's persistent felony offender statute is unconstitutional. (Dkt. No. 8: Am. Pet. ¶ 13 & Ex. E: Jackson 1st Dep't Br. at 52.)  The First Department rejected this claim, ruling that Jackson's "sentencing as a discretionary persistent felony offender was constitutional."  People v. Jackson, 45 A.D.3d 433, 434, 846 N.Y.S.2d 126, 128 (1st Dep't 2007), appeal denied, 10 N.Y.3d 812, 857 N.Y.S.2d 45, cert. denied, 129 S. Ct. 462 (2008); see page 22 above.

Under New York law, a persistent felony offender is defined as one who "stands convicted of a felony after having previously been convicted of two or more felonies."  Penal Law

§ 70.10(1)(a).[62/]   After finding the defendant to be a persistent felony offender, the court may sentence the defendant as if he was convicted of a class A-I felony "when [the court] is of the opinion that the history and character of the defendant and the nature and circumstances of his criminal conduct indicate that extended incarceration and life-time supervision will best serve the public interest."  Penal Law § 70.10(2).  As interpreted by the New York Court of Appeals, "defendants are eligible for persistent felony offender sentencing based solely on whether they had two prior felony convictions."  See People v. Rivera, 5 N.Y.3d 61, 67, 800 N.Y.S.2d 51, 55 (emphasis in original), cert. denied, 546 U.S. 984, 126 S. Ct. 564 (2005).  The judge's finding under subsection two merely "describes the exercise of judicial discretion characteristic of indeterminate sentencing schemes."  See People v. Rivera, 5 N.Y.3d at 66, 800 N.Y.S.2d at 54-55; see also People v. Quinones, 12 N.Y.3d 116, 130, 879 N.Y.S.2d 1, 9 (interpreting Penal Law § 70.10(2) as "set[ting] the parameters for the performance of one of the sentencing court's most traditional and basic functions, i.e., the exercise of sentencing discretion.") (fn. omitted), cert. denied, 130 S. Ct. 104 (2009).

In Portalatin v. Graham, -- F.3d --, 2010 WL 4055571 (2d Cir. Oct. 18, 2010) (en banc), the Second Circuit upheld the constitutionality of New York's persistent felony offender statute in light of Supreme Court precedent.  After finding that it was bound by the New York Court of Appeal's interpretation of New York law, Portalatin v. Graham, 2010 WL 4055571 at *11, the Second Circuit found New York's persistent felony offender statute "authorize[s] a class A-I

---

[62/]   Subsections (b) and (c) provide which prior felonies may be considered.  Penal Law § 70.10(1)(b), (c).

sentence based on the defendant's predicate felony convictions alone." Id. at *16.  Consequently, the Second Circuit found that, under the persistent felony offender statute, the statutory maximum "was fixed at that of a class A-I felony once the recidivism findings were established: an indeterminate sentence, with a minimum term of between fifteen and twenty-five years, and a maximum term of life in prison." Id. at *18.  The Second Circuit denied habeas relief, ruling that the New York courts did not engage in an unreasonable application of clearly established Supreme Court precedent in affirming the petitioners' persistent felony offender sentences.  Id. at 19-20.

Accordingly, because Portalatin controls, Jackson's persistent felony offender sentencing habeas claim should be DENIED.

## VII.   JACKSON'S EXCESSIVE SENTENCE HABEAS CLAIM IS NOT COGNIZABLE ON HABEAS REVIEW

Jackson's excessive sentence claim (Dkt. No. 8: Am. Pet. ¶ 13 & Ex. E: Jackson 1st Dep't Br. at 52-57) should be denied because it is not cognizable on habeas review.

An excessive sentence claim does not provide a basis for habeas relief, because "[n]o federal constitutional issue is presented where, as here, the sentence is within the range prescribed by state law." White v. Keane, 969 F.2d 1381, 1383 (2d Cir. 1992).[63/]

In this case, it is undisputed that Jackson's sentence is within the range prescribed by New York law.  Jackson was convicted of class B, C, D and E felonies.  Penal Law §§ 460.20,

---

[63/]     Accord, e.g., Garcia v. Rivera, 07 Civ. 2535, 2007 WL 2325928 at *17 & n.18 (S.D.N.Y. Aug. 16, 2007) (Peck, M.J.) (& cases cited therein); see Thomas v. Senkowski, 968 F. Supp. 953, 956 (S.D.N.Y. 1997) ("It is well established that, when a sentence falls within the range prescribed by state law, the length of the sentence may not be raised as grounds for federal habeas relief."); see also, e.g., Townsend v. Burke, 334 U.S. 736, 741, 68 S. Ct. 1252, 1255 (1948) (severity of sentence generally not reviewable on habeas).

140.25, 155.40, 165.52, 210.15, 105.10. Since Jackson was adjudicated a persistent felonly offender pursuant to Penal Law § 70.10, Justice Berkman was authorized to impose the sentence of a class A-I felony for each count, that is, an indeterminate prison term of from a minimum of no less than fifteen years and no more than twenty-five years to the maximum period of life.  See Penal Law §§ 70.00(2)(a), (3)(a); 70.10(2).  Jackson was sentenced to seven concurrent terms of twenty-five years to life imprisonment.  (See page 21 above.)  Because Jackson's sentence is within the statutory range, it is not reviewable on habeas corpus by this Court as "excessive."

Accordingly, Jackson's excessive sentence habeas claim should be DENIED.

## CONCLUSION

For the reasons set forth above, Jackson's habeas petition should be DENIED in its entirety, and a certificate of appealability should not be issued.

## FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections.  See also Fed. R. Civ. P. 6.[64/]  Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Lewis A. Kaplan, 500 Pearl Street, Room 1310, and to my chambers, 500 Pearl Street, Room 1370. Any requests for an extension of time for filing objections must be directed to Judge Kaplan (with a courtesy copy to my chambers).  Failure to file objections will result in a waiver of those

---

[64/]     If the pro se petitioner requires copies of any of the cases reported only in Westlaw, petitioner should request copies from opposing counsel.  See Lebron v. Sanders, 557 F.3d 76, 79 (2d Cir. 2009); SDNY-EDNY Local Civil Rule 7.1(c)

97

objections for purposes of appeal. Thomas v. Arn, 474 U.S. 140, 106 S. Ct. 466 (1985); IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1054 (2d Cir. 1993), cert. denied, 513 U.S. 822, 115 S. Ct. 86 (1994); Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993); Frank v. Johnson, 968 F.2d 298, 300 (2d Cir.), cert. denied, 506 U.S. 1038, 113 S. Ct. 825 (1992); Small v. Sec'y of Health & Human Servs., 892 F.2d 15, 16 (2d Cir. 1989); Wesolek v. Canadair Ltd., 838 F.2d 55, 57-59 (2d Cir. 1988); McCarthy v. Manson, 714 F.2d 234, 237-38 (2d Cir. 1983); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

Dated:      New York, New York
            November 16, 2010

                                   Respectfully submitted,

                                   _____
                                   **Andrew J. Peck**
                                   United States Magistrate Judge

Copies to:   Trevers Jackson
             Ashlyn Dannelly, Esq.
             Judge Lewis A. Kaplan